David S. Cohen
Nicholas A. Bassett
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Attorneys for Plaintiffs Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| LEHMAN BROTHERS SPECIAL FINANCING INC. AND LEHMAN BROTHERS HOLDINGS INC., AS PLAN ADMINISTRATOR, | Adv. Proc. No. 11-02403 |
| Plaintiffs, | **AMENDED ADVERSARY COMPLAINT** |
| v. | |
| AMERICREDIT FINANCIAL SERVICES INC., AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2005 B-M, AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007 B-F, AND AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007 D-F, | |
| Defendants. | |

Plaintiffs Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under

the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan"), and Lehman Brothers Special Financing Inc. ("LBSF" and,

together with LBHI and its affiliated debtors, the "Debtors"), by their undersigned attorneys,

allege (the "Amended Complaint") the following against defendants, AmeriCredit Automobile

Receivables Trust 2005 B-M (the "2005 B-M Trust"); AmeriCredit Automobile Receivables

Trust 2007 B-F (the "2007 B-F Trust"); and AmeriCredit Automobile Receivables Trust 2007 D-

F (the "2007 D-F Trust," together with the 2007 B-F Trust, the "2007 Trusts," and, together with

the 2005 B-M Trust, the "Trusts"), acting through AmeriCredit Financial Services Inc., in its

capacity as servicer ("AmeriCredit" and, together with the Trusts, the "Defendants"):

## NATURE OF THE ACTION

1.       This adversary proceeding arises out of AmeriCredit's breach of its

express contractual obligations and the implied covenant of good faith and fair dealing and its

violation of the Bankruptcy Code concerning the proper determination of amounts owed to

LBSF upon the termination of six separate interest rate swaps between LBSF and the Trusts

(collectively, the "Swaps").  As a result of these breaches, the Defendants owe LBSF at least

$30,724,153.

2.       AmeriCredit is an automobile financier.  The Trusts were formed in 2005

and 2007 as part of three separate automobile financing securitizations that provided

AmeriCredit with capital for its financing and leasing activities.  Under the securitizations, the

Trusts issued approximately $3.85 billion in fixed and floating rate notes (the "Notes"), which

were backed by automobile loan and lease receivables.  The Trusts were required under the

indentures governing the Notes to enter into and maintain interest rate swaps.

3.       Accordingly, AmeriCredit, as servicing agent acting on behalf of the

Trusts, and LBSF entered into the Swaps in connection with the Notes.  The Trusts were the

fixed rate payers under the Swaps, and LBSF was the floating rate payer, with the floating rate

based on the one-month U.S. Dollar ("USD") London Interbank Offered Rate ("LIBOR"), plus a spread. This arrangement provided a hedge to AmeriCredit and allowed AmeriCredit to lower its cost of capital by protecting itself against large fluctuations in the floating-rate interest payments due under the Notes. Consequently, LBSF's payments were tied to fluctuations in the LIBOR rate—if the rate declined, LBSF's payments would decrease and the price that a counterparty would pay to assume LBSF's position would increase, and vice versa.

4.       The Swaps were "guaranteed balance swaps"—that is, swaps with notional amounts that did not amortize on a fixed schedule, but instead periodically adjusted to equal the actual outstanding principal balance of the Notes. The principal balance of the Notes amortized at an uncertain rate because it was based on the repayments of hundreds of thousands of different automobile loans, which generally could be prepaid at any time.

5.       On November 20, 2008 (the "Early Termination Date"), AmeriCredit exercised its right to terminate the Swaps following the chapter 11 filings of LBHI, LBSF and certain of their affiliates. Upon termination, AmeriCredit was obligated by its agreement with LBSF and the Bankruptcy Code to follow certain processes to calculate the settlement payment (the "Early Termination Payment") owing to LBSF.

6.       In violation of its contractual obligations, the implied covenant of good faith and fair dealing, and section 562 of the Bankruptcy Code, AmeriCredit failed to follow these calculation processes. As of the Early Termination Date, all of the Swaps were significantly "in-the-money" to LBSF, thereby entitling LBSF to sizeable Early Termination Payments. AmeriCredit, however, pursued a course of conduct designed to deprive LBSF of the benefit of its bargain and reap improper economic gains for itself and the Trusts. Consequently,

AmeriCredit calculated unreasonably low Early Termination Payments that significantly

undervalued LBSF's contractual rights.

7.      In addition to violating section 562 of the Bankruptcy Code and the

contractual requirements for calculating the Early Termination Payments, AmeriCredit also

violated the automatic stay created by section 362 of the Bankruptcy Code by improperly

withholding funds that constituted property of LBSF's estate.  Pursuant to section 542(b) of the

Bankruptcy Code, AmeriCredit is required to turn over the funds to LBSF's estate.

8.      In order to recover the payments of at least $30,724,153 properly due to

LBSF from the Defendants and to determine the parties' respective legal rights, duties, and

obligations under their agreements, the Bankruptcy Code, and applicable non-bankruptcy law,

LBHI, as Plan Administrator, and LBSF bring this action against the Defendants for breach of

contract, turnover, violation of section 562 of the Bankruptcy Code, violation of the automatic

stay, and breach of the implied covenant of good faith and fair dealing.

## **PARTIES**

9.      LBHI is a corporation organized and incorporated under the laws of

Delaware, with its principal business address at 1271 Avenue of the Americas, New York, New

York 10020.  On September 15, 2008, LBHI filed a voluntary petition for relief under chapter 11

of the Bankruptcy Code.

10.      LBSF is a corporation organized and incorporated under the laws of

Delaware, with its principal business address at 1271 Avenue of the Americas, New York, New

York 10020.  On October 3, 2008, LBSF filed a voluntary petition for relief under chapter 11 of

the Bankruptcy Code.

11.     On December 6, 2011, the Court approved and entered an order

confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant

to the Plan, LBHI, as Plan Administrator, is authorized to prosecute all causes of action held by

the Debtors, including LBSF, on behalf of their estates.

12.     Upon information and belief, Defendant AmeriCredit is a Delaware

corporation with its principal business address at 801 Cherry Street, Suite 3900, Fort Worth, TX

76102.  AmeriCredit was a subsidiary of AmeriCredit Corp., a Texas corporation headquartered

in Fort Worth, Texas.  Upon information and belief, AmeriCredit Corp. was acquired by the

General Motors Company on October 1, 2010 and was subsequently renamed General Motors

Financial Company, Inc.

13.     Defendant 2005 B-M Trust was a Delaware statutory trust whose owner

trustee was Wilmington Trust Company, Rodney Square North, 1100 North Market Street,

Wilmington, Delaware 19890-0001.

14.     Defendant 2007 B-F Trust is a Delaware statutory trust whose owner

trustee is Wilmington Trust Company, Rodney Square North, 1100 North Market Street,

Wilmington, Delaware 19890-0001.

15.     Defendant 2007 D-F Trust is a Delaware statutory trust whose owner

trustee is Wilmington Trust Company, Rodney Square North, 1100 North Market Street,

Wilmington, Delaware 19890-0001.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C. §§ 157 and 1334, section 14.1 of the Plan, and section 13(b)(i) of the Master Agreements

(as defined below).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

17.    Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

18.    The statutory prerequisites for the relief requested herein are sections 105(a), 362, 541, 542 and 562 of the Bankruptcy Code, and 28 U.S.C. § 2201.  Plaintiffs bring this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## RELEVANT FACTUAL BACKGROUND

19.    AmeriCredit formed the Trusts, issued the Notes, and entered into the Swaps as part of three separate automobile financing securitizations that were designed to raise capital for AmeriCredit's financing and leasing activities.  The relevant agreements setting forth the respective rights and obligations of AmeriCredit and LBSF in connection with the Swaps include (i) the indentures governing the Notes, (ii) the agreements authorizing AmeriCredit to act as agent for the Trusts, and (iii) the agreements governing the Swaps.

### A.  The Indentures

20.    The Notes issued by each Trust are governed by an indenture (together, the "Indentures") between the respective Trust and Wells Fargo Bank, N.A., serving as Indenture Trustee and Collateral Agent.  To hedge against interest rate variations on certain of the Notes, the Indentures required the Trusts to enter into and maintain the Swaps.

21.    LBSF, as the Swap provider, is a secured party and third-party beneficiary under each of the Indentures.  Thus, LBSF may enforce the terms of the Indentures.

### B.  The Servicing Agreements

22.    AmeriCredit is the sponsor and servicer for the 2005 B-M Trust under a Sale and Servicing Agreement, dated as of May 25, 2005 (the "2005 Servicing Agreement"), for the 2007 B-F Trust under a Sale and Servicing Agreement, dated as of April 1, 2007 (the "2007 B-F Servicing Agreement"), and for the 2007 D-F Trust under a Sale and Servicing

Agreement, dated as of September 12, 2007 (the "2007 D-F Servicing Agreement" and, together

with the 2005 Servicing Agreement and the 2007 B-F Servicing Agreement, the "Servicing

Agreements").

23.     Under the Servicing Agreements, AmeriCredit is authorized to act as

agent for the Trusts to manage and administer the Notes and to perform certain other duties on

behalf of the Trusts, including terminating the Swaps and calculating the Early Termination

Payments.

24.     Each Servicing Agreement also provides that AmeriCredit is required

to indemnify the respective Trust for any claims or losses arising out of AmeriCredit's breach,

bad faith, negligence or other wrongful conduct in the performance of its duties thereunder.

25.     LBSF is an express third-party beneficiary under each Servicing

Agreement.  Consequently, LBSF may legally enforce AmeriCredit's obligation to indemnify the

Trusts for losses owing to LBSF.

## C.  The Interest Rate Swap Agreements

26.     LBSF and the Trusts, with AmeriCredit acting as servicer, entered into six

Swaps in connection with the Trusts' issuance of the Notes.  The Swaps consisted of one interest

rate swap with the 2005 B-M Trust (the "2005 Swap"), two interest rate swaps with the 2007 B-F

Trust (the "2007 B-F Swaps"), and three interest rate swaps with the 2007 D-F Trust (the "2007

D-F Swaps," and together with the 2007 B-F Swaps, the "2007 Swaps").

27.     The Swaps were governed by separate agreements that provided the basic

terms of the parties' contractual relationship.  As is common industry practice, LBSF and the

Defendants contemplated supplementing the agreements by confirmations providing the

economic terms of specific transactions.  *See* Exhibit A (Master Agreement at §1(b)).  Under the

agreements, LBHI was designated as LBSF's "Credit Support Provider," guaranteeing all of LBSF's obligations thereunder.  *See* Exhibit A (Schedules at Part 4(g)).

**1.      The Agreements Governing the 2005 Swap**

28.      On or about June 2, 2005, LBSF and the 2005 B-M Trust entered into the 2005 Swap, which was governed by the terms of a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement dated as of June 2, 2005 (the "2005 Master Agreement"), as supplemented and/or modified by:  (i) that certain Schedule to the 2005 Master Agreement, also dated as of June 2, 2005 (the "2005 Schedule"); (ii) that certain Credit Support Annex to the 2005 Schedule, also dated as of June 2, 2005 (the "2005 Credit Support Annex"); and (iii) the confirmation dated as of June 2, 2005 and revised as of May 9, 2007, evidencing the 2005 Interest Swap (the "2005 Confirmation" and, together with the 2005 Master Agreement, the 2005 Schedule and the 2005 Credit Support Annex, the "2005 Swap Agreement").

29.      Under the terms of the 2005 Swap Agreement, the commencement of a bankruptcy proceeding by either party or its respective Credit Support Provider constituted an event of default.  *See* Exhibit A (2005 Master Agreement at §5(a)(vii)).  Following such an event of default, "the other party (the 'Non-defaulting Party') may, by . . . notice to the Defaulting Party . . . , designate . . . an Early Termination Date in respect of all outstanding Transactions." *See* Exhibit A (2005 Master Agreement at §6(a)).

30.      In the event of an early termination, LBSF and AmeriCredit mutually agreed that, in respect of any event of default, any Early Termination Payment payable under the 2005 Swap Agreement would be measured by a process of soliciting quotations to replace the terminated transactions ("Market Quotation").  *See* Exhibit A (2005 Schedule at Part l(i); 2005 Master Agreement at §§ 6(e)(i)(3), 14).  The Early Termination Payment then would be

calculated by a method ("Second Method") of combining (i) the sum of quotations received

through the Market Quotation process and the total losses and gains for transactions for which a

Market Quotation was unavailable (the "Standard Settlement Amount") and (ii) the aggregate of

amounts that became payable (or would have become payable but for the event of default) on or

prior to the Early Termination Date (the "Unpaid Amounts").  *See* Exhibit A (2005 Schedule at

Part 1(i); 2005 Master Agreement at §§ 6(e)(i)(3), 14).

31.    In the Market Quotation process detailed in the 2005 Master Agreement

("2005 Market Quotation" or "Standard Market Quotation"), AmeriCredit was required to solicit

quotations for replacement transactions "*as of the same day and time on or as soon as*

*reasonably practicable after*"—but not before—the Early Termination Date.  *See* Exhibit A

(2005 Master Agreement at § 14) (emphasis added).  In selecting the day and time for obtaining

quotations for replacement transactions, AmeriCredit was obligated to act in good faith.  *See id.*

AmeriCredit was also required to act in good faith in soliciting quotations from four leading

dealers in the interest rate swap market (the "Reference Market-makers").  *See id.*

32.    If, despite acting in good faith and in a commercially reasonable manner,

AmeriCredit was unable to obtain three quotations from four Reference Market-makers, the 2005

Swap Agreement required that AmeriCredit calculate the Standard Settlement Amount using the

"Loss" method.  *See* Exhibit A (2005 Master Agreement at § 14).  Under the Loss method,

AmeriCredit was required to calculate the amount equal to AmeriCredit's total losses and costs

in connection with the 2005 Swaps *as of the Early Termination Date or as of the earliest date*

*thereafter that is reasonably practicable*.  *See id.*

**2.    The Agreements Governing the 2007 Swaps**

33.    On or about April 19, 2007, LBSF and the 2007 B-F Trust entered into the

2007 B-F Swaps, which were governed by the terms of a standard form 1992 Multicurrency-

Cross Border ISDA Master Agreement dated as of April 19, 2007 (the "2007 B-F Master Agreement"), as supplemented and/or modified by:  (i) that certain Schedule to the 2007 B-F Master Agreement, also dated as of April 19, 2007 (the "2007 B-F Schedule"); (ii) that certain Credit Support Annex to the 2007 B-F Schedule, also dated as of April 19, 2007 (the "2007 B-F Credit Support Annex"); and (iii) those certain confirmations dated as of April 19, 2007 evidencing the 2007 B-F Interest Swaps (the "2007 B-F Confirmations" and, together with the 2007 B-F Master Agreement, the 2007 B-F Schedule and the 2007 B-F Credit Support Annex, the "2007 B-F Swap Agreement").

34.      Similarly, on or about September 20, 2007, LBSF and the 2007 D-F Trust entered into the 2007 D-F Swaps, which were governed by the terms of a standard form 1992 Multicurrency Cross-Border ISDA Master Agreement dated as of September 20, 2007 (the "2007 D-F Master Agreement" and, together with the 2007 B-F Master Agreement and the 2005 Master Agreement, the "Master Agreements"), as supplemented and/or modified by:  (i) that certain Schedule to the 2007 D-F Master Agreement, also dated as of September 20, 2007 (the "2007 D-F Schedule," together with the 2007 B-F Schedule, the "2007 Schedules" and, together with the 2005 Schedule, the "Schedules"); (ii) that certain Credit Support Annex to the 2007 D-F Schedule, also dated as of September 20, 2007 (the "2007 D-F Credit Support Annex"); and (iii) those certain Confirmations dated as of September 20, 2007 evidencing the 2007 D-F Interest Swaps (the "2007 D-F Confirmations" and, together with the 2007 B-F Confirmations, the "2007 Confirmations," collectively with the 2007 D-F Master Agreement, the 2007 D-F Schedule and the 2007 D-F Credit Support Annex, the "2007 D-F Swap Agreement," and collectively with the 2007 B-F Swap Agreement, the "2007 Swap Agreements," and together with the 2005 Swap Agreement, the "Swap Agreements").

35.    The commencement of a bankruptcy proceeding by either party or its

respective Credit Support Provider was an event of default under the 2007 Swap Agreements,

giving the non-defaulting party the right to terminate the 2007 Swaps.  *See* Exhibit A (2007

Master Agreement at §§ 6(a), 5(a)(vii)).

36.    Under the 2007 Swap Agreements, the method for calculating the Early

Termination Payment was different than the method prescribed by the 2005 Swap Agreement.

Although LBSF and AmeriCredit again agreed that the Early Termination Payment would be

calculated using Second Method and Market Quotation, the 2007 Schedules and 2007

Confirmations modified the methodology in several ways.

37.    First, in the 2007 Schedules, LBSF and AmeriCredit mutually agreed that

if LBSF were a Defaulting Party in respect of any event of default, an alternative definition of

Market Quotation would apply.  Under this scenario, AmeriCredit was to calculate the Early

Termination Payment using an offer by a Reference Market-maker that was capable of becoming

legally binding upon acceptance (a "Firm Offer") for an amount that would have the effect of

preserving for AmeriCredit the economic equivalent of the terminated transactions.  *See* Exhibit

A (2007 Schedules at Part 1(k)(i); Part 5(b)(iv)(C)-(D)).  In pursuing such a Firm Offer,

AmeriCredit was expressly required to act in a commercially reasonable manner.  *See* Exhibit A

(2007 Schedules at Part 1(k)(iii)).

38.    Second, LBSF and AmeriCredit mutually agreed in the 2007 Schedules

that if LBSF were a Defaulting Party in respect of any event of default, the settlement amount

(the "2007 Settlement Amount") would be the amount equal to any Market Quotation accepted

by AmeriCredit.  *See* Exhibit A (2007 Schedules at Part 1(k)(ii)).  The 2007 Swap Agreement

did not contain any requirement that AmeriCredit receive at least three Firm Offers.  Instead,

AmeriCredit was to revert to Loss valuation only if it did not secure *any* Firm Offers.  *See id.* (Part 1(k)(ii)(B)).

39.    Third, the 2007 Confirmations further modified the Market Quotation process by providing that, notwithstanding anything to the contrary contained in the 2007 Master Agreements, the Settlement Amount due to LBSF would be determined by soliciting quotations, not for identical replacement transactions—which would have been "guaranteed balance swaps"—but rather for stipulated "fixed amortization swaps."  *See* Exhibit A (Confirmations at §2, ¶ 4).  Fixed amortization swaps are more commonplace and frequently traded than guaranteed balance swaps and do not carry uncertainty in respect of their future notional amounts.  The market for fixed amortization swaps is more liquid—and was more liquid in 2008 at the time AmeriCredit sought replacement bids—than the market for guaranteed balance swaps, thus making them easier to value.  When deciding on the appropriate method for calculating an Early Termination Payment under the 2007 Swaps, the parties opted for the relative ease and reliability of valuing fixed amortization swaps over the potentially more problematic exercise of valuing guaranteed balance swaps.

**D.  LBSF's Default and AmeriCredit's Attempts to Secure Replacement Transactions**

40.    LBHI filed for chapter 11 protection on September 15, 2008, thus triggering an event of default under the Swap Agreements.  *See* Exhibit A (Master Agreement at §§ 5(a)(vii), 6(a)).

41.    Following the event of default, AmeriCredit did not immediately exercise its right to deliver a notice of early termination of the Swaps.  Instead, AmeriCredit waited until November 20, 2008 to send letters to LBSF (the "Early Termination Notices," attached hereto as

Exhibits B-D), notifying LBSF that AmeriCredit was designating November 20, 2008 as the Early Termination Date in respect of the Swaps.

42.    More than two months earlier, however, beginning on or about September 15, 2008, AmeriCredit solicited quotations for replacement guaranteed balance swaps from four Reference Market-makers: Deutsche Bank, Credit Suisse, Barclays and Wachovia. AmeriCredit also requested bids on September 17, 2008 and October 10, 2008, from the Royal Bank of Canada ("RBC") and the Royal Bank of Scotland ("RBS"), respectively, after RBC and RBS contacted AmeriCredit to express their interest in participating in the bidding process.

43.    Wachovia submitted its bid (the "Wachovia Replacement Bid") for the replacement swaps to AmeriCredit on or about October 14, 2008. The Wachovia Replacement Bid valued the Swaps at approximately $10 million. AmeriCredit accepted the Wachovia Replacement Bid, but it did not do so until November 20, 2008.

44.    On or about October 17, 2008, Defendants received a bid of over $20 million on the replacement swaps from RBS (the "RBS Bid"). The RBS Bid nearly doubled the Wachovia Replacement Bid. AmeriCredit rejected the RBS Bid, however, because, according to AmeriCredit, it was not a Firm Offer. Upon information and belief, the Wachovia Replacement Bid was in actuality no more "firm" than the RBS Bid. AmeriCredit improperly chose to pursue the Wachovia Replacement Bid instead of the RBS Bid.

45.    During a five-week period from October 14, 2008, when AmeriCredit received the Wachovia Replacement Bid, to November 20, 2008, when AmeriCredit delivered the Early Termination Notice, the one-month USD LIBOR rate sharply declined (from 4.18% to 1.39%). Moreover, the two-year swap rate (*i.e.*, the rate most closely corresponding to the remaining weighted average life of the Swaps) decreased from 3.13% to 1.99%. Because LBSF

was the floating-rate payer under the Swaps (meaning its payments were tied to fluctuations in the one-month USD LIBOR rate), the reduction in these interest rates dramatically improved LBSF's in-the-money position *vis-a-vis* the Trusts, the fixed-rate payers under the Swaps.

46.    Based on the decline in the USD LIBOR rate, AmeriCredit should have known that the values of the Swaps had increased greatly, thus rendering the Wachovia Replacement Bid from October 14, 2008 stale and commercially unreasonable.  In addition, on October 17, 2008, AmeriCredit received the RBS Bid, which nearly doubled the prices offered in the Wachovia Replacement Bid.  The RBS Bid further demonstrated that, even as of October 17, 2008, the Wachovia Replacement Bid was not commercially reasonable.

47.    AmeriCredit, however, did virtually nothing to address the fact that the Wachovia Replacement Bid did not accurately reflect true market conditions.  Upon information and belief, the only nominal action that AmeriCredit took was to have Wachovia "refresh" its bid on November 12, 2008.  This "refreshed" bid exceeded the original Wachovia Replacement Bid by a mere $90,000.  This insignificant increase should have signaled to AmeriCredit that the bid was flawed, because the sharp decline in the USD LIBOR rate (more than 3%) should have resulted in a valuation that was approximately $14 million more favorable to LBSF.

48.    Moreover, AmeriCredit did not even utilize Wachovia's marginally better bid to calculate the Settlement Amounts.  Rather, AmeriCredit established the Settlement Amounts for the Swaps using the premature—and lower—Wachovia Replacement Bid, despite clear indications that this bid was below market.

**E.  AmeriCredit's Improper Calculation of Settlement Amounts Due to LBSF**

49.    By separate letters dated November 21, 2008 (the "Calculation Statements," attached hereto as Exhibits E-G), AmeriCredit provided LBSF with statements

purporting to show the calculation of the Early Termination Payments in ostensible compliance with the Master Agreements and Schedules.

50.      The Calculation Statements provided that the Early Termination Payments to which LBSF was entitled were only:  $691,009 with respect to the 2005 Interest Swap; $11,096,248 with respect to the 2007 B-F Interest Swap; and $1,399,588 with respect to the 2007 D-F Interest Swap.

51.      In the Calculation Statement for the 2005 Swap, AmeriCredit asserted that, because it failed to obtain at least three Market Quotations, the Market Quotation measure could not be determined.  Thus, to calculate the Settlement Amount, AmeriCredit purportedly used the Loss measure, referencing a single quotation in the amount of $343,010 that AmeriCredit received from Wachovia on November 20, 2008, which it attached to the Calculation Statement.  This quotation, however, was actually the original Wachovia Replacement Bid.

52.      In the Calculation Statements for the 2007 Swaps, AmeriCredit asserted that it calculated Settlement Amounts due to LBSF by reference to quotations received from Wachovia on November 20, 2008 in the amount of $9,255,485 with respect to the 2007 B-F Interest Swap and $972,305 with respect to the 2007 D-F Interest Swap.  These quotations, however, were actually the same quotations in the original Wachovia Replacement Bid.  Moreover, the quotations were for guaranteed balance swaps, rather than fixed amortization swaps, the requisite replacement transactions pursuant to the 2007 Confirmations.

**F.  LBSF's Entitlement to the Market Value of the Swaps on the Early Termination Date**

53.     On or about November 21, 2008, LBSF received Early Termination Payments from the Trusts in the aggregate amount of $13,186,845.

54.     As of the Early Termination Date, each of the Swaps was heavily in-the-money to LBSF.  This was not reflected in the payments that AmeriCredit made to LBSF because the payments were based on stale information, which failed to account for changed market conditions and, in the case of the 2007 Swaps, were based on quotations for the wrong type of replacement transactions.

55.     The actual market values of the Swaps, based on mark-to-market prices prevailing as of November 20, 2008, were much higher than the Settlement Amounts calculated by the Defendants.  The market value of the 2005 Interest Swap to LBSF was approximately $4,463,565.  The market values of replacements for the 2007 Swaps on a fixed amortization basis were approximately $28,601,865 for the 2007 B-F Interest Swap and approximately $8,048,543 for the 2007 D-F Interest Swap (collectively, the "Adjusted Settlement Amounts").

56.     After accounting for approximately $346,885, $1,806,232 and $419,923 in Unpaid Amounts that were owed to LBSF as of November 20, 2008, under the 2005 Interest Swap, 2007 B-F Interest Swap and 2007 D-F Interest Swap, respectively, a contractually proper and commercially reasonable calculation should have resulted in Early Termination Payments payable to LBSF of approximately $4,810,450, $30,408,097 and $8,692,451 under the 2005 Interest Swap, 2007 B-F Interest Swap and 2007 D-F Interest Swap, respectively.  Thus, the Defendants underpaid LBSF by a total of approximately $30,724,153 for the six Swaps.

## COUNT I

### *Breach of Contract By AmeriCredit and the 2005 B-M Trust Under the 2005 Swap Agreement*

57.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

58.     LBSF, AmeriCredit, and the 2005 B-M Trust had valid and enforceable contracts, including the 2005 Servicing Agreement and the 2005 Swap Agreement.

59.     Under the 2005 Servicing Agreement, AmeriCredit acted as the agent for the 2005 B-M Trust, thereby performing certain duties on behalf of the 2005 B-M Trust such as terminating the 2005 Swaps and calculating the Early Termination Payments.

60.     Under the express terms of the 2005 Swap Agreement, the 2005 B-M Trust and LBSF agreed to the standard Second Method and Market Quotation payment measure for determining Early Termination Payments.  Therefore, AmeriCredit was contractually required to act in good faith in soliciting quotations from four Reference Market-makers as of, but not before, the Early Termination Date.

61.     In the event that fewer than three market quotations were received, AmeriCredit was required to use the Second Method and Loss to reasonably determine in good faith its losses (or gains) and costs in connection with the termination of the 2005 Swap Agreement as of, but not before, the Early Termination Date.

62.     On November 20, 2008, AmeriCredit delivered an Early Termination Notice to LBSF that designated November 20, 2008 as the Early Termination Date under the terms of 2005 Swap Agreement.

63.     On or about September 15, 2008—more than two months before the Early

Termination Date—AmeriCredit began soliciting market quotations from Reference Market-

makers.  AmeriCredit allegedly failed to receive three market quotations at that time.  On

October 14, 2008, AmeriCredit received the Wachovia Replacement Bid, which it eventually

accepted.

64.     Pursuant to the terms of the 2005 Master Agreement, AmeriCredit was

required to solicit Market Quotations as of the same day and time on or as soon as reasonably

practicable after November 20, 2008, the Early Termination Date.  If AmeriCredit had adhered

to the terms of the 2005 Master Agreement, the bids it received would have reflected market

conditions at the contractually relevant time.

65.     Between October 14, 2008 and November 20, 2008, the USD LIBOR rate

significantly decreased, thereby increasing the value of the Swaps in favor of LBSF.  As a result,

AmeriCredit should have known that the Wachovia Replacement Bid was stale and

commercially unreasonable as of the Early Termination Date.

66.     On or about October 17, 2008, AmeriCredit received the RBS Bid, which

nearly doubled the price offered in the Wachovia Replacement Bid.  The RBS Bid further

demonstrated that the Wachovia Replacement Bid was far below market value and therefore not

commercially reasonable.  AmeriCredit, however, failed to actively pursue the RBS Bid and

instead accepted the Wachovia Replacement Bid.

67.     By letter dated November 21, 2008, AmeriCredit delivered the Calculation

Statement to LBSF.  The Calculation Statement reflected that the Early Termination Payment to

which LBSF was entitled was $691,009 under the 2005 Interest Swap.  The Calculation

18

Statement also indicated that AmeriCredit calculated the Early Termination Payment using the Loss measure because it was unable to obtain at least three market quotations.

68.    AmeriCredit failed to solicit quotations from Reference Market-makers as of the Early Termination Date, in good faith, in accordance with the Market Quotation payment measure. AmeriCredit sought bids from dealers over two months before the Early Termination Date and did not approach these dealers again on or after the Early Termination Date. Thus, AmeriCredit breached the express contractual requirements under Market Quotation.

69.    AmeriCredit also failed to properly apply the Loss measurement for the Early Termination Payment. AmeriCredit acknowledged that LBSF's Loss was determined exclusively on the stale Wachovia Replacement Bid, which was made as of October 14, 2008. This bid, however, did not take into account the sharp decline in applicable interest rates in the intervening five-week period before the designation of the Early Termination Date, during which time LBSF's position increased in value by approximately $14 million.

70.    Accordingly, AmeriCredit failed to determine Loss (i) in a reasonable manner, (ii) as of the Early Termination Date, or (iii) based on relevant interest rates under current market conditions as of such date. Thus, AmeriCredit's determination of the settlement amount breached the parties' express contractual requirements for measuring Loss.

71.    Accordingly, and by reason of the foregoing, the determination of the Early Termination Payment for the 2005 Swap by AmeriCredit and the 2005 B-M Trust was in breach of their express contractual obligations under the 2005 Swap Agreement. As a result of this breach, LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $4,119,441, plus applicable interest.

## COUNT II

### *Breach of Contract By AmeriCredit and the 2007 B-F Trust Under the 2007 B-F Swap Agreement*

72.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

73.     LBSF, AmeriCredit, and the 2007 B-F Trust had valid and enforceable contracts.  These contracts included the 2007 B-F Servicing Agreement and the 2007 B-F Swap Agreement.

74.     Under the 2007 B-F Servicing Agreement, AmeriCredit acted as the agent for the 2007 B-F Trust, thereby performing certain duties on behalf of the 2007 B-F Trust, such as terminating the Swaps and calculating the Early Termination Payments.

75.     Under the express terms of the 2007 B-F Swap Agreement, the 2007 B-F Trust and LBSF agreed to a modified Second Method and Market Quotation payment measure for determining the Early Termination Payment.  Using this measurement, AmeriCredit was obligated to act in a commercially reasonable manner in (i) pursuing bids from potential replacement counterparties for replacement transactions and (ii) paying LBSF the amount of the offer made by the actual replacement counterparty accepted by AmeriCredit.

76.     According to the 2007 Confirmations, which further amended the 2007 B-F Schedule, AmeriCredit was to solicit quotations for fixed amortization swaps as replacement transactions.

20

77.     On November 20, 2008, AmeriCredit delivered an Early Termination Notice to LBSF that designated November 20, 2008 as the Early Termination Date under the terms of 2007 B-F Swap Agreement.

78.     On or about September 15, 2008, the date of LBHI's bankruptcy filing and more than two months before the Early Termination Date, AmeriCredit began soliciting market quotations from Reference Market-makers.  On October 14, 2008, AmeriCredit received the Wachovia Replacement Bid, which it eventually accepted.

79.     Between October 14, 2008 and November 20, 2008, the USD LIBOR rate significantly decreased, thereby increasing the value of the Swaps in favor of LBSF.  As a result, AmeriCredit should have known that the Wachovia Replacement Bid was stale and commercially unreasonable as of the Early Termination Date.

80.     On or about October 17, 2008, AmeriCredit received the RBS Bid, which nearly doubled the price offered in the Wachovia Replacement Bid.  The RBS Bid demonstrated that the Wachovia Replacement Bid was far below market value and therefore was not commercially reasonable.  AmeriCredit, however, failed to actively pursue the RBS Bid and instead accepted the Wachovia Replacement Bid.

81.     By letter dated November 21, 2008, AmeriCredit delivered the Calculation Statement to LBSF.  The Calculation Statement reflected that the Early Termination Payment to which LBSF was entitled was $11,096,248 under the 2007 B-F Interest Swap.  AmeriCredit based this calculation solely on the stale and commercially unreasonable Wachovia Replacement Bid, which was for guaranteed balance swaps.

82.    As a result of the foregoing, AmeriCredit and the 2007 B-F Trust breached the 2007 B-F Swap Agreement, including its requirement to act in good faith and in a commercially reasonable manner, by: (i) calculating the Early Termination Payment based on quotations for guaranteed balance swaps, instead of fixed amortization swaps, as required by the 2007 Confirmations; (ii) failing to return to the market on or about the Early Termination Date to seek new bids for fixed amortization swaps based on then-current market conditions; (iii) failing to actively pursue the RBS Bid, which nearly doubled the price offered by the Wachovia Replacement Bid; and (iv) accepting and calculating the Early Termination Payment based on the Wachovia Replacement Bid, which was not commercially reasonable.

83.    As a result of this breach of the 2007 B-F Swap Agreement, LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $19,311,849, plus applicable interest.

## COUNT III

### *Breach of Contract By AmeriCredit and the 2007 D-F Trust Under the 2007 D-F Swap Agreement*

84.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

85.    LBSF, AmeriCredit, and the 2007 D-F Trust had valid and enforceable contracts.  These contracts included the 2007 D-F Servicing Agreement and the 2007 D-F Swap Agreement.

86.    Under the 2007 D-F Servicing Agreement, AmeriCredit acted as the agent for the 2007 D-F Trust, thereby performing certain duties on behalf of the 2007 D-F Trust, such as terminating the Swaps and calculating the Early Termination Payments.

22

87.     Under the express terms of the 2007 D-F Swap Agreement, the 2007 D-F Trust and LBSF agreed to a modified Second Method and Market Quotation payment measure for determining the Early Termination Payment.  Using this measurement, AmeriCredit was obligated to act in a commercially reasonable manner in (i) pursuing bids from potential replacement counterparties for replacement transactions and (ii) paying LBSF the amount of the offer made by the actual replacement counterparty accepted by AmeriCredit.

88.     According to the 2007 Confirmations, which further amended the 2007 D-F Schedule, AmeriCredit was to solicit quotations for fixed amortization swaps as replacement transactions.

89.     On November 20, 2008, AmeriCredit delivered an Early Termination Notice to LBSF that designated November 20, 2008 as the Early Termination Date under the terms of 2007 D-F Swap Agreement.

90.     On or about September 15, 2008, the date of LBHI's bankruptcy filing and more than two months before the Early Termination Date, AmeriCredit began soliciting market quotations from Reference Market-makers.  On October 14, 2008, AmeriCredit received the Wachovia Replacement Bid, which it eventually accepted.

91.     Between October 14, 2008 and November 20, 2008, the USD LIBOR rate significantly decreased, thereby increasing the value of the Swaps in favor of LBSF.  As a result, AmeriCredit should have known that the Wachovia Replacement Bid was stale and commercially unreasonable as of the Early Termination Date.

92.     On or about October 17, 2008, AmeriCredit received the RBS Bid, which nearly doubled the price offered in the Wachovia Replacement Bid.  The RBS Bid demonstrated

that the Wachovia Replacement Bid was far below market value and therefore was not commercially reasonable.  AmeriCredit, however, failed to actively pursue the RBS Bid and instead accepted the Wachovia Replacement Bid.

93.     By letter dated November 21, 2008, AmeriCredit delivered the Calculation Statement to LBSF.  The Calculation Statement stated that the Early Termination Payment to which LBSF was entitled was $1,399,588 under the 2007 D-F Interest Swap.  AmeriCredit based this calculation solely on the stale and commercially unreasonable Wachovia Replacement Bid, which was for guaranteed balance swaps.

94.     As a result of the foregoing, AmeriCredit and the 2007 D-F Trust breached the 2007 D-F Swap Agreement, including its requirement to act in good faith and in a commercially reasonable manner, by:  (i) calculating the Early Termination Payment based on quotations for guaranteed balance swaps, instead of fixed amortization swaps, as required by the 2007 Confirmations; (ii) failing to return to the market on or about the Early Termination Date to seek new bids for fixed amortization swaps based on then-current market conditions; (iii) failing to actively pursue the RBS Bid, which nearly doubled the price offered by the Wachovia Replacement Bid; and (iv) accepting and calculating the Early Termination Payment based on the Wachovia Replacement Bid, which was not commercially reasonable.

95.     As a result of this breach of the 2007 D-F Swap Agreement, LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $7,292,862, plus applicable interest.

## COUNT IV

### *Breach of Contract By AmeriCredit Regarding the 2005 B-M Trust Under the 2005 Servicing Agreement*

96.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

97.     AmeriCredit and the 2005 B-M Trust had a valid and enforceable contract: the 2005 Servicing Agreement.  Under the 2005 Servicing Agreement, AmeriCredit was obligated to perform the 2005 B-M Trust's duties under the 2005 Interest Swap and to indemnify the 2005 B-M Trust for any breach of the 2005 Servicing Agreement by AmeriCredit.

98.     LBSF was a third-party beneficiary of the 2005 Servicing Agreement and is entitled to enforce the agreement's terms.

99.     AmeriCredit failed to perform the duties of the 2005 B-M Trust under the 2005 Interest Swap by failing to solicit market quotations in good faith as of the Early Termination Date, failing to consider and pursue higher bids, and failing to use current information to measure the appropriate Early Termination Payments.

100.     As a result of AmeriCredit's breach, any amounts due to the 2005 B-M Trust as a result of AmeriCredit's duty to indemnify the trust shall be payable to LBSF to satisfy LBSF's damages, in an amount to be determined at trial, but not less than $4,119,441, plus applicable interest.

25

## COUNT V

### *Breach of Contract By AmeriCredit Regarding the 2007 B-F Trust*
### *Under the 2007 B-F Servicing Agreement*

101.    Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this

cause of action.

102.    AmeriCredit and the 2007 B-F Trust had a valid and enforceable contract:

the 2007 B-F Servicing Agreement.  Under the 2007 B-F Servicing Agreement, AmeriCredit was

obligated to perform the 2007 B-F Trust's duties under the 2007 B-F Interest Swap and to

indemnify the 2007 B-F Trust for any breach of the 2007 B-F Servicing Agreement by

AmeriCredit.

103.    LBSF was a third-party beneficiary of the 2007 B-F Servicing Agreement

and is entitled to enforce the agreement's terms.

104.    AmeriCredit failed to perform the duties of the 2007 B-F Trust under the

2007 B-F Interest Swap by failing to pursue bids for fixed amortization swaps, failing to consider

and pursue higher bids, and failing to use current information to measure the appropriate Early

Termination Payments.

105.    As a result of AmeriCredit's breach, any amounts due to the 2007 B-F

Trust as a result of AmeriCredit's duty to indemnify the trust shall be payable to LBSF to satisfy

LBSF's damages, in an amount to be determined at trial, but not less than $19,311,849, plus

applicable interest.

## COUNT VI

### *Breach of Contract By AmeriCredit Regarding the 2007 D-F Trust*
### *Under the 2007 D-F Servicing Agreement*

106.     Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this

cause of action.

107.     AmeriCredit and the 2007 D-F Trust had a valid and enforceable contract:

the 2007 D-F Servicing Agreement.  Under the 2007 D-F Servicing Agreement, AmeriCredit

was obligated to perform the 2007 D-F Trust's duties under the 2007 D-F Interest Swap and to

indemnify the 2007 D-F Trust for any breach of the 2007 D-F Servicing Agreement by

AmeriCredit.

108.     LBSF was a third-party beneficiary of the 2007 D-F Servicing Agreement

and is entitled to enforce the agreement's terms.

109.     AmeriCredit failed to perform the duties of the 2007 D-F Trust under the

2007 D-F Interest Swap by failing to pursue bids for fixed amortization swaps, by failing to

consider and pursue higher bids, and by failing to use current information to measure the

appropriate Early Termination Payments.

110.     As a result of AmeriCredit's breach, any amounts due to the 2007 D-F

Trust as a result of AmeriCredit's duty to indemnify the trust shall be payable to LBSF to satisfy

LBSF's damages, in an amount to be determined at trial, but not less than $7,292,862, plus

applicable interest.

## COUNT VII

*Violation of Section 562 of the Bankruptcy Code by Failing to Determine the Value of the Swaps in a Commercially Reasonable Manner (Against All Defendants)*

111.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

112.    Section 562 of the Bankruptcy Code provides that where a "swap participant liquidates, terminates or accelerates" a swap agreement, "damages shall be measured as of the earliest of . . . (2) the date or dates of such liquidation, termination or acceleration" provided that there are commercially reasonable determinants of value on that date.  11 U.S.C. § 562(a).  If no such commercially reasonable determinants of value exist on that date, then damages "shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562(b).

113.    Under section 562(c) of the Bankruptcy Code, a swap participant seeking to use a date other than the date of the liquidation, termination or acceleration "has the burden of proving that there were no commercially reasonable determinants of value as of" the date of liquidation, termination or acceleration.  11 U.S.C. § 562(c).

114.    Here, commercially reasonable determinants of value existed on November 20, 2008, the Early Termination Date, for the requisite Swaps under the Swap Agreements (guaranteed balance swaps pursuant to the 2005 Swap Agreement and fixed amortization swaps pursuant to the 2007 Swap Agreements).

115.    AmeriCredit, however, acting on behalf of the other Defendants, utilized quotations it received over two months earlier from the Wachovia Replacement Bid that did not

account for changes in interest rates, which significantly increased the amount owing to LBSF.

AmeriCredit's reliance on the stale Wachovia Replacement Bid was commercially unreasonable.

116.    Consequently, in calculating the Early Termination Payments, the

Defendants violated sections 562(a) and (b) of the Bankruptcy Code.  As a result of the

Defendants' violation of section 562, LBSF has been damaged in an amount to be determined at

trial, but not less than $30,724,153, plus applicable interest.

## COUNT VIII

*Violation of the Automatic Stay under Section 362 of the Bankruptcy Code by Refusing to Pay
the Revised Settlement Amounts and Unpaid Amounts (Against All Defendants)*

117.    Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this

cause of action.

118.    Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a

voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.  11

U.S.C. § 362(a)(3).

119.    As fully alleged above, AmeriCredit, as servicer for the Trusts, improperly

calculated the Early Termination Payments.  Therefore, the Defendants owe a multi-million

dollar payable to LBSF in the form of the Adjusted Settlement Amounts and Unpaid Amounts.

120.    The Adjusted Settlement Amounts and Unpaid Amounts constitute

property of LBSF's estate.  *See* 11 U.S.C. § 541(a).  AmeriCredit's withholding of such payables

constitutes an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

121.    Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  This Court may grant damages to punish violations of the automatic stay.

122.    As set forth above, there is an actual controversy between LBSF and the Defendants with respect to the amounts owed by the Defendants to LBSF under Swaps.  *See* 28 U.S.C. § 2201.

123.    Accordingly, and by reason of the foregoing, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, Plaintiffs are entitled to (i) a declaration that the Defendants have willfully and knowingly acted in violation of section 362(a)(3) of the Bankruptcy Code; and (ii) pursuant to section 105(a) of the Bankruptcy Code, an award of money damages in an amount to be proven at trial, but not less than $30,724,153, plus applicable interest.

## COUNT IX

### *Turnover by the Trusts of Adjusted Settlement Amounts and Unpaid Amounts to Plaintiffs Pursuant to Section 542(b) of the Bankruptcy Code*

124.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

125.    Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee."  11 U.S.C. § 542(b).

126.    The Trusts and LBSF entered into the Swap Agreements, pursuant to which the Trusts and LBSF each agreed and promised to make certain payments, including, among other things, an Early Termination Payment if the Swaps were terminated due to an event of default.

127.    Under the Servicing Agreements, AmeriCredit acted as the agent for the Trusts, thereby performing certain duties on behalf of the Trusts such as terminating the Swaps and calculating the Early Termination Payments.

128.    LBHI's commencement of bankruptcy proceedings on September 15, 2008 constituted an event of default under the Swap Agreements.  Consequently, the Trusts elected to designate November 20, 2008 as the Early Termination Date for the Swaps.

129.    On November 21, 2008, the Trusts provided LBSF with the Calculation Statements.  These Calculation Statements were neither contractually proper nor commercially reasonable and grossly understated the true value of the Trusts' obligations to LBSF.  Thus, the Trusts have outstanding obligations to LBSF under the Swap Agreements.

130.    The debt owed to LBSF by AmeriCredit and the Trusts under the Swap Agreements as of November 20, 2008 is property of LBSF's estate under section 541(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 541(a).  AmeriCredit, on behalf of the Trusts, is required to pay the Adjusted Settlement Amounts and the remaining Unpaid Amounts to the Plaintiffs pursuant to section 542(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 542(b).

131.    Accordingly, and by reason of the foregoing, the Plaintiffs request an order compelling and directing the Trusts to turn over the Adjusted Settlement Amounts and the

Unpaid Amounts owed to LBSF under the Swap Agreements as of November 20, 2008, plus

applicable interest.

## COUNT X

### *Breach of Implied Covenant of Good Faith and Fair Dealing By AmeriCredit and the 2005 B-M Trust*

132.    Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this

cause of action.

133.    LBSF, AmeriCredit, and the 2005 B-M Trust had valid and enforceable

contracts.  These contracts included the 2005 Servicing Agreement and the 2005 Swap

Agreement.

134.    Inherent in these contracts was the implied covenant that AmeriCredit and

the 2005 B-M Trust act in good faith and fair dealing in their dealings with LBSF.

135.    Under the 2005 Servicing Agreement, AmeriCredit acted as the agent for

the 2005 B-M Trust, thereby performing certain duties on behalf of the 2005 B-M Trust such as

terminating the 2005 Swap and calculating the Early Termination Payments.

136.    As described above, under the 2005 Swap Agreement, the 2005 B-M Trust

and LBSF agreed to a particular method to measure the Early Termination Payments.  According

to industry custom and practice, AmeriCredit was obligated to consider and pursue higher bids

and to not use stale information to measure the appropriate Early Termination Payment.

137.    AmeriCredit breached the implied covenant of good faith and fair dealing

with LBSF by rejecting a higher bid and by using stale information to determine the Settlement

Amount for the 2005 Swap Agreement.

138.    As a result of this breach, LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $4,119,441, plus applicable interest.

### COUNT XI

*Breach of Implied Covenant of Good Faith and Fair Dealing By*
*AmeriCredit and the 2007 B-F Trust*

139.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

140.    LBSF, AmeriCredit, and the 2007 B-F Trust had valid and enforceable contracts.  These contracts included the 2007 B-F Servicing Agreement and the 2007 B-F Swap Agreement.

141.    Inherent in these contracts was the implied covenant that AmeriCredit and the 2007 B-F Trust act in good faith and fair dealing in their dealings with LBSF.

142.    Under the 2007 B-F Servicing Agreement, AmeriCredit acted as the agent for the 2007 B-F Trust, thereby performing certain duties on behalf of the 2007 B-F Trust such as terminating the 2007 B-F Swaps and calculating the Early Termination Payments.

143.    As described above, the 2007 B-F Trust and LBSF agreed to a particular method to measure Early Termination Payments for replacement transactions in the form of fixed amortization swaps.  According to industry custom and practice, AmeriCredit was obligated to pursue bids for fixed amortization swaps, to consider and pursue higher bids, and to not use stale information to measure the appropriate Early Termination Payment.

144.    AmeriCredit breached the implied covenant of good faith and fair dealing with LBSF by failing to pursue bids for fixed amortization swaps and by using stale information to determine the Early Termination Payment for the 2007 B-F Swap.

145.    As a result of this breach, LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $19,311,849, plus applicable interest.

## COUNT XII

### *Breach of Implied Covenant of Good Faith and Fair Dealing By AmeriCredit and the 2007 D-F Trust*

146.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Amended Complaint as though fully set forth in this cause of action.

147.    LBSF, AmeriCredit, and the 2007 D-F Trust had valid and enforceable contracts.  These contracts included the 2007 D-F Servicing Agreement and the 2007 D-F Swap Agreement.

148.    Inherent in these contracts was the implied covenant that AmeriCredit and the 2007 D-F Trust act in good faith and fair dealing in their dealings with LBSF.

149.    Under the 2007 D-F Servicing Agreement, AmeriCredit acted as the agent for the 2007 D-F Trust, thereby performing certain duties on behalf of the 2007 D-F Trust such as terminating the 2007 D-F Swaps and calculating the Early Termination Payment.

150.    As described above, the 2007 D-F Trust and LBSF agreed to a particular method to measure Early Termination Payments for replacement transactions in the form of fixed amortization swaps.  According to industry custom and practice, AmeriCredit was

obligated to pursue bids for fixed amortization swaps, to consider and pursue higher bids, and to not use stale information to measure the appropriate Early Termination Payments.

151.    AmeriCredit breached the implied covenant with LBSF by failing to pursue bids for fixed amortization swaps and by using stale information to determine the Early Termination Payment for the 2007 D-F Swap Agreement.

152.    As a result of this breach, LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $7,292,862, plus applicable interest.

[*Remainder Intentionally Left Blank*]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following

relief:

A.    an order (i) declaring that, in withholding the Adjusted Settlement

Amounts and the Unpaid Amounts payable by the Defendants to LBSF

under the Swap Agreements, the Defendants have acted in violation of

sections 362 and 562 of the Bankruptcy Code, and (ii) awarding the

Plaintiffs money damages in an amount to be determined at trial, plus

applicable interest, for such violations;

B.    an order compelling and directing Defendants to turn over to the Plaintiffs

the Adjusted Settlement Amounts and the Unpaid Amounts owed to LBSF

under the Swap Agreements, plus applicable interest;

C.    a judgment against all Defendants that the Defendants breached their

agreements with and contractual obligations to LBSF under the Swap

Agreements and, accordingly, the Plaintiffs are entitled to an award of

money damages in an amount to be determined at trial, but not less than

$30,724,153, plus applicable interest;

D.    a judgment against all Defendants that the Defendants breached the

covenant of good faith and fair dealing implied in each Swap Agreement

and, accordingly, the Plaintiffs are entitled to an award of money damages

in an amount to be determined at trial, but not less than $30,724,153, plus

applicable interest;

E.      an award of interest from November 20, 2008 through the date of

judgment at the Default Rate under the 2005 Swap Agreement, 2007 B-F

Swap Agreement and the 2007 D-F Swap Agreement;

F.      any other damages suffered as a result of the Defendants' misconduct, in

an amount to be determined at trial, in addition to statutory interest; and

G.      any such other and further relief as the Court deems just, including costs

and attorneys' fees.

Respectfully submitted,


 /s/David S. Cohen
David S. Cohen
Nicholas A. Bassett
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Attorneys for Plaintiffs and Debtors Lehman
Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.


Dated:      Washington, DC
            November 25, 2013

# **Exhibit A**

(Multicurrency – Cross Border)



# ISDA®

**International Swap Dealers Association, Inc.**

# MASTER AGREEMENT

dated as of _____ June 2, 2005 _____

| Lehman Brothers Special Financing Inc. | and | AmeriCredit Automobile Receivables Trust 2005-B-M |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

## 1.    Interpretation

(a)    *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2.    Obligations

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)     **Change of Account.** Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     **Netting.** If on any date amounts would otherwise be payable: —

       (i)     in the same currency; and

       (ii)     in respect of the same Transaction,

by each party to the other. then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     **Deduction or Withholding for Tax.**

       (i)     *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will: —

              (1)     promptly notify the other party ("Y") of such requirement;

              (2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

              (3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

              (4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes. whether assessed against X or Y) will equal ft full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for: —

                  (A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

                  (B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

ISDA® 1992

    (ii)   *Liability.* If: —

        (1)     X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)     X does not so deduct or withhold; and

        (3)     a liability resulting from such Tax is assessed directly against X,

    then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)     **Default Interest; Other Amounts.** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that: —

(a)     *Basic Representations.*

    (i)     *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)   *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)     **Absence of Certain Events.**  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     **Absence of Litigation.**  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     **Accuracy of Specified Information.**  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     **Payer Tax Representation.**  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     **Payee Tax Representations.**  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.     Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party: —

(a)     **Furnish Specified Information.**  It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs: —

   (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)     any other documents specified in the Schedule of any Confirmation; and

   (iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     **Maintain Authorisations.**  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     **Comply with Laws.**  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     **Tax Agreement.**  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

4

ISDA® 1992

(e)     ***Payment of Stamp Tax.***  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled. or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events or Default and Termination Events

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: —

    (i)    *Failure to Pay or Deliver*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)    *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)    *Credit Support Default.*

        (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)    *Misrepresentation.*  A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)    *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)    *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

6

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specific Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)     *Bankruptcy.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:–

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof, (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which. under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    *Merger Without Assumption.*  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: –

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)     the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     **Termination Events.**  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

7

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date. it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); of

    (v)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying. the occurrence of such event (and, in such event the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

8

**ISDA® 1992**

## 6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(l), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

9

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   **Effect of Designation.**

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   **Calculations.**

(i)   *Statement.*  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date.*  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   **Payments on Early Termination.**  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default.*  If the Early Termination Date results from an Event of Default:—

(1)   *First Method and Market Quotation*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss.*  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.*  If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

10

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)   *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)   *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)   *Two Affected Parties.* If there are two Affected Parties:—

(A)   if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

11

**ISDA® 1992**

## 7. Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e)

Any purported transfer that is not in compliance with this Section will be void.

## 8. Contractual Currency

(a) *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b) *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c) *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d) *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

## 9. Miscellaneous

(a) **Entire Agreement.** This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) **Amendments.** No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) **Survival of Obligations.** Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) **Remedies Cumulative.** Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) **Counterparts and Confirmations.**

    (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

    (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) **No Waiver of Rights.** A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) **Headings.** The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10. Offices; Multibranch Parties

(a) If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b) Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c) If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11. Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12. Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i) if in writing and delivered in person or by courier, on the date it is delivered;

(ii) if sent by telex, on the date the recipient's answerback is received;

(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v) if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to all

## 13. Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

14

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    **Waiver of Immunities.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement: —

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means: —

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

16

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values, If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of.-

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

ISDA® 1992

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

18

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**              **AMERICREDIT AUTOMOBILE**
(Name of Party)                                          **RECEIVABLES TRUST 2005-B-M**

By. _____                              By: _____
Name:                                                        Name:
Title:                                                       Title:
Date:    Allyson M. Carina                                   Date:
         Authorized Signatory

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**AMERICREDIT AUTOMOBILE**
**RECEIVABLES TRUST 2005-B-M**
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
**BY:   AMERICREDIT FINANCIAL SERVICES,**
(Name of Party)
**INC., AS ATTORNEY-IN-FACT**

By: _____  _____

    Name:

    Title:                                        By: _____

    Date:                                         Name:  Susan B. Sheffield

                                    Title:  Senior Vice President, Structured Finance

                                    Date:  June 2, 2005

EXECUTION COPY

## Schedule
## to the
## Master Agreement

dated as of June 2, 2005

between

**Lehman Brothers Special Financing Inc.**      **And**      **AmeriCredit Automobile Receivables Trust 2005-B-M**
("<u>Party A</u>")                                                    ("<u>Party B</u>")


## Part 1
## Termination Provisions

In this Agreement:

(a)    *Specified Entity*. "<u>Specified Entity</u>" means none.

(b)    *Specified Transaction*. "<u>Specified Transaction</u>" has the meaning specified in Section 14.

(c)    *Breach of Agreement*.  The Breach of Agreement provisions of Section 5(a)(ii) will not apply to Party A and will not apply to Party B.

(d)    *Misrepresentation*.  The Misrepresentation provisions of Section 5(a)(iv) will not apply to Party A and will not apply to Party B.

(e)    *Default under Specified Transaction*.  The Default under Specified Transaction provisions of Section 5(a)(v) will not apply to Party A and will not apply to Party B.

(f)    *Cross Default.*  The Cross Default provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(g)    *Credit Event Upon Merger*. The Credit Event Upon Merger provision in Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

(h)    *Automatic Early Termination*.  The Automatic Early Termination provision of Section 6(a) will not apply to either Party A or Party B.

(i)    *Payments on Early Termination*.  For the purpose of Section 6(e), the Second Method and Market Quotation will apply.

(j)    *Termination Currency*.  "<u>Termination Currency</u>" means United States Dollars.

**(k)** *Designation of Early Termination Date.* (i) Notwithstanding anything to the contrary in Section 6 of this Agreement, if:

    (A)    any Event of Default in respect of any Insured Transaction occurs, or

    (B)    any Termination Event in respect of any Insured Transaction under this Agreement occurs (other than the Additional Termination Event described in Part 1(l)(ii)(c) or (d) below),

then, in either case, neither Party A nor Party B shall designate an Early Termination Date in respect of any such Insured Transaction unless: (1) MBIA Insurance Corporation ("MBIA") has failed to pay any payment due to Party A under the terms and conditions of the Interest Rate Swap Insurance Policy issued on June 2, 2005 (the "Swap Policy") by MBIA, for the account of Party B, as principal, and for the benefit of Party A, as beneficiary; or (2) MBIA has otherwise consented in writing to such designation.

(ii)    If any Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party, then MBIA (so long as it has not failed to pay any payment due to Party A under the terms and conditions of the Swap Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by MBIA under the Swap Policy. The parties acknowledge that, except as the Swap Policy may be otherwise endorsed, unless MBIA designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties), payments due from Party B because an Early Termination Date has been designated will not be insured.

**(l)** *Additional Termination Events.* (i) Each of the following events shall be an Additional Termination Event with respect to Party A:

    (a)    If at any time the unsubordinated and unsecured long-term debt rating of Party A's Credit Support Provider is withdrawn, suspended or falls to or below "A-" by Standard & Poor's Rating Services Group, a division of McGraw-Hill, Inc. ("S&P"), or "A3" by Moody's Investors Service, Inc. ("Moody's") and Party A shall not, within thirty (30) days of such downgrade, at its own cost, have performed its obligations under the Credit Support Document.

    (b)    If Party A's Credit Support Provider's (i) long-term senior unsecured rating by Moody's is withdrawn, suspended or falls to or below "Baa1" or (ii) long-term senior unsecured rating by Standard and Poor's is withdrawn, suspended or falls to or below "BBB+" Party A must, within sixty (60) days, (X) find a replacement counterparty who is acceptable to the Insurer and enters into documents acceptable to the Insurer or (Y) obtain a guaranty from, or contingent agreement of, another person who is acceptable to the Insurer and enters into documents acceptable to the Insurer.

2

At any time that Party A is performing its obligations under the Credit Support Document, it may elect, with the prior written consent of the Insurer, such consent not to be unreasonably withheld, to take one of the actions described in clause (X) or (Y) of this subsection (b). Upon the completion of any assignment of this Agreement to a replacement counterparty pursuant to clause (X) above or the obtaining of a guaranty or contingent agreement pursuant to clause (Y) above, any outstanding arrangement with respect to the collateral posted by Party A shall terminate and all collateral posted by Party A shall be immediately returned to Party A.

(c)     If Party A's Credit Support Provider's S&P short-term rating is below "A-1" or Moody's short-term rating is below "P-1", Party A shall endeavor to find a replacement counterparty promptly; provided that such replacement counterparty must be reasonably acceptable to MBIA. Party A shall continue to perform its obligations and endeavor to find a replacement counterparty until a suitable substitute that is reasonably acceptable to MBIA is in place. The cost of finding a substitute shall be borne by Party A. If, after 30 days, Party A has not found such a substitute and Party A's Credit Support Provider's S&P short-term rating remains below "A-1" or Moody's short-term rating remains below "P-1", for such time until a replacement is in place, Party A shall perform its obligations under the Credit Support Document.

The Insurer shall have the right to consent to any substitute counterparty elected pursuant to this Part 1(l)(i) such consent not to be unreasonably withheld.

For the purpose of the Additional Termination Events described in this Part 1(l)(i), Party A shall be the sole Affected Party.

(ii)    Each of the following events shall be Additional Termination Events with respect to Party B:

(a)     Unless Party B has received the prior, written consent of Party A, Party B's consolidation or merger pursuant to Section 3.10(a) of the Indenture or any conveyance or transfer of all or substantially all of the properties or assets of the Issuer (as defined in the Indenture) pursuant to Section 3.10(b) of the Indenture if such consolidation, merger or conveyance or transfer of properties or assets would materially, adversely affect any of (A) Party A's rights under the Transaction Documents or (B) Party A's rights under this Agreement.

(b)     The Indenture, the Sale and Servicing Agreement or any other instrument or agreement relating to the issuance of the Notes (as defined in the Indenture) (collectively, the "Transaction Documents") shall have been amended or modified without at least three (3) prior Business Days notice to Party A and the prior written consent of Party A, and such amendment or modification could reasonably be expected to have a material adverse effect on the obligations of Party B or the rights of Party A hereunder.

3

(c)     MBIA fails to meet its payment obligations under the Swap Policy and such failure is continuing with respect to MBIA under the Swap Policy.

(d)     MBIA fails at any time during the term of this Agreement to have (a) a claim paying ability rating of at least "A-" or higher from S&P or (b) a financial strength rating of at least "A3" or higher from Moody's; provided, however, that additionally:

> (i)     an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or
>
> (ii)    a Termination Event has occurred or is continuing with respect to Party B.

For the purpose of the Additional Termination Events described in this Part 1(l)(ii), Party B shall be the sole Affected Party.

(m)    *No Suspension of Payments*.  Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Transaction under Section 2(a)(iii) unless MBIA is in default in respect of any payment obligations under the Swap Policy.

(n)     *Replacement*.  Party A agrees that if Party B or MBIA has a right to designate an Early Termination Date pursuant to Part 1(l)(i)(a) or (b) above, then, (i) upon the request of MBIA or Party B with the consent of MBIA, Party A shall use its best efforts to procure a replacement Transaction at its own expense (and at no expense to Party B) with a swap counterparty on the same terms as this Agreement *mutatis mutandis*, or else with such amendments to the terms of this Agreement (A) as have been confirmed by S&P and Moody's as not resulting in a reduction, withdrawal or suspension of the ratings assigned to the Notes without regard to the presence of the Note Policy (the "Rating Agency Condition") and (B) as have been approved by MBIA or (ii) Party A may, at its sole option, elect to procure a replacement Transaction at its own expense (and at no expense to Party B) with a swap counterparty acceptable to MBIA on the same terms as this Agreement *mutatis mutandis*, or else with such amendments to the terms of this Agreement (A) as to which the Rating Agency Condition have been met and (B) as have been approved by MBIA.

## Part 2
## Tax Representations

(a)     *Payer Tax Representations*.  For the purpose of Section 3(e), Party A and Party B each makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e)) to be made by it to the other party under this Agreement.  In making this representation, it may rely on:-

4

      (i)     the accuracy of any representation made by the other party pursuant to Section 3(f);

      (ii)    the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii); and

      (iii)   the satisfaction of the agreement of the other party contained in Section 4(d);

*provided* that it shall not be a breach of this representation where reliance is placed on clause (ii), and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

**(b)**    ***Payee Tax Representations.***  For the purpose of Section 3(f), Party A and Party B each represent to the other that, in respect of each Transaction which it enters into through an Office or discretionary agent in the United States of America ("U.S."), each payment received or to be received by it under that Transaction will be effectively connected with its conduct of a trade or business in the U.S.

## Part 3
## Agreement to Deliver Documents

Each party agrees to deliver the following documents as applicable:

**(a)**    For the purpose of Section 4(a)(i), tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
| --- | --- | --- |
| Party A and Party B | A correct, complete and executed U.S. Internal Revenue Service Form W-9 (or any successor form thereto), including appropriate attachments, that eliminates U.S. federal backup withholding tax on payments made pursuant to this Agreement. | (i) Upon execution of this Agreement and (ii) promptly upon any Form W-9 (or any successor form thereto) previously provided by the relevant Party becoming incorrect, obsolete or expired. |

**(b)**    For the purpose of Section 4(a)(ii), other documents to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
| --- | --- | --- | --- |
| Party A and Party B | Evidence reasonably satisfactory to the other | Upon execution of this Agreement and, if | Yes |

5

|  | party as to the names, true signatures and authority of the officers or officials singing this Agreement or any Confirmation on its behalf | requested, upon execution of any Confirmation |  |
| --- | --- | --- | --- |
| Party A | A copy of the annual report for such party containing audited or certified financial statements for the most recently ended financial year | Upon request, as soon as publicly available | Yes |
| Party A and Party B | An opinion of counsel to a party in form and substance acceptable to the other party and to MBIA | Upon execution of this Agreement | No |
| Party B | A Preliminary Servicer's Certificate | On each Determination Date | No |

## Part 4
## Miscellaneous

(a)     *Addresses for Notices.*  For the propose of Section 12(a):

(i) (1) Address for notices or communications to Party A (other than by facsimile):-

     Address:    Lehman Brothers Special Financing Inc.
                     c/o Lehman Brothers Inc.
                     Transaction Management
                     745 Seventh Avenue, 28th Floor
                     New York, New York 10019
                     Attention: Documentation Manager

     Tel.:   (212) 526-7187
     Fax:   (212) 526-7672

     With copies to MBIA:

     Address:    MBIA Insurance Corporation
                     113 King Street
                     Armonk, New York 10504
                     Attn:  Insured Portfolio Management – Structured Finance (IPM-SF)
                              (AmeriCredit Automobile Receivables Trust 2005-B-M)

NY1 935949v5

Tel.: (914) 765-3781
Fax.: (914) 765-3810

(ii)    Address for notices or communications to Party B for all purposes:

Address:    AmeriCredit Automobile Receivables Trust 2005-B-M
c/o AmeriCredit Financial Services, Inc.
801 Cherry Street
Fort Worth, Texas 76102
Attn: Derivatives Operations

Tel.: (817) 302-7210
Fax: (817) 302-7951

With copies to MBIA:

Address:    MBIA Insurance Corporation
113 King Street
Armonk, New York 10504
Attn: Insured Portfolio Management – Structured Finance (IPM-SF)
(AmeriCredit Automobile Receivables Trust 2005-B-M)

Tel.: (914) 765-3781
Fax.: (914) 765-3810

With copies to:

Address:    Wells Fargo, National Association
Sixth and Marquette Avenue
MAC N9311-161
Minneapolis, Minnesota 55479
Attn: CTS/ABS

Tel.: (612) 667-8058

**(b)**    *Process Agent.* For the purpose of Section 13(c):

Party A appoints as its Process Agent:    Not Applicable

Party B appoints as its Process Agent:    Not Applicable

**(c)**    *Offices.* The provisions of Section 10(a) will apply to this Agreement.

**(d)**    *Multibranch Party.* For the purpose of Section 10(c):

Party A is not a Multibranch Party.

Party B is not a Multibranch Party

7

NY1 935949v5

(e)     **Calculation Agent.** The Calculation Agent is Party A; provided, that if an Event of Default has occurred and is continuing with Party A as the Defaulting Party, the Calculation Agent shall be any designated third party mutually agreed to by the parties until such time as Party A is no longer a Defaulting Party.

(f)     **Credit Support Document** means (i) with respect to Party A, a guarantee of Party A's obligations hereunder substantially in the form annexed hereto as Exhibit A to this Schedule and, (ii) with respect to Party A and Party B, the Credit Support Annex between Party A and Party B attached hereto and forming an integral part hereof.

(g)     **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Lehman Brothers Holdings Inc., ("Holdings").

Credit Support Provider means in relation to Party B:  Not applicable.

(h)     **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York and each party hereby submits to the jurisdiction of the Courts of the State of New York.

(i)     **Netting of Payments.**  Section 2(c)(ii) of this Agreement will apply to any Transactions described in Part 5(a) of this Agreement; provided, that notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Transactions against the payment obligations of such party under Insured Transactions, it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other Transactions.   Section 6(e) of this Agreement shall apply to all Insured Transactions with the same effect as if the Insured Transactions constituted a single master agreement.  Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transaction shall be determined without regard to any Transactions other than the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other Transactions unless otherwise specified in such other Transaction and agreed to in writing by MBIA.

(j)     **Affiliate.**  Affiliate will have meaning specified in Section 14 provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

### Part 5
### Other Provisions

(a)     **Scope of Agreement.**  The swap Transactions dated June 2, 2005 between the parties shall be governed by and be subject to this Agreement.  Any such confirmation shall be a

8

"Confirmation." Any Transaction to which the Swap Policy relates shall be an "<u>Insured Transaction</u>" for purposes of this Agreement.

(b) **Definitions.** Unless otherwise specified in a Confirmation, this Agreement and each Insured Transaction between the parties are subject to the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "<u>Definitions</u>"), and will be governed in all relevant respects by the provisions set forth in the Definitions, without regard to any amendment to the Definitions subsequent to the date hereof.

(c) **Confirmations.** Each Confirmation shall be substantially in the form of one of the Exhibits to the Definitions, in any other form which is published by the International Swaps and Derivatives Association, Inc. or in such other form as the parties may agree.

(d) **Non-Reliance, Etc.** Each party will be deemed to represent to the other party on the date that it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

   (1) <u>Non-Reliance</u>. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered to be investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (2) <u>Assessment and Understanding</u>. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

   (3) <u>Status of Parties</u>. The other party is not acting as a fiduciary for or adviser to it in respect of that Transaction.

   (4) <u>Commodity Exchange Act</u>. (A) Each Transaction is intended to be exempt from, or otherwise not subject to regulation under, the Commodity Exchange Act (the "<u>CEA</u>"); and (B) each party hereto is an "eligible contract participant" within the meaning of Section 1a(12) of the CEA.

(e) **Change of Account.** Section 2(b) of this Agreement is hereby amended by the addition of the following after the word "delivery" in the first line thereof:-

   "to another account in the same legal and tax jurisdiction as the original account"

(f) **Recording of Conversation.** Each party (i) consents to the recording of the telephone conversations of trading and marketing and/or other personnel of the parties and their

9

Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to obtain any necessary consent of and give notice of such recording to such personnel of it and its Affiliates; and (iii) agrees that recordings may be submitted in evidence in any Proceedings relating to this Agreement.

(g) *Waiver of Right to Trial by Jury.* Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver, and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable by, among other things, the mutual waivers and certifications in this Section.

(h) *Sale and Servicing Agreement.* Reference is hereby made to the Sale and Servicing Agreement, dated as of May 25, 2005 among Party B, AFS SenSub Corp., AmeriCredit Financial Services, Inc. and Wells Fargo Bank, National Association, in its capacities as Trust Collateral Agent and Backup Servicer (the "Sale and Servicing Agreement"). Capitalized terms used but not defined in this Agreement shall have the respective meanings assigned to such terms in the Sale and Servicing Agreement.

(i) *Non-petition.* Party A agrees that it will not institute against, or join any other Person in instituting against, or cause any other Person to institute against, Party B any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other analogous proceedings under any bankruptcy or similar law until at least one year and one day after the payment in full of all Notes and all payments due under the Insurance Agreement dated as of May 25, 2005 among Party B, AmeriCredit Financial Services, Inc., AFS SenSub Corp., the Trustee, the Trust Collateral Agent, Wells Fargo Bank, National Association, as collateral agent, and MBIA; *provided*, that this paragraph shall not restrict or prohibit Party A from joining any other person, including, without limitation, the Trustee, in any bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or other analogous proceedings relating to Party B under any bankruptcy or similar law.

(j) *Acknowledgment of Charge.* Party A hereby acknowledges that Party B has granted a first priority security interest in its rights under this Agreement and has assigned this Agreement to the Trust Collateral Agent pursuant to the Indenture, and consents thereto, and Party A hereby consents to any transfer of such rights to the Trust Collateral Agent pursuant to an exercise of creditor's remedies in respect of such security interest or assignment. Party A hereby agrees that, unless notified in writing by the Trust Collateral Agent of other payment instructions, any and all amounts payable by Party A to Party B under this Agreement shall be paid to the Trust Collateral Agent at the account specified in each Confirmation. Any payments in accordance with the provisions hereof by Party A to Party B shall fully release Party A from any further liability to Party B in respect of such payment.

(k) *Expenses.* In the event that the Defaulting Party is Party A, the reasonable out-of-pocket expenses specified in Section 11 of this Agreement shall also include the reasonable legal

10

fees incurred by MBIA by reason of the enforcement and protection of Party B's rights under this Agreement; provided, that in no event will Party A be liable to MBIA for payment of any expenses or legal fees that (i) Party A has previously paid to Party B with respect to the same matter or (ii) Party A would not otherwise have been required to pay to Party B pursuant to Section 11 of this Agreement if such expenses or legal fees had been incurred by Party B. Party B agrees to reimburse MBIA immediately and unconditionally upon demand for all reasonable expenses incurred by MBIA in connection with the issuance of the Swap Policy and the enforcement by MBIA of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by MBIA which are related to, or resulting from any breach by Party B of its obligations hereunder.

(l) **Representations and Agreements.** Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of MBIA.

(m) **Third-Party Beneficiary.** Party B agrees with Party A that Party A shall be an express third-party beneficiary of the Indenture for the purposes of receiving the rights specifically granted to Party A in the Indenture, but subject to the rights of the Controlling Party under the Indenture. Party A and Party B hereby each acknowledge and agree that MBIA shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and the obligations of such party under any Insured Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Transaction against such party on its own behalf and/or on behalf of the holders of the related Obligations and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by MBIA including, but not limited to, fees (including legal, accounting and other professional fees), costs and expenses incurred by MBIA which are related to, or resulting from any breach by such party of its obligations hereunder; provided, that in no event will Party A be liable to MBIA for payment of any fees, costs or expenses that (i) Party A has previously paid to Party B with respect to the same matter or (ii) Party A would not otherwise have been required to pay to Party B pursuant to this Agreement if such fees, costs or expenses had been incurred by Party B.

(n) **Swap Policy Coverage.** Party A and Party B hereby each acknowledge and agree that MBIA's obligation with respect to the Insured Transactions shall be limited to the terms of the Swap Policy. Notwithstanding Section 2(e) or any other provision of this Agreement, MBIA shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(o) **Subrogation.** Party A and Party B hereby acknowledge that to the extent of payments made by MBIA to Party A under the Swap Policy, MBIA shall be fully subrogated to the rights of Party A against Party B under the Insured Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to MBIA its right to receive payment from Party B under any Insured Transaction to the extent of any payment thereunder by MBIA to Party A. Party B hereby acknowledges and consents to the assignment by Party A

11

to MBIA of any rights and remedies that Party A has under any Insured Transaction or any other document executed in connection herewith.

(p) *Transfers and Assignments.* Notwithstanding Section 7 of the Agreement, no Transaction may be assigned by either Party A or Party B unless the Rating Agency Condition has been met. Notwithstanding Section 7 of the Agreement, no Insured Transaction may be assigned by either Party A or Party B without the prior written consent of MBIA, which consent will not be unreasonably withheld; provided, that Party A may make such an assignment to an affiliate of Party A or Party A's Credit Support Provider without MBIA's prior written consent, if Party A (or the entity currently guaranteeing the obligations of Party A, if any) provides a guaranty of the Swap, as assigned, acceptable to MBIA. A guaranty identical to an existing guaranty of Party A's obligations under the Agreement will be acceptable.

(q) *Amendments and Waivers.* Section 9(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof, (B) adding the phrase "and the Controlling Party (whose execution of and consent to such amendment, modification or waiver will not be unreasonably withheld), " following the word "parties" in the third line thereof and (C) adding the phrase "and unless the Rating Agency Condition has been met with respect to such amendments, modifications or waiver" after the word "system" in the third line thereof.

(r) *Notices.* A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded, by or on behalf of Party B, to MBIA.

(s) *Reference Market-Makers.* The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

> "Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same city. The rating classification assigned to any outstanding long-term senior debt securities issued by such dealers shall be at least (1) "Aa3" or higher as determined by Moody's, (2) "AA-" or higher as determined by S&P or (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties, provided, however, that, in any case, if four (4) such Reference Market-makers cannot be readily identified by the determining party, the party making the determination of the Market Quotation may designate, with the consent of the other party and MBIA, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating and; provided further, that (a) Lehman Brothers Special Financing Inc. (guaranteed by Lehman Brothers Holdings Inc.) will be acceptable as a reference market-maker, so long as Lehman Brothers Holdings Inc.'s long-term, senior, unsecured debt rating is "A" or

12

better from S&P and "A1" or better from Moody's, (b) Deutsche Bank AG will be acceptable as a reference market-maker, so long as its long-term, senior, unsecured debt rating is "AA-" or better from S&P and "Aa3" or better from Moody's and (c) Goldman Sachs Mitsui Marine Derivative Products LP will be acceptable as a reference market-maker, so long as its long-term, senior, unsecured debt rating is "AA+" or better from S&P and "Aaa" or better from Moody's.

(t)     *Isolation of Insured Transactions in Designating an Early Termination Date.* Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Transactions by MBIA or by Party A with the consent of MBIA pursuant to Part 1(k) above shall apply only to the Insured Transactions and not to any other Transaction under this Agreement, unless Party A shall designate an Early Termination Date in respect of such other Transaction. Nothing contained in this Part 5(t) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction other than the Insured Transactions, which designation shall not apply to the Insured Transactions unless expressly provided in such designation and unless MBIA shall have designated, or consented to the designation by Party A of, an Early Termination Date in respect of the Insured Transactions in accordance with Part 1(k) above.

(u)     *No set-off or counterclaim.* In no event shall either Party A or Party B be entitled to:

    (1)     set-off its payment obligations in respect of a Transaction against the payment obligations of the other party (whether by counterclaim or otherwise), or

    (2)     net the payment obligations of the other party that are not with respect to Insured Transactions against the payment obligations of such party under Insured Transactions,

it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transaction shall be determined without regard to any obligation other than those under the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by MBIA.

(v)     *Control by Controlling Party.* Party B acknowledges that it has Granted all of its rights and benefits under this Agreement pursuant to the Indenture and understands and agrees that Party A reserves the right to treat as null and void any notice or direction received by it from Party B if the Controlling Party is required hereunder to consent to such notice or direction and the Controlling Party has not provided such consent.

(w)     *Accuracy of Specified Information.* Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the

13

NY1 935949v5

phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

NY1 935949v5

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:

Allyson M. Carine
Authorized Signatory

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2005-B-M by AmeriCredit Financial
Services, Inc.

By: _____
Name:
Title:

[Schedule]

LEHMAN BROTHERS SPECIAL FINANCING INC.

AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2005-B-M by AmeriCredit Financial Services, Inc., as Attorney-In-Fact

By:_____
    Name:
    Title:

By:_____
    Name:  Susan B. Sheffield
    Title:  Senior Vice President, Structured Finance

[Schedule]

**EXECUTION COPY**

# ISDA®

## International Swaps and Derivatives Association, Inc.

### CREDIT SUPPORT ANNEX

#### to the Schedule to the
#### ISDA MASTER AGREEMENT

#### dated as of June 2, 2005
#### between
#### LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A")
#### and
#### AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2005-B-M ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above (this "Agreement"), is part of its Schedule and is a Credit Support Document under this Agreement with respect to Party A.

At any time a Credit Support Commencement Date has occurred and the related Collateral Event is continuing with respect to Party A, Party A shall be obligated to transfer Eligible Collateral in accordance with the terms of this Annex. In addition, Party A shall obtain a written confirmation from S&P that such action will not result in a reduction or a withdrawal of its rating on the Notes. If a Credit Support Commencement Date occurs and the related Collateral Event thereafter ceases to be continuing (and provided that no Event of Default or Potential Event of Default exists with respect to Party A) or Party A has made a permitted transfer under this Agreement, then Party A's obligations to transfer Eligible Collateral under this Annex will immediately cease with respect to that Collateral Event, and Party B will, upon demand by Party A, return, or cause its Custodian to return, all Collateral held under this Annex with respect to such Collateral Event.

"*Collateral Event*" means (i) that the unsecured and unsubordinated debt, deposit or letter of credit obligations of Party A are withdrawn, suspended or carry an assigned rating at or below "A-" by S&P or "A3" by Moody's, (ii) the occurrence of an Over-collateralization Commencement Date, or (iii) Party A's Credit Support Provider's Moody's short-term rating is below "P-1".

"*Credit Support Commencement Date*" is (i) the first New York Business Day following the 30 Calendar Day period after the occurrence of a Collateral Event or (ii) the Over-collateralization Commencement Date.

"*Over-collateralization Commencement Date*" is the first Business Day following the thirty-day period after Party A's failure to maintain a short-term rating by S&P of "A-1".

Accordingly, the parties agree as follows:

## Paragraphs 1 - 12. Incorporation

Paragraphs 1 through 12 inclusive of the ISDA Credit Support Annex (Bilateral Form) (ISDA Agreements Subject to New York Law Only) published in 1994 by the International Swaps and Derivatives Association, Inc. are incorporated herein by reference and made a part hereof, except that Paragraph 1(b) is hereby amended in its entirety to read as follows:

"(b)    **Secured Party and Pledgor.** Notwithstanding anything contained in this Annex to the contrary, (i) all references in this Annex to the "Secured Party' and all references to "other party" in Paragraphs 2, 9 and 11(b) of this Annex, will be to Party B exclusively, and (iii) all references in this Annex to the "Pledgor" and all references to "Each party" or "a party" in Paragraphs 2, 9 and 11(b) of this Annex, will be to Party A exclusively."

## Paragraph 13. Elections and Variables

(a)    *Security Interest for "Obligations".*  The term *"Obligations"* as used in this Annex includes no additional obligations of Secured Party and, for purposes of the definition of Obligations in Paragraph 12, includes no additional obligations of Pledgor.

(b)    *Credit Support Obligations.*

   (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

      (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

      (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

      (C)    *"Credit Support Amount"* has the meaning specified in Paragraph 3 except upon the occurrence of an Over-collateralization Commencement Date, in which event Credit Support Amount for any Valuation Date associated with an Over-collateralization Commencement Date and any weekly Valuation Date thereafter during the continuation of the Collateral Event shall not have its meaning as defined Paragraph 3, but shall mean the greater of (x) the sum of (i) Party B's Exposure under the Affected Transactions plus (ii) the product of (a) the Transactional Notional Amount (as hereinafter defined) multiplied by (b) the Applicable Volatility Buffer (as hereinafter defined) and (y) $0.

      (D)    "*Transactional Notional Amount*" shall mean, as of the date of determination, an amount equal to the aggregate Notional Amount outstanding at the beginning of and for the current Calculation Period under the applicable Affected Transactions.

      (E)    "*Applicable Volatility Buffer*" shall mean (i) if Party A's Credit Support Provider's S&P short-term rating is "A-1", 0.00%, (ii) if Party A's Credit

Support Provider's S&P short-term rating is "A-2", 3.25% and (iii) if Party A's Credit Support Provider's S&P short-term rating is "A-3", 4.00%.

(ii) *Eligible Collateral*. The *following* items will qualify as *"Eligible Collateral"*:

|  | | Valuation Percentage:* | Moody's | S&P |
|---|---|---|---|---|
| (A) | *Cash:* US Dollars in depository form. | | 100% | 100% |
| (B) | *U.S. Treasury Securities*: negotiable debt obligations issued by the U.S. Treasury Department ("Treasuries") having a remaining maturity of up to and not more than 1 year. | | 98% | 99% |
| (C) | Treasuries having a remaining maturity of greater than 1 year but not more than 5 years. | | 97% | 94% |
| (D) | Treasuries having a remaining maturity of greater than 5 years but not more than 10 years. | | 95% | 90% |
| (E) | Treasuries having a remaining maturity of greater than 10 years but not more than 20 years. | | 95% | 85% |
| (F) | Treasuries having a remaining maturity of greater than 20 years but not more than 30 years. | | 95% | 85% |
| (G) | *Agency Securities*: negotiable debt obligations of the Federal National Mortgage Association (FNMA), Federal Home Loan Mortgage Corporation (FHLMC), (collectively, "Agency Securities") having a remaining maturity of not more than 1 year. | | 93% | 98% |
| (H) | Agency Securities having a remaining maturity of greater than 1 year but not more than 5 years. | | 93% | 93% |

| | | | |
|---|---|---|---|
| (I) | Agency Securities having a remaining maturity of greater than 5 years but not more than 10 years. | 93% | 87% |
| (J) | Agency Securities having a remaining maturity of greater than 10 years but not more than 20 years. | 93% | 79% |
| (K) | Agency Securities having a remaining maturity of greater than 20 years but not more than 30 years. | 93% | 79% |
| (L) | *FHLMC Certificates.* Mortgage participation certificates issued by FHLMC evidencing undivided interests or participations in pools of first lien conventional or FHA/VA residential mortgages or deeds of trust, guaranteed by FHLMC, and having a remaining maturity of not more than 30 years. | 93% | 81% |
| (M) | *FNMA Certificates.* Mortgage-backed pass-through certificates issued by FNMA evidencing undivided interests in pools of first lien mortgages or deeds of trust on residential properties, guaranteed by FNMA, having a remaining maturity of not more than 30 years. | 93% | 81% |
| (N) | *GNMA Certificates.* Mortgage-backed pass-through certificates issued by private entities, evidencing undivided interests in pools of first lien mortgages or deeds of trust on single family residences, guaranteed by the Government National Mortgage Association (GNMA) with the full faith and credit of the United States, and having a remaining maturity of not more than 30 years. | 93% | 81% |
| (O) | *Commercial Paper.* Commercial Paper with a rating of at least P-1 by Moody's, at least F-1 by Fitch and at least A-1+ by S&P and having a remaining | 80% | 98% |

maturity of not more than 30 days. Commercial Paper must come from at least three different issuers and represent no more than 20% of the collateral posted.

(P) *Other.* Other items of Credit Support (i) approved by each applicable rating agency and (ii) approved by MBIA so long as the Swap Policy is in effect, with such valuation percentages as determined by (i) each applicable rating agency and (ii) MBIA so long the Swap Policy is in effect.

|  |  |
|---|---|
| % to be determined | % to be determined |

\* The Valuation Percentage shall equal the percentage specified under such Rating Agency's name above. If any Notes are rated by more than one Rating Agency specified above, the Valuation Percentage shall equal the lowest of the applicable percentages specified above.

(iii) *Other Eligible Support.* Not applicable.

(iv) *Thresholds.*

(A) *"Independent Amount"* means for Pledgor: zero.

*"Independent Amount"* means for Secured Party: zero

(B) *"Threshold"* means for Pledgor: zero.

(C) *"Minimum Transfer Amount"* is $25,000 for any Delivery Amount of Pledgor, and zero for any Return Amount of Secured Party.

(D) *Rounding:* The Delivery Amount will be rounded up and the Return Amount will be rounded down to the nearest integral multiple of $10,000.

(c) *Valuation and Timing.*

(i) *"Valuation Agent"* means Party A. The Value of Posted Credit Support other than Cash or of any Transfer of Eligible Credit Support or Posted Credit Support (other than Cash) as the case may be, will be calculated by the Valuation Agent in accordance with standard market practice using third party sources (such as, by way of example only, Bloomberg or Reuters).

(ii) *"Valuation Date"* means, for any Collateral Event, the second New York Business Day prior to the Credit Support Commencement Date and thereafter while the Collateral Event is continuing there shall be one Valuation Date per week on a date selected by the Valuation Agent, which shall be the same calendar day each week to the extent practicable, on a reasonably consistent basis. If the Delivery Amount for the Valuation Date associated with the Credit Support

Commencement Date or a weekly Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the demand by the Secured Party referred to in Paragraph 3(a) of this Annex shall be deemed to have been given (A) with respect to a Credit Support Commencement Date, on the first New York Business Day preceding the Credit Support Commencement Date, prior to the Notification Time, and (B) with respect to a weekly Valuation Date, on such weekly Valuation Date, prior to the Notification Time, and, subject to the terms and conditions of this Annex, the Pledgor will Transfer to the Secured Party the amount of Eligible Collateral it is required to Transfer with respect to that Valuation Date in accordance with Paragraph 3(a) of this Annex.

(iii) *"Valuation Time"* means the close of business in New York City on the Local Business Day before the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) *"Notification Time"* means 11:00 a.m., New York time, on a Local Business Day.

(d) ***Conditions Precedent and Secured Party's Rights and Remedies.*** No Specified Conditions apply.

(e) ***Substitution.***

(i) *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

(ii) ***Consent.*** The Pledgor is not required to obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f) ***Dispute Resolution.***

(i) *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii) ***Value.*** For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated based upon the mid-point between the bid and offered purchase rates or prices for that Posted Credit Support as reported on the Bloomberg electronic service as of the Resolution Time, or if unavailable, as quoted to the Valuation Agent as of the Resolution Time by a dealer in that Posted Credit Support of recognized standing selected in good faith by the Valuation Agent, which calculation shall include any unpaid interest on that Posted Credit Support.

(iii) ***Alternative.*** The provisions of Paragraph 5 will apply.

(g) **Holding and Using Posted Collateral.**

(i) *Eligibility to Hold Posted Collateral; Custodians.* Secured Party will not be entitled to hold Posted Collateral itself, and instead the Secured Party will be entitled to hold Posted Collateral through a Custodian pursuant to Paragraph 6(b), *provided* that (1) Posted Collateral may be held only in New York or an alternative jurisdiction within the United States acceptable to Party A, (2) the Custodian shall at all times be a bank or trust company with total assets in excess of \$10 billion and having a rating assigned to its unsecured and unsubordinated long-term debt or deposit obligations of at least "BBB+" from S&P and "Baa1" from Moody's, and (3) Posted Collateral may be held by the Indenture Trustee. Initially the Custodian will be Wells Fargo, National Association. Any successor custodian shall be acceptable to MBIA.

(ii) *Use of Posted Collateral.* The provisions of Paragraph 6(c) will not apply to Secured Party and without prejudice to Secured Party's rights under Paragraph 8 of the Credit Support Annex, Secured Party will not take any action specified in such Section 6(c).

(h) **Interest Amount.**

(i) *Interest Rate.* The *"Interest Rate"* will be the rate actually earned by the Custodian on the Posted Collateral as from time to time in effect and the Custodian shall invest Posted Collateral in the form of cash in such Eligible Investments as selected and directed by the Pledgor. Custodian will provide details concerning such earnings upon Pledgor's request.

(ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply.

(i) *Additional Representation(s).* Not applicable.

(j) *Other Eligible Support and Other Posted Support.* Not applicable.

(k) *Demands and Notices.* All demands, specifications and notices under this Annex will be made to a party as follows unless otherwise specified from time to time by that party for purposes of this Annex in a written notice given to the other party:

**To Pledgor:**

Lehman Brothers Special Financing Inc.
  c/o Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019
Attention: Documentation Manager
Telephone No.:   (212) 526-7187
Facsimile No.:    (212) 526-7672

**To Secured Party:**

AmeriCredit Automobile Receivables Trust 2005-B-M
  c/o AmeriCredit Financial Services, Inc.
801 Cherry Street
Fort Worth, Texas 76102
Attention:  Derivatives Operations
Telephone No.:   (817) 302-7210
Facsimile No.:    (817) 302-7951

(l)   *Addresses for Transfers.*

(i)   For each Transfer hereunder to Pledgor, instructions will be provided by Pledgor for that specific Transfer.

(ii)   For each Transfer hereunder to Secured Party, instructions will be provided by Secured Party for that specific Transfer.

**IN WITNESS WHEREOF** the parties have executed this Credit Support Annex as of the date hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____

Name:

Title:

Allyson M. Carino
Authorized Signatory

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2005-B-M**

By: _____

Name:

Title:

NY1 935959v4

IN WITNESS WHEREOF the parties have executed this Credit Support Annex as of the date hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____
Name:
Title:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2005-B-M**
**BY:    AMERICREDIT FINANCIAL SERVICES, INC.,**
**        AS ATTORNEY-IN-FACT**

By: _____
Name:  Susan B. Sheffield
Title:  Senior Vice President, Structured Finance

**Paragraph 3. Credit Support Obligations**

(a)     *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)     *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)     *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)     *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)     *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA®1994

**(d)**   *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

3                                                             **ISDA®1994**

**Paragraph 6. Holding and Using Posted Collateral**

(a)   *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)   *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)   *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)   *Distributions and Interest Amount.*

(i) *Distributions.*  Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

4

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a) *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies.

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)   *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement)·

    (i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party,

    (ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

    (iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

    (iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

        (A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

        (B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)   *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)   *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

    (i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

    (ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

    (iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

    (iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

**Paragraph 10. Expenses**

(a)     *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)     *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)     *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties

**Paragraph 11. Miscellaneous**

(a)     *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)     *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)     *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)     *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)     *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)     *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

  (x) the amount of that Cash on that day; multiplied by

  (y) the Interest Rate in effect for that day; divided by

  (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5, *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b)

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA©1994

*"Valuation Agent"* has the meaning specified in Paragraph 13

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

## EXHIBIT A to Schedule
### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2005-B-M ("Party B") have entered into a Master Agreement dated as of June 2, 2005, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)     Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(h)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

**Representations of Guarantor.** Guarantor makes the following representations except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Guarantor represents to the other party that:—

(a)    *Basic Representations.*

    (i)    *Status.* It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

    (ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

    (iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events.* No Event of Default (as defined in the Master Agreement, and the Schedule thereto dated June 2, 2005 between Lehman Brothers Special Financing Inc. and AmeriCredit Automobile Receivables Trust 2005-B-M collectively (the "Master Agreement")) or Potential Event of Default (as defined in the Master Agreement) or, to its knowledge, Termination Event (as defined in the Master Agreement) with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates (as defined in the Master Agreement) any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of Part 2(a) of the Master Agreement is accurate and true.

**Governing Law and Jurisdiction.** Guarantor agrees to the following except that references to a "party" will be deemed to be references to "the Guarantor" and references to "the Agreement" below will be deemed to be references to "the Guarantee."

17

(a)   *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)   *Jurisdiction*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)   submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City; and

    (ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

(c)   *Service of Process.*  The parties irrevocably consent to service of process given in the manner provided for notices in Section 12 of the Master Agreement. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)   *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, 399 Park Avenue, 11th Floor, New York, NY 10022 USA (Facsimile No. (212) 526-0339) with a copy to: Lehman Brothers Special Financing Inc., Attention: Transaction Management, 745 Seventh Avenue, 28th Floor, New York, NY 10019 USA.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: James J. Killerlane III
       Vice President

Title:

Date: June 6, 2005

18

09/27/2007   10:44   LEHMAN → 916468859551                                    NO.356   P01
11·00·2003·prop–D0·d0.-1 FiEde·ti1075114311 Enfenede·ti075113·12014·635429 Main·Docume·Pg
P@09of 03402

25/09/2007   18:16   LEHMAN → 916468859551                                    NO.004   P01

# LEHMAN BROTHERS

### -Revised- Transaction

| | |
|---|---|
| **Date:** | May 09, 2007 |
| **To:** | AmeriCredit Automobile Receivables Trust 2005-B-M |
| **Attention:** | Swap Administration |
| **Facsimile:** | (817) 302-7951 |
| **Our Reference:** | Effort ID: N1310864 / Global ID: 2162536 |
| **Re:** | **TRUST SWAP TRANSACTION** |

This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

1.  The Confirmation incorporates the definitions and provisions contained in (i) the 2000 ISDA Definitions and the Annex to the 2000 ISDA Definitions (each, as published by the International Swaps and Derivatives Association, Inc., referred to herein as the "ISDA Definitions") and (ii) the definitions contained in the Sale and Servicing Agreement dated as of May 25, 2005 among AmeriCredit Automobile Receivables Trust 2005-B-M (the "Trust"), AFS SenSub Corp., AmeriCredit Financial Services, Inc., and Wells Fargo Bank, National Association, in its capacities as Trust Collateral Agent and Backup Servicer (the "SSA"), relating to the issuance by the Trust of certain debt obligations (the "Notes"). In the event of any inconsistency between the definitions in the SSA, the Definitions, and this Confirmation, the definitions in the SSA govern; in the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the ISDA Definitions.

    This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement dated as of June 2, 2005, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

    **In this Confirmation "Party A" means Lehman Brothers Special Financing Inc. and "Party B" means the Trust.**

2.  The terms of the particular Transaction to which this Confirmation relates are as follows:

    | | |
    |---|---|
    | Trade Date: | May 17, 2005 |
    | Effective Date: | June 2, 2005 |
    | Termination Date: | The earlier of (i) May 7, 2012 (the Legal Final Distribution Date on the Class A-4 Notes) and (ii) the |

date on which the outstanding principal balance of the Class A-4 Notes is reduced to zero, subject to adjustment in accordance with the Following Business Day Convention (unless such outstanding principal balance is reduced to zero due to the occurrence of an Insurer Acceleration Event).

Notional Amount    For the purpose of the Initial Calculation Period, the Notional Amount will be equal to the outstanding principal balance of the Class A-4 Notes of the Trust as of the Closing Date. The Notional Amount shall reset on each Distribution Date and will at all times be equal to the outstanding principal balance of the Class A-4 Notes of the Trust; provided, however, that if (a) an Event of Default occurs under Section 5.1 of the Indenture, (b) the Insurer exercises it rights to declare that the Notes shall become immediately due and payable pursuant to Section 5.2 of the Indenture and (c) as a result the principal balance of the Class A-4 Notes is reduced to zero, (collectively, an "Insurer Acceleration Event"), then notwithstanding the foregoing, the Notional Amount for such Distribution Date and for each Distribution Date thereafter, through and including the Distribution Date occurring on May 7, 2012, shall mean the Notional Amount set forth on the attached Schedule A (the "Scheduled Notional Amount") for such Distribution Date, assuming that Schedule A has been adjusted in accordance with the next two sentences.

On the Distribution Date immediately following an Insurer Acceleration Event, if the Notional Amount (calculated as equal to the outstanding principal balance of the Class A-4 Notes without giving effect to any principal reduction as stated in (a), (b) or (c) above (the "Note Balance Notional Amount")) is smaller than the Scheduled Notional Amount for such Distribution Date, then (1) the Scheduled Notional Amount for such Distribution Date shall be reduced to equal the Note Balance Notional Amount calculated above, and (2) the Scheduled Notional Amount for each subsequent Distribution Date shall be multiplied by a percentage equivalent of a fraction equal to: (a) the Note Balance Notional Amount immediately following an Insurer Acceleration Event, over (b) the Scheduled Notional Amount immediately following an Insurer Acceleration Event.

On the Distribution Date following an Insurer Acceleration Event, if the Note Balance Notional Amount is greater than or equal to the Scheduled Notional Amount no adjustment shall be made.

With respect to any Distribution Date, the outstanding balance of the Notes will be determined using the Servicer's Certificate, (as defined in the SSA), which shall be delivered to Party A two Business Days preceding each Fixed Rate Payer Payment Date, issued with respect to such Distribution Date (before giving effect to all distributions to be made on such Distribution Date).

Distribution Date:     Each Fixed Rate Payer Payment Date, subject to Adjustment in accordance with the Following Business Day Convention.

Indenture:     Dated as of May 25, 2005 between Party B and Wells Fargo Bank, National Association.

Class A-4 Notes:     Means as defined in the Indenture with the CUSIP # 03061NJJ9.

Fixed Amounts:

Fixed Rate Payer:     Party B

Fixed Rate Payer
Payment Dates:     The sixth calendar day of each month, commencing on July 6, 2005 and ending on the Termination Date, subject to the Following Business Day Convention.

Fixed Rate:     4.21% per annum

Fixed Rate
Day Count Fraction:     Actual/360

Floating Amounts:

Floating Rate Payer:     Party A

Floating Rate Payer
Payment Dates:     The sixth calendar day of each month, commencing on July 6, 2005 and ending on the Termination Date, subject to the Following Business Day Convention.

Floating Rate for Initial
Calculation Period:     To be determined.  For the avoidance of doubt, the Floating Rate for the Initial Calculation Period will be an interpolated rate between One Month USD-LIBOR-BBA and Two Month USD-LIBOR-BBA.

Floating Rate Option:     USD-LIBOR-BBA

Risk ID: 945909L / Effort ID: 1310864 / Global Deal ID: 2162536

09/27/2007    10:44    LEHMAN → 916468859551                                      NO.356    P04

11:00:2003 prop  DDoc 10-1 File dek 10751311 1 Entered:10751311312014635429 Main Doc Amerg
05/09/2007    18:16    LEHMAN → 916468859559300 28 802                             NO.004    P04

|  | Designated Maturity: | One Month |
|--|--|--|
|  | Spread: | Plus 0.08% |
|  | Floating Rate Day Calculation Fraction: | Actual/360 |
|  | Reset Dates: | The first day of each Calculation Period |
|  | Compounding: | Inapplicable |
|  | Period End Dates: | In regard to the Floating Amounts and the Fixed Amounts, the sixth calendar day of each month from and including July 06, 2005 up to but excluding the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
|  | Calculation Period: | In respect of this Transaction and each party, each period from, and including, one Period End Date of that party to, but excluding, the next following applicable Period End Date during the Term of the Transaction, except that (a) the initial Calculation Period for each party will commence on, and include, the Effective Date and (b) the final Calculation Period for each party will end on, but exclude, the Termination Date. |
|  | Initial Calculation Period: | From and including June 2, 2005 to but excluding July 6, 2005. |
|  | Business Days: | New York |
|  | Calculation Agent: | Party A. However, if Party A is the Defaulting Party, the Calculation Agent shall be any designated third party Reference Market Maker mutually agreed to by both Parties and the Insurer, until such time as Party A is no longer a Defaulting Party. |

3.    Account Details:

|  | Payments to Party A: | JP MORGAN CHASE BANK NEW YORK (CHASUS33) A/C LEHMAN BROTHERS SPECIAL FINANCING. A/C# 066-143-543 |
|--|--|--|
|  | Payments to Party B: | To be advised under separate cover or telephone confirmed prior to each Payment Date. |

4.    Representations:

Party A, if it is a nonresident alien individual, foreign corporation, foreign partnership, foreign trust, or foreign state, represents that is a foreign person for purposes of US Treasury regulations relating to information reporting and backup withholding.

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

    (i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether this Transaction is appropriate or proper for it based upon its own judgment and upon advise from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

    (ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advise), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

    (iii) **Status of Parties.** The other party is not acting as a fiduciary for, or an adviser to it in respect of this Transaction.

Please confirm that the foregoing correctly sets forth the terms of our agreement by signing and returning this Confirmation. This message will be the only form of Confirmation dispatched by us. If you wish to exchange hard copy forms of this Confirmation, please contact us.

Yours sincerely,

Lehman Brothers Special Financing Inc.

By:

Name:
Authorized Signatory

Confirmed as of the date first written above:

AmeriCredit Automobile Receivables Trust 2005-B-M

By:

Name:

Title:

## SCHEDULE A
### Schedule Notional Amount

| From and Including | To but Excluding | Notional Balance |
|---|---|---|
| June 2, 2005 | July 6, 2005 | 306,000,000 |
| July 6, 2005 | August 6, 2005 | 306,000,000 |
| August 6, 2005 | September 6, 2005 | 306,000,000 |
| September 6, 2005 | October 6, 2005 | 306,000,000 |
| October 6, 2005 | November 6, 2005 | 306,000,000 |
| November 6, 2005 | December 6, 2005 | 306,000,000 |
| December 6, 2005 | January 6, 2006 | 306,000,000 |
| January 6, 2006 | February 6, 2006 | 306,000,000 |
| February 6, 2006 | March 6, 2006 | 306,000,000 |
| March 6, 2006 | April 6, 2006 | 306,000,000 |
| April 6, 2006 | May 6, 2006 | 306,000,000 |
| May 6, 2006 | June 6, 2006 | 306,000,000 |
| June 6, 2006 | July 6, 2006 | 306,000,000 |
| July 6, 2006 | August 6, 2006 | 306,000,000 |
| August 6, 2006 | September 6, 2006 | 306,000,000 |
| September 6, 2006 | October 6, 2006 | 306,000,000 |
| October 6, 2006 | November 6, 2006 | 306,000,000 |
| November 6, 2006 | December 6, 2006 | 306,000,000 |
| December 6, 2006 | January 6, 2007 | 306,000,000 |
| January 6, 2007 | February 6, 2007 | 306,000,000 |
| February 6, 2007 | March 6, 2007 | 306,000,000 |
| March 6, 2007 | April 6, 2007 | 306,000,000 |
| April 6, 2007 | May 6, 2007 | 306,000,000 |
| May 6, 2007 | June 6, 2007 | 306,000,000 |
| June 6, 2007 | July 6, 2007 | 306,000,000 |
| July 6, 2007 | August 6, 2007 | 306,000,000 |
| August 6, 2007 | September 6, 2007 | 306,000,000 |
| September 6, 2007 | October 6, 2007 | 306,000,000 |
| October 6, 2007 | November 6, 2007 | 306,000,000 |
| November 6, 2007 | December 6, 2007 | 306,000,000 |
| December 6, 2007 | January 6, 2008 | 306,000,000 |
| January 6, 2008 | February 6, 2008 | 306,000,000 |
| February 6, 2008 | March 6, 2008 | 288,856,047 |
| March 6, 2008 | April 6, 2008 | 271,559,997 |
| April 6, 2008 | May 6, 2008 | 255,320,640 |
| May 6, 2008 | June 6, 2008 | 239,458,787 |
| June 6, 2008 | July 6, 2008 | 224,474,397 |
| July 6, 2008 | August 6, 2008 | 209,583,934 |
| August 6, 2008 | September 6, 2008 | 195,240,813 |
| September 6, 2008 | October 6, 2008 | 181,401,343 |
| October 6, 2008 | November 6, 2008 | 167,812,259 |
| November 6, 2008 | December 6, 2008 | 154,857,613 |
| December 6, 2008 | January 6, 2009 | 142,380,523 |
| January 6, 2009 | February 6, 2009 | 130,261,640 |

* All dates listed above (with the exception of June 2, 2005) are subject to adjustment in accordance with the Following Business Day Convention.

Risk ID: 945909L / Effort ID: 1310864 / Global Deal ID: 2162536

(Multicurrency – Cross Border)



**International Swap Dealers Association, Inc.**

# MASTER AGREEMENT

dated as of April 19, 2007

LEHMAN BROTHERS SPECIAL FINANCING INC.  and  AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

## 1. Interpretation

(a)     *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2. Obligations

(a)     *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)     **Change of Account.**  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.*  If on any date amounts would otherwise be payable: —

    (i)     in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     **Deduction or Withholding for Tax.**

    (i)     *Gross-Up.*  All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will: —

        (1)     promptly notify the other party ("Y") of such requirement;

        (2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for: —

            (A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii) *Liability.* If: —

    (1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2) X does not so deduct or withhold; and

    (3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e) ***Default Interest; Other Amounts.*** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3. Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that: —

(a) ***Basic Representations.***

    (i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)    *Absence of Certain Events.*  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.*  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.*  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.*  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.*  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party: —

(a)    *Furnish Specified Information.*  It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs: —

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.*  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.*  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.*  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.*  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                                                                    **ISDA® 1992**

organised, managed and controlled. or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5. Events of Default and Termination Events

(a) **Events of Default.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: —

(i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5                                                                                      **ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)     *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:–

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof, (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)     *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: –

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)     the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

**ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date. it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); of

    (v)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    **Event of Default and Illegality.** If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

                          **ISDA® 1992**

## 6. Early Termination

(a) **Right to Terminate Following Event of Default.** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b) **Right to Terminate Following Termination Event.**

(i) *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate.* If:--

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                                 **ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  **Effect of Designation.**

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  **Calculations.**

(i)  *Statement.*  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.*  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  **Payments on Early Termination.**  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.*  If the Early Termination Date results from an Event of Default:—

(1)  *First Method and Market Quotation.*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.*  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.*  If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

9                                                                                                    **ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)	*Termination Events.* If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:—

(A)	if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)	if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)	*Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)	*Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.*  Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.*  To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.*  To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.*  For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

## 9.    Miscellaneous

(a)    ***Entire Agreement.*** This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    ***Amendments.*** No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    ***Survival of Obligations.*** Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    ***Remedies Cumulative.*** Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    ***Counterparts and Confirmations.***

   (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

   (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    ***No Waiver of Rights.*** A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    ***Headings.*** The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12. Notices**

(a) **Effectiveness.** Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i) if in writing and delivered in person or by courier, on the date it is delivered;

(ii) if sent by telex, on the date the recipient's answerback is received;

(iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v) if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) **Change of Addresses.** Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to all

**13. Governing Law and Jurisdiction**

(a) **Governing Law.** This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) **Jurisdiction.** With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) **Service of Process.** Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

13                                                                 **ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     ***Waiver of Immunities.*** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.     Definitions

As used in this Agreement: —

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means: —

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different. in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(c)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values, If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:-

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

**ISDA® 1992**

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction. for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL FINANCING INC.

(Name of Party)

By:
Name:
Title:
Date:        Allyson M. Carine
             Authorized Signatory

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F**

(Name of Party)
**By: AMERICREDIT FINANCIAL SERVICES, INC., as Attorney-In-Fact**

By
Name:
Title:
Date:

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(c) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

(Name of Party)

By: _____  _____

    Name:

    Title:

    Date:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F**

(Name of Party)
**By: AMERICREDIT FINANCIAL SERVICES, INC., as Attorney-In-Fact**

By _____

Name:  Susan B. Sheffield

Title: Senior Vice President, Structured Finance

Date: April 19, 2007

**SCHEDULE**
to the
**MASTER AGREEMENT**
dated as of April 19, 2007 between

**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("<u>Party A</u>")

and

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F** ("<u>Party B</u>")

**Part 1.**   *Termination Provisions*

(a)   "<u>Specified Entity</u>" means, with respect to Party A for all purposes of this Agreement, none, and with respect to Party B for all purposes of this Agreement, none.

(b)   "<u>Specified Transaction</u>" has its meaning as defined in Section 14 of this Agreement.

(c)   The "**Automatic Early Termination**" provision of Section 6(a) of this Agreement does not apply to Party A or Party B.

(d)   [Reserved]

(e)   **Payments on Early Termination**.  Except as otherwise provided in this Schedule, "Market Quotation" and the "Second Method" apply.

(f)   "<u>Termination Currency</u>" means United States Dollars.

(g)   **Timing of Party B Termination Payment**.  If an amount calculated as being due in respect of an Early Termination Date under Section 6(e) of this Agreement is an amount to be paid by Party B to Party A then, notwithstanding the provisions of Section 6(d)(ii) of this Agreement, such amount will be payable on the first Distribution Date following the date on which the payment would have been payable as determined in accordance with Section 6(d)(ii); *provided* that if the date on which the payment would have been payable as determined in accordance with Section 6(d)(ii) is a Distribution Date, then the payment will be payable on the date determined in accordance with Section 6(d)(ii).

(h)   **Limitation on Defaults by Party A and Party B**.  The Events of Default specified in Section 5 of this Agreement shall not apply to Party A or Party B except for the following:

   (i)   With respect to both Party A and Party B, Section 5(a)(i) of this Agreement (Failure to Pay or Deliver) subject to the provisions of the last paragraph hereof;

   (ii)   With respect to Party A only, Section 5(a)(ii) of this Agreement (Breach of Agreement); *provided* that Section 5(a)(ii) will not apply to Party A with respect to Party A's failure to comply with its obligations under Part 5(b)(ii) or 5(b)(iii) herein or under the Credit Support Annex;

   (iii)   With respect to Party A only, Section 5(a)(iii) of this Agreement (Credit Support Default) subject to the provisions of the last paragraph hereof; *provided* that Section 5(a)(iii)(1) shall apply to Party B with respect to Party B's obligations under Paragraph 3(b) of any Credit Support Annex;

   (iv)   With respect to Party A only, Section 5(a)(iv) of this Agreement (Misrepresentation);

   (v)   With respect to Party A only, Section 5(a)(vi) of this Agreement (Cross Default).  For the purposes of this Part 1 h(v), "<u>Threshold Amount</u>" shall mean, with respect to Party A, the lesser of (i) USD 100 million and (ii) three percent (3%) of the Stockholders' Equity (excluding deposits) of Lehman Brothers Holdings Inc. ("<u>Lehman Brothers Holdings Inc.</u>" or "<u>Holdings</u>"), in the case of

NYI 1088067v8

Party A and Holdings (or its equivalent in any other currency). "<u>Stockholders' Equity</u>" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"<u>Specified Indebtedness</u>," with respect to Party A, shall have the meaning specified in Section 14,

(vi)     With respect to both Party A and Party B, Section 5(a)(vii) of this Agreement (Bankruptcy); *provided* that clauses (2), (7) and (9) thereof shall not apply with respect to Party B, *provided* further that clause (4) shall not apply to Party B to the extent that it refers to proceedings or petitions instituted or presented by Party A or any of its Affiliates, *provided* further that clause (6) shall not apply to Party B to the extent that it refers to (i) any appointment that is effected by or pursuant to the Basic Documents or (ii) any appointment to which Party B has not become subject, and *provided* further that clause (8) shall not apply to Party B to the extent that clause (8) relates to clauses (2), (4), (6) and (7) (except to the extent that such provisions are not disapplied to Party B); and

(vii)     With respect to both Party A and Party B, Section 5(a)(viii) of this Agreement (Merger Without Assumption).

Notwithstanding Sections 5(a)(i) and 5(a)(iii) of this Agreement, any failure by Party A to comply with or perform any obligation to be complied with or performed by Party A under the Credit Support Annex shall not be an Event of Default unless (A) (i) the Second Rating Trigger Requirements apply and at least 30 Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply and (ii) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A, or (B) (i) a Ratings Event has occurred and is continuing and at least 10 Local Business Days (or 30 calendar days, in the case of Fitch) have elapsed since the date on which a Ratings Event occurred and (ii) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A.

(i)     **Limitation on Termination Events by Party A and Party B**.  The Termination Events specified in Section 5 of this Agreement shall not apply to Party A or Party B except for the following:

(i)     With respect to both Party A and Party B, Section 5(b)(i) of this Agreement (Illegality);

(ii)     With respect to both Party A and Party B, Section 5(b)(ii) of this Agreement (Tax Event); and

(iii)     With respect to both Party A and Party B, Section 5(b)(iii) of this Agreement (Tax Event Upon Merger); *provided* that Party A shall not be entitled to designate an Early Termination Date by reason of a Tax Event upon Merger in respect of which it is the Affected Party.

(j)     **Additional Termination Events**.  The occurrence of any of the following events shall be an Additional Termination Event.

(i)     **First Rating Trigger Collateral.**  Party A has failed to comply with or perform any obligation to be complied with or performed by Party A in accordance with the Credit Support Annex or Part 5(b) hereof (after giving effect to the relevant time frame specified in Part 5(b) hereof) and either (1) the Second Rating Trigger Requirements do not apply or (2) less than 30 Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply.  With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(ii)     **Second Rating Trigger Replacement**.  (1) The Second Rating Trigger Requirements apply and 30 or more Local Business Days have elapsed since the last time the Second Rating Trigger

Requirements did not apply and (2) (x) at least one Eligible Replacement has made a Firm Offer (which remains capable of becoming legally binding upon acceptance) to be the transferee of a transfer to be made in accordance with Part 6(a) below and/or (y) at least one entity with the First Trigger Required Ratings and/or the Second Trigger Required Ratings has made a Firm Offer (which remains capable of becoming legally binding upon acceptance by the offeree) to provide an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement. With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(iii) **Ratings Event**. Party A fails to comply with any downgrade provisions as set forth in Part 5(b), after giving effect to the relevant time frame specified therein, and (i) at least one Eligible Replacement has made a Firm Offer (which remains capable of becoming legally binding upon acceptance) to be the transferee of a transfer to be made in accordance with Part 6(a) below and/or (ii) at least one entity with the Hedge Counterparty Ratings Requirement has made a Firm Offer (which remains capable of becoming legally binding upon acceptance by the offeree) to provide an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement. With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(iv) **Regulation AB Matters**. Party A fails to comply with Part 6(n)(ii) of this Agreement. With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(v) **Termination**. Party B is dissolved. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(vi) **Acceleration**. The Trustee declares the Notes due and payable for any reason and such declaration is (or becomes) unrescindable or irrevocable. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(vii) **Redemption**. Any mandatory redemption, auction call redemption, optional redemption, tax redemption, clean-up call or other prepayment in full or repayment in full of all Notes outstanding occurs under the Indenture (or any notice is given to that effect and such mandatory redemption, auction call redemption, optional redemption, tax redemption, clean-up call or other prepayment or repayment is not capable of being rescinded). With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(viii) **Default**. Any Event of Default (as defined in the Indenture) occurs under the Indenture (or any notice is given by the Trustee or any other authorized party to that effect), the Notes have been declared due and payable under the Indenture (and such declaration has not been rescinded and annulled in accordance with the Indenture), and the Trustee, the Noteholders or any other party authorized under the terms of the Basic Documents or by law: (1) initiates procedures to sell, liquidate or dispose of any of the Collateral under the Indenture; (2) institutes Proceedings for the collection of all amounts payable under the Indenture; (3) institutes Proceedings for the complete or partial foreclosure of the Indenture with respect to the Collateral; or (4) exercises any remedies of a secured party under the UCC with respect to the Collateral, and any such action is not to judgment or final decree. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions; *provided, however*, in connection with the foregoing Additional Termination Event, for purposes of designating any Early Termination Date, notwithstanding anything contained in Section 6(a) of the Agreement to the contrary, either Party A or Party B shall be permitted to designate an Early Termination Date.

3                                                                                            NY1 1088067v8

(ix)    **Amendment**.  Any Basic Document is amended or modified without the prior written consent of Party A if the consent of Party A is required pursuant to the terms of the related Basic Document; *provided, however*, that it shall not be an Additional Termination Event where such amendment or modification involves the appointment of any successor trustee, securities administrator, master servicer or servicer pursuant to the terms of the Indenture.  With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(x)    FSA fails, at any time during the term of this Agreement, to have (a) a claims paying ability rating of "A-" or above from S&P, (b) a financial strength rating of "A3" or above from Moody's or (c) a financial strength rating of "A-" or above from Fitch and either (x) an Event of Default under this Agreement has occurred and is continuing with respect to which Party B is the Defaulting Party or (y) a Termination Event has occurred and is continuing with respect to which Party B is the Affected Party.  With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(xi)    FSA fails to meet its payment obligations under the Swap Policy with respect to Fixed Amounts (as defined in the related Confirmation) (other than Termination Payments) due from Party B and such failure is continuing under the Swap Policy.  With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(A)    Notwithstanding anything to the contrary in Section 6 of this Agreement, if either an Event of Default or Termination Event has occurred and is continuing, (other than with respect to Section 5(b)(i) or an Additional Termination Event described in Part 1(j)(iv), (x) or (xi)), neither Party A nor Party B shall have the right to designate an Early Termination Date unless either (a) FSA has failed to pay any payment due to Party A under the terms and conditions of the Swap Policy with respect to Fixed Amounts (other than Termination Payments), which failure is continuing, or (b) FSA has directed such designation in writing and any purported designation in violation of this provision will, at the election of FSA, be void and of no effect.

(B)    Notwithstanding any other provision of this Agreement, at any time after the occurrence of an Event of Default for which Party B is the Defaulting Party, FSA (so long as it has not failed to pay any payment due to Party A under the terms and conditions of the Swap Policy with respect to Fixed Amounts (other than Termination Payments), which failure is continuing,) shall have the right (but not the obligation) to direct Party A to designate an Early Termination Date.  For purposes of the foregoing sentence, an Event of Default for which Party B is the Defaulting Party shall be considered to be continuing notwithstanding any payments made by FSA pursuant to the Swap Policy.  Each of Party A and Party B acknowledges that, except as the Swap Policy may be otherwise endorsed, unless FSA so directs Party A to designate an Early Termination Date or consents to such designation by one of the parties, payments due from Party B because an Early Termination Date has been designated will not be insured.

(k)    **Calculations.**  Notwithstanding Section 6 of this Agreement, for so long as Party A is (A) the sole Affected Party in respect of an Additional Termination Event or a Tax Event Upon Merger or (B) the Defaulting Party in respect of any Event of Default, the following shall apply:

(i)    The definition of "Market Quotation" shall be deleted in its entirety and replaced with the following:

"Market Quotation" means, with respect to one or more Terminated Transactions, a Firm Offer which is (1) made by a Reference Market-maker that is an Eligible Replacement, (2) for an amount that would be paid to Party B (expressed as a negative number) or by Party B (expressed as a positive number) in consideration of an agreement between Party B and such Reference

Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transactions or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date, (3) made on the basis that Unpaid Amounts in respect of the Terminated Transaction or group of Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included and (4) made in respect of a Replacement Transaction with terms substantially the same as those of this Agreement (save for the exclusion of provisions relating to Transactions that are not intended to be replacements for Terminated Transactions).

(ii)     The definition of "Settlement Amount" shall be deleted in its entirety and replaced with the following:

"Settlement Amount" means, with respect to any Early Termination Date, an amount (as determined by Party B) equal to the Termination Currency Equivalent of the amount (whether positive or negative) of any Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions that is accepted by Party B so as to become legally binding; *provided* that:

(A)     If, on the day falling ten Local Business Days after the day on which the Early Termination Date is designated or such later day as Party B may specify in writing to Party A (but in either case no later than the Early Termination Date) (such day the "Latest Settlement Amount Determination Day"), no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions has been accepted by Party B so as to become legally binding and one or more Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal the Termination Currency Equivalent of the amount (whether positive or negative) of the lowest of such Market Quotations (for the avoidance of doubt, the lowest negative number shall equal the largest absolute value such that, for example, negative 3 shall be lower than negative 2); or

(B)     If, on the Latest Settlement Amount Determination Day, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by Party B so as to become legally binding and no Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal Party B's Loss (whether positive or negative and without reference to any Unpaid amounts) for the relevant Terminated Transaction or group of Terminated Transactions.

(iii)    For the purpose of clause (4) of the definition of Market Quotation, Party B shall determine in its sole discretion, acting in a commercially reasonable manner, whether a Firm Offer is made in respect of a Replacement Transaction with commercial terms substantially the same as those of this Agreement (save for the exclusion of provisions relating to Transactions that are not Terminated Transactions); *provided, however*, that notwithstanding the provisions of this Part 1(k), nothing in this Agreement shall preclude Party A from obtaining Market Quotations.

(iv)     At any time on or before the Latest Settlement Amount Determination Day at which two or more Market Quotations remain capable of becoming legally binding upon acceptance, Party B shall be entitled to accept only the lowest of such Market Quotations.

(v)      If Party B requests Party A in writing to obtain Market Quotations, Party A shall use its reasonable efforts to do so before the Latest Settlement Amount Determination Day.

5                                                          NY1 1088067v8

(vi) If the Settlement Amount is a negative number, Section 6(e)(i)(3) of this Agreement shall be deleted in its entirety and replaced with the following:

*Second Method and Market Quotation.* If Second Method and Market Quotation apply, (1) Party B shall pay to Party A an amount equal to the absolute value of the Settlement Amount in respect of the Terminated Transactions, (2) Party B shall pay to Party A the Termination Currency Equivalent of the Unpaid Amounts owing to Party A and (3) Party A shall pay to Party B the Termination Currency Equivalent of the Unpaid Amounts owing to Party B; *provided* that, (i) the amounts payable under (2) and (3) shall be subject to netting in accordance with Section 2(c) of this Agreement and (ii) notwithstanding any other provision of this Agreement, any amount payable by Party A under (3) shall not be netted-off against any amount payable by Party B under (1).

(l) **Designation of Early Termination Date; Amendments**. Notwithstanding any other provision of this Agreement, Party B shall not designate an Early Termination Date, and no transfer of any rights or obligations under this Agreement shall be made, unless each Rating Agency has been given prior written notice of such amendment, designation or transfer. Furthermore, this Agreement will not be amended unless the Rating Agency Condition is satisfied.

**Part 2.** *Tax Provisions*

(a) **Payer Tax Representations**. For the purpose of Section 3(e) of this Agreement, each party makes the following representation: None.

(b) **Gross Up**. Section 2(d)(i)(4) shall not apply to Party B as X, and Section 2(d)(ii) shall not apply to Party B as Y, in each case such that Party B shall not be required to pay any additional amounts referred to therein.

(c) **Indemnifiable Tax**. The definition of "Indemnifiable Tax" in Section 14 is deleted in its entirety and replaced with the following:

"Indemnifiable Tax" means, in relation to payments by Party A, any Tax and, in relation to payments by Party B, no Tax.

(d) **Payee Tax Representations**. For the purpose of Section 3(f) of this Agreement:

(i) Party A makes the following representation(s): None

(ii) Party B makes the following representation(s): None.

(e) **Tax Forms**.

(i) **Delivery of Tax Forms**. For the purpose of Section 4(a)(i), and without limiting Section 4(a)(iii), each party agrees to duly complete, execute and deliver to the other party the tax forms specified below with respect to it (A) before the first Payment Date under this Agreement and (B) promptly upon reasonable demand by the other party.

In addition, in the case of any tax form that is a Periodic Tax Form required to be delivered by Party B under this Agreement, Party B agrees to renew such tax form prior to its expiration by completing, executing and delivering to Party A that tax form ("Renewal Tax Form") in each succeeding third year following the year of execution of any such tax form or Renewal Tax Form delivered by Party B to Party A under this Agreement so that Party A receives each Renewal Tax Form not later than December 31 of the relevant year. "Periodic Tax Form" means any IRS Form W-8BEN, W-8IMY or W-8EXP that is delivered by Party B to Party A without a U.S. Taxpayer Identification Number.

(ii)     **Tax Forms to be Delivered by Party A**:

        None specified.

(iii)    **Tax forms to be Delivered by Party B**:

        Party B will deliver a correct, complete and duly executed U.S. Internal Revenue Service Form W-9 (or successor thereto) that eliminates U.S. federal back-up withholding tax on payments to Party B under this Agreement.

**Part 3.**     *Documents*

(a)     **Delivery of Documents**.   When it delivers this Agreement, each party shall also deliver its Closing Documents to the other party, and from time to time after it delivers this Agreement, each party shall deliver its Other Documents to the other party, in each case in form and substance reasonably satisfactory to the other party.   For each Transaction, a party shall deliver, promptly upon request, a duly executed incumbency certificate for the person(s) executing the Confirmation for that Transaction on behalf of that party.

(b)     **Closing Documents**.

        (i)     For Party A, "Closing Documents" means:

                (A)     an opinion of Party A's counsel addressed to Party B, FSA and the Rating Agencies in form and substance acceptable to Party B, FSA and the Rating Agencies;

                (B)     a duly executed incumbency certificate for each person executing this Agreement for Party A, or in lieu thereof, a copy of the relevant pages of its official signature book; and

                (C)     each Credit Support Document (if any) specified for Party A in this Schedule, together with a duly executed incumbency certificate for the person(s) executing that Credit Support Document, or in lieu thereof, a copy of the relevant pages of its official signature book.

        (ii)    For Party B, "Closing Documents" means:

                (A)     an opinion of Party B's counsel addressed to Party A, FSA and the Rating Agencies in form and substance acceptable to Party A and the Rating Agencies;

                (B)     a duly executed incumbency certificate with respect to each signatory to this Agreement;

                (C)     a duly executed copy of the Indenture and the other operative documents relating thereto and referred to therein, executed and delivered by the parties thereto; and

                (D)     the duly executed Swap Policy.

(c)     **Other Documents**.

        (i)     For Party A, "Other Documents" means:   none.

        (i)     For Party B, "Other Documents" means:   a copy of each Servicer's Certificate that is delivered to the Trustee

NY1 1088067v8

**Part 4.** *Miscellaneous*

(a)     **Addresses for Notices**.  For purposes of Section 12(a) of this Agreement, all notices to a party shall, with respect to any particular Transaction, be sent to its address, telex number or facsimile number specified in the relevant Confirmation, *provided* that any notice under Section 5 or 6 of this Agreement, and any notice under this Agreement not related to a particular Transaction, shall be sent to a party at its address, telex number or facsimile number specified below; *provided, further*, that any notice under the Credit Support Annex shall be sent to a party at its address, telex number or facsimile number specified in the Credit Support Annex.

**To Party A**:

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, New York 10019

| Attention: | Documentation Manager |
|---|---|
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |
| | For all purposes. |

**To Party B**:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F**
c/o Wilmington Trust Company, as Owner Trustee
1100 North Market Street
Wilmington, Delaware  19890

with a copy to:

**AMERICREDIT FINANCIAL SERVICES, INC.**
801 Cherry Street, Suite 3900
Forth Worth, Texas 76102
Attention: Derivatives Operations

(b)     **Process Agent**.  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent:  Not applicable

Party B appoints as its Process Agent:  Not applicable.

(c)     **Offices**.  The provisions of Section 10(a) will apply to this Agreement.

(d)     **Multibranch Party**.  For the purpose of Section 10(c) of this Agreement, neither party is a Multibranch Party.

(e)     "Calculation Agent" means Party A; *provided* that if Party A is the Defaulting Party, the Calculation Agent shall be any designated party mutually agreed to by the parties and FSA (so long as no Swap Insurer Default has occurred and is continuing) until such time as Party A is no longer the Defaulting Party.

NY1 1088067v8

"Swap Insurer Default" shall have the meaning given to "Insurer Default" (as defined in the Sale and Servicing Agreement); *provided* that any reference therein to "Note Policy" shall be deemed to refer instead to "Swap Policy".

(f) **Credit Support Document**.

   (i) For Party A, the following is a Credit Support Document: (i) the Credit Support Annex dated the date hereof (the "Credit Support Annex") and duly executed and delivered by Party A and Party B; (ii) the guarantee of Party A's obligations hereunder that is annexed hereto as Exhibit A and any replacement guarantee of Party A's obligations hereunder that is substantially in the form of such Exhibit A and (iii) any Eligible Guarantee, if applicable.

   (ii) For Party B, the Financial Guaranty Insurance Policy (Policy No 51831B-N) (the "Swap Policy") issued by Financial Security Assurance Inc. ("FSA"). Fixed Rate Payer Payment Dates shall be deemed to be included in the definition of "Scheduled Payments" under the Swap Policy.

(g) **Credit Support Provider**.

   (i) For Party A, Credit Support Provider means Lehman Brothers Holdings Inc. so long as any subsidiary of Holdings is Party A or any other guarantor, if applicable, under an Eligible Guarantee.

   (ii) For Party B, Credit Support Provider means FSA and its successors and assigns.

(h) **Governing Law**. This Agreement will be governed by and construed in accordance with the law (and not the law of conflicts except with respect to §§ 5-1401 and 5-1402 of the New York General Obligations Law) of the State of New York.

(i) **Waiver of Jury Trial**. To the extent permitted by applicable law, each party irrevocably waives any and all right to trial by jury in any legal proceeding in connection with this Agreement, any Credit Support Document to which it is a party, or any Transaction.

(j) **Netting of Payments**. Section 2(c)(ii) of this Agreement will apply to all Transactions.

(k) "Affiliate" has its meaning as defined in Section 14 of this Agreement, *provided* that Party B shall be deemed to have no Affiliates and with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(l) **Severability**. If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement *provided, however*, that this severability provision shall not be applicable if any provision of Sections 1(c), 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or in connection with any such Section) shall be held to be invalid or unenforceable.

(m) **Single Agreement**. Section 1(c) shall be amended by adding the words ", the credit support annex entered into between Party A and Party B in relation to this Agreement" after the words "Master Agreement."

(n) **Local Business Day**. The definition of Local Business Day in Section 14 of this Agreement shall be amended by the addition of the words "or any Credit Support Document" after "Section 2(a)(i)" and the addition of the words "or Credit Support Document" after "Confirmation".

NY1 1088067v8

**Part 5.**    *Other Provisions*

(a)    **2000 ISDA Definitions**.  This Agreement and each Transaction are subject to the 2000 ISDA Definitions (including its Annex) published by the International Swaps and Derivatives Association, Inc. (together, the "2000 ISDA Definitions") and will be governed by the provisions of the 2000 ISDA Definitions.  The provisions of the 2000 ISDA Definitions are incorporated by reference in, and shall form part of, this Agreement and each Confirmation.  Any reference to a "Swap Transaction" in the 2000 ISDA Definitions is deemed to be a reference to a "Transaction" for purposes of this Agreement or any Confirmation, and any reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for purposes of the 2000 ISDA Definitions.  The provisions of this Agreement (exclusive of the 2000 ISDA Definitions) shall prevail in the event of any conflict between such provisions and the 2000 ISDA Definitions.

(b)    **Downgrade Provisions**.

    (i)    **Second Trigger Failure Condition.**  So long as the Second Rating Trigger Requirements apply, Party A shall, at its own expense use commercially reasonable efforts, as soon as reasonably practicable (but not later than thirty days after the Second Rating Trigger Requirements first apply), to either:

        (A)    furnish an Eligible Guarantee of Party A's obligations under this Agreement from a guarantor that maintains the First Trigger Required Ratings and/or the Second Trigger Required Ratings (provided, that if such guarantor maintains only the Second Trigger Required Ratings, it must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch) at the time that such Eligible Guarantee is so furnished); or

        (B)    obtain an Eligible Replacement pursuant to Part 6(a) that (1) upon satisfaction of the Rating Agency Condition (as defined below) assumes the obligations of Party A under this Agreement (through a novation or other assignment and assumption agreement in form and substance reasonably satisfactory to Party B) or (2) having provided prior written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with transactions on identical terms, except that Party A shall be replaced as counterparty, *provided* that such Eligible Replacement, as of the date of such assumption or replacement, will not, as a result thereof, be required to withhold or deduct on account of tax under the Agreement or the new Transactions, as applicable, and such assumption or replacement will not lead to a Termination Event or Event of Default occurring under the Agreement or new Transactions, as applicable.

    (ii)    **Collateralization Event**. Within 30 calendar days from the date a Collateralization Event has occurred and so long as such Collateralization Event is continuing, Party A shall, at its sole expense, either:

        (A)    post collateral in an amount required to be posted pursuant to terms of the Credit Support Annex (such amount which is the greater of amounts required to be posted by Moody's, S&P and Fitch); or

        (B)    obtain an Eligible Replacement pursuant to Part 6(a) that (1) upon satisfaction of the Rating Agency Condition (as defined below), assumes the obligations of Party A under this Agreement (through a novation or other assignment and assumption agreement in form and substance reasonably satisfactory to Party B) or (2) having provided prior written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with transactions on identical terms, except that Party A shall be replaced as counterparty; *provided* that such Eligible Replacement, as of the date of such assumption or replacement, will not, as a result thereof, be required to withhold or deduct on account of

NY1 1088067v8

tax under the Agreement or the new Transactions, as applicable, and such assumption or replacement will not lead to a Termination Event or Event of Default occurring under the Agreement or new Transactions, as applicable.

(iii)     **Ratings Event.**

(A)     Upon the occurrence of a Ratings Event, Party A shall immediately post collateral in an amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch).

(B)     Within 60 calendar days (or, in the case of a Ratings Event due to a failure to meet the requirements of subparagraph (1) of the definition of "Hedge Counterparty Ratings Threshold", within 30 calendar days) from the date a Ratings Event has occurred and so long as such Ratings Event is continuing, Party A shall, at its sole expense, obtain an Eligible Replacement that (1) upon satisfaction of the Rating Agency Condition, assumes the obligations of Party A under this Agreement (through a novation or other assignment and assumption agreement in form and substance reasonably satisfactory to Party B) or (2) having provided prior written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with transactions on identical terms, except that Party A shall be replaced as counterparty; *provided* that such Eligible Replacement, as of the date of such assumption or replacement, will not, as a result thereof, be required to withhold or deduct on account of tax under the Agreement or the new Transactions, as applicable, and such assumption or replacement will not lead to a Termination Event or Event of Default occurring under the Agreement or new Transactions, as applicable.

(iv)     **Downgrade Definitions.**

(A)     "Collateralization Event" means that:

(1) either (a) the unsecured, short-term debt obligations of the Relevant Entity are not rated "A-1" or above by S&P or the unsecured, long-term senior debt obligations of a Relevant Entity are not rated "A" or above by S&P or (b) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of a Relevant Entity are not rated "A+" or above by S&P; or

(2) the unsecured, long-term senior debt obligations or financial strength ratings of the Relevant Entity are not rated "A" or above by Fitch. For the avoidance of doubt, the parties hereby acknowledge and agree that notwithstanding the occurrence of a Collateralization Event, this Agreement and each Transaction hereunder shall continue to be a Swap Agreement for purposes of the Basic Documents.

(B)     "Eligible Guarantee" means an unconditional and irrevocable guarantee that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either:

(1) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to withholding for Tax; or

(2) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net

> amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required.

(C)   "Eligible Replacement" means a transferee:

> (1) either (a) with the First Trigger Required Ratings and/or the Second Trigger Required Ratings (provided, that if such transferee maintains only the Second Trigger Required Ratings, it must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch) at the time that it becomes a transferee) or (b) whose present and future obligations owing to Party B are guaranteed pursuant to an Eligible Guarantee provided by a guarantor with the First Trigger Required Ratings and/or the Second Trigger Required Ratings (provided, that if such guarantor maintains only the Second Trigger Required Ratings, it must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch) at the time that such Eligible Guarantee is so furnished); and

> (2) that satisfies the Hedge Counterparty Ratings Requirement below.

(D)   "Firm Offer" means an offer which, when made, was capable of becoming legally binding upon acceptance.

(E)   "First Trigger Required Ratings" means with respect to an entity, either:

> (1) where the entity is the subject of a Moody's Short-term Rating, such entity's Moody's Short-term Rating is "Prime-1" and the entity's long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's; or

> (2) where the entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

(F)   "Fitch" means Fitch, Inc.

(G)   "Hedge Counterparty Ratings Requirement" means with respect to an entity both:

> (1) either (a) the unsecured, short-term debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "A-1" or above by S&P and the unsecured, long-term senior debt obligations of the Relevant Entity are rated "A-" or above by S&P (provided, that if the unsecured, long-term senior debt obligations of such Relevant Entity are rated "A-" by S&P, such entity must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch) at the time that it becomes an Eligible Replacement) or (b) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "A+" or above by S&P; and

> (2) either (a) the unsecured, long-term senior debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "A" or above by Fitch or (b) the

unsecured, short-term debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "F1" or above by Fitch.

For the purpose of this definition, no direct or indirect recourse against one or more shareholders of the substitute counterparty (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of the substitute counterparty.

(H)     "Hedge Counterparty Ratings Threshold" means that both:

(1) either (a) the unsecured, short-term debt obligations of the Relevant Entity are rated "A-2" or above by S&P and the unsecured, long-term senior debt obligations of the Relevant Entity are rated "A-" or above by S&P; or (b) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of the Relevant Entity are rated "A-" or above by S&P; and

(2) either (a) the unsecured, senior debt obligations or financial strength ratings of the Relevant Entity, are rated "A" or above by Fitch or (b) the unsecured, short-term debt obligations (if any) of the Relevant Entity, are rated "F1" or above by Fitch.

(I)     "Moody's" means Moody's Investors Service, Inc.

(J)     "Moody's Short-term Rating" means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

(K)     "Rating Agency Condition" means first receiving prior written confirmation from S&P and Fitch that their then-current ratings of the rated Notes (without giving effect to the Note Policy) will not be downgraded or withdrawn by such Rating Agency.

(L)     "Ratings Event" means that on any date the Relevant Entity shall fail to satisfy the Hedge Counterparty Ratings Threshold or the Relevant Entity is no longer rated by S&P.

(M)     "Relevant Entity" means Party A or any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement.

(N)     "S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

(O)     "S&P Short-term Rating" means a rating assigned by S&P under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

(P)     "Second Rating Trigger Requirements" shall apply at any time that no Relevant Entity maintains the Second Trigger Required Ratings.

(Q)     "Second Trigger Required Ratings" means with respect to an entity:

(1) where the entity is the subject of a Moody's Short-term Rating, such entity's Moody's Short-term Rating is "Prime-2" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's; and

13                                                      NY1 1088067v8

(2) where such entity is not the subject of a Moody's Short-term Rating, if the entity's long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

(c)     **Additional Representations**. Section 3 of this Agreement is hereby amended by adding the following Sections 3(g) and (h):

"(g)     **Non-Reliance**. For any Relevant Agreement: (i) it acts as principal and not as agent, (ii) it acknowledges that the other party acts only arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement, (iii) it is relying solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) and upon advice from its own professional advisors, (iv) it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, (v) it has not relied and will not be relying upon any evaluation or advice (including any recommendation, opinion, or representation) from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder); and (vi) if a party is acting as a Calculation Agent or Valuation Agent, it does so not as the other party's agent or fiduciary, but on an arm's length basis for the purpose of performing an administrative function in good faith.

"Relevant Agreement" means this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating thereto or to any Transaction.

(h)     **Eligibility**. It is an "eligible contract participant" within the meaning of the Commodity Exchange Act (as amended by the Commodity Futures Modernization Act of 2000)."

(d)     **Recorded Conversations**. Each party and any of its Affiliates may electronically record any of its telephone conversations with the other party or with any of the other party's Affiliates in connection with this Agreement or any Transaction, and any such recordings may be submitted in evidence in any proceeding to establish any matters pertinent to this Agreement or any Transaction.

**Part 6.**     *Additional Terms*

(a)     **Transfers by Party A.**

(i)     Notwithstanding anything to the contrary in Section 7 of the Agreement, Party A may assign all of its rights and obligations under the Agreement (in one or more transactions to one or more other entities, provided that all of its rights and obligations relating to any single Transaction must be assigned to a single entity), (1) to any Affiliate of Holdings effective upon delivery to Party B of a guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, (x) that is identical to the guarantee then in effect of the obligations of the transferor (except for the name, address and the jurisdiction of such Affiliate) or (y) that otherwise satisfies the Rating Agency Condition and is satisfactory in form and substance to FSA in its sole discretion, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer, in each case provided that (A) the transferee is an Eligible Replacement and (B) in the case of a transfer of less than all of Party A's obligations under this Agreement to a single entity, as determined by Party B acting in a commercially reasonable manner. In the event of any such transfer, this Agreement shall be replaced with an Agreement having identical terms except that Party A shall be replaced as a counterparty or, solely with respect to clause (2) above, with an agreement that otherwise satisfies the Rating Agency Condition and is satisfactory in form and substance to FSA in its sole discretion. Notwithstanding the foregoing, any assignment hereunder shall not be permitted if, as a result thereof, a payment becomes subject to any deduction or withholding for or on account of any tax which would not

have arisen had such assignment not been effected or such transfer would cause an Event of Default or Termination event to occur. Party A will provide prior written notice to each Rating Agency of any such assignment. If an entity has made a Firm Offer (which remains capable of becoming legally binding upon acceptance) to be the transferee of a transfer, Party B shall at Party A's written request take any reasonable steps required to be taken by it to effect such transfer. The costs of any transfer pursuant to this Part 6(a)(i) shall be at the expense of Party A.

(ii)     All collateral posted by Party A shall be returned to Party A immediately upon the assumption by a substitute counterparty of all of Party A's obligations hereunder and the posting by such substitute counterparty of collateral in the amount required to be posted, if any, pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch).

(b)     **Permitted Security Interest.** For purposes of Section 7 of this Agreement, Party A hereby consents to the Permitted Security Interest, subject to the provisions of paragraph (c) below.

"Permitted Security Interest" means the collateral assignment by Party B of the Swap Collateral to the Trustee pursuant to the Indenture, and the granting to the Trustee of a security interest in the Swap Collateral pursuant to the Indenture.

"Swap Collateral" means all right, title and interest of Party B in this Agreement, each Transaction hereunder, and all present and future amounts payable by Party A to Party B under or in connection with this Agreement or any Transaction governed by this Agreement, whether or not evidenced by a Confirmation, including, without limitation, any transfer or termination of any such Transaction.

"Trustee" means Wells Fargo Bank, National Association or any successor acting as indenture trustee pursuant to the Indenture.

(c)     **Effect of Permitted Security Interest.**

(i)     Notwithstanding the Permitted Security Interest, Party B shall not be released from any of its obligations under this Agreement or any Transaction, and Party A may exercise its rights and remedies under this Agreement without notice to, or the consent of the Trustee or any Noteholder except as otherwise expressly provided in this Agreement.

(ii)     Party A's consent to the Permitted Security Interest is expressly limited to the Trustee for the benefit of the secured parties under the Indenture, and Party A does not consent to the sale or transfer by the Trustee of the Swap Collateral to any other person or entity (other than a successor to the Trustee under the Indenture acting in that capacity).

(iii)     Party B hereby acknowledges that, as a result of the Permitted Security Interest, all of its rights under this Agreement, including any Transaction, have been assigned to the Trustee pursuant to the Indenture and notwithstanding any other provision in this Agreement, Party B may not take any action hereunder to exercise any of such rights without the prior written consent of the Trustee, including, without limitation, providing any notice under this Agreement the effect of which would be to cause an Early Termination Date to occur or be deemed to occur. If Party B gives any notice to Party A for the purposes of exercising any of Party B's rights under this Agreement, Party A shall have the option of treating that notice as void unless that notice is signed by the Trustee acknowledging its consent to the provisions of that notice. Nothing herein shall be construed as requiring the consent of the Owner Trustee, the Trustee or any Noteholder for the performance by Party B of any of its obligations hereunder.

(iv)     Except as expressly provided in this Agreement for any Permitted Transfer, Event of Default, Termination Event, Additional Termination Event, Party A and Party B may not enter into any agreement to dispose of any Transaction, whether in the form of a termination, unwind, transfer or otherwise without the prior written consent of the Trustee and FSA.

(v) Except as expressly provided in this Agreement, no amendment, modification, or waiver in respect of this Agreement will be effective unless (A) evidenced by a writing executed by each party hereto, and (B) each of FSA and the Trustee has acknowledged its consent thereto in writing and each Rating Agency (other than Moody's) confirms that the amendment, modification or waiver will not cause the reduction or withdrawal of its then current rating on any Notes under the Indenture (without giving effect to the Note Policy). Notwithstanding the foregoing, so long as no Swap Insurer Default shall have occurred and be continuing, no Transactions may be entered into by Party A and Party B pursuant to this Agreement other than the two Transactions memorialized by Confirmations dated as of April 19, 2007, and no waiver, amendment or modification of any provision of either such Confirmation or any of the other terms of this Agreement may be made without the prior written consent of FSA (so long as no Swap Insurer Default has occurred and is continuing).

(d) **Payments**. All payments to Party B under this Agreement or any Transaction shall be made to the appropriate account under the Basic Documents.

(e) **Set-off**. Except as otherwise provided in this Schedule, Party A and Party B hereby waive any and all right of set-off with respect to any amounts due under this Agreement or any Transaction, *provided* that nothing herein shall be construed to waive or otherwise limit the netting provisions contained in Sections 2(c) and 6 of this Agreement or the setoff rights contained in the Credit Support Annex. Section 6(e) shall be amended by the deletion of the following sentence: "The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off".

(f) **Indenture.**

(i) Party B hereby acknowledges that Party A is a secured party under the Indenture with respect to this Agreement and a third-party beneficiary under the Indenture and that Party A has the benefit of the consent rights with respect to proposed amendments of the Basic Documents (as defined in the Indenture) as set forth in each related Basic Document.

"Indenture" means that certain Indenture, by and among Party B as Issuer, and the Trustee, dated as of April 11, 2007, as the same may be amended, modified, supplemented or restated from time to time.

(ii) On the date Party B executes and delivers this Agreement and on each date on which a Transaction is entered into, Party B hereby represents and warrants to Party A: that the Indenture is in full force and effect; that Party B is not party to any separate agreement with any of the parties to the Indenture that has not been disclosed to Party A prior to such date and that would have the effect of diminishing or impairing the rights, interests or benefits that have been granted to Party A under, and which are expressly set forth in, the Indenture; that Party B's obligations under this Agreement are secured under the Indenture; that this Agreement constitutes a "Swap Agreement" under the Basic Documents applicable to it; that each Transaction entered into under this Agreement is a Swap Agreement under the Basic Documents applicable to it; that Party A constitutes a Swap Provider under the Basic Documents applicable to it; that no Event of Default has occurred and is continuing as defined in the Basic Documents applicable to it; that nothing herein violates or conflicts with any of the provisions of the Basic Documents applicable to it or any other documents executed in connection therewith. In addition, on each date on which a Transaction is entered into, Party B hereby represents and warrants to Party A: that the Transaction meets all of the requirements under the Basic Documents applicable to it and does not violate or conflict with any of the provisions of the Basic Documents applicable to it or any other documents executed in connection therewith; and that under the terms of the Basic Documents applicable to it, neither the consent of the Owner Trustee, the Trustee nor of any of the Noteholders under the Basic Documents is required for Party B to enter into that Transaction or for Party A to be entitled for that Transaction to the rights, interests and benefits granted to Party A under the Basic Documents.

NY1 1088067v8

       (iii)    Party B will provide at least five Business Days' prior written notice, or lesser time period as agreed to by Party A and Party B, to Party A of any proposed amendment or modification to the Basic Documents.

(g)    **Consent to Notice & Communications**.  Party B hereby consents to the giving to the Trustee of notice by Party A of Party A's address and telecopy and telephone numbers for all purposes of the Basic Documents, and in addition, Party A shall also be entitled at any time to provide the Trustee with copies of this Agreement, including all Confirmations.  In addition, Party A shall not be precluded from communicating with the Trustee or any party to, or any third party beneficiary under, the Basic Documents for the purpose of exercising, enforcing or protecting any of Party A's rights or remedies under this Agreement or any rights, interests or benefits granted to Party A under the Basic Documents.

(h)    **No Bankruptcy Petition**.  Without impairing any right afforded to it under the Basic Documents as a third party beneficiary, Party A shall not institute against or cause any other person to institute against, or join any other person in instituting against Party B any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy, dissolution or similar law, for a period of one year and one day following indefeasible payment in full of the Notes and all payments due to FSA under the Insurance Agreement.  Nothing shall preclude, or be deemed to stop, Party A (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by Party B or (B) any involuntary insolvency proceeding filed or commenced by a Person other than Party A, or (ii) from commencing against Party B or any of the Collateral any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.  This Part 6(h) shall survive termination of this Agreement.

(i)    **Limitation of Liability.**  It is expressly understood and agreed by the parties hereto that (i) this Agreement is executed and delivered by the Trustee not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as a personal representation, undertaking or agreement by the Trustee but is made and intended for the purpose of binding only the Trust, (iii) nothing herein contained shall be construed as creating any liability on the part of the Trustee, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (iv) under no circumstances shall the Trustee be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement.

(j)    **Party A Rights Solely Against Collateral**.  The liability of Party B to Party A hereunder is limited in recourse to the assets of the Trust, and to distributions of interest proceeds and principal proceeds thereon applied in accordance with the terms of the Indenture.  Upon application of and exhaustion of all of the assets of the Trust (and proceeds thereof) in accordance with the Indenture, Party A shall not be entitled to take any further steps against Party B to recover any sums due but still unpaid hereunder or thereunder, all claims in respect of which shall be extinguished. Notwithstanding the foregoing or anything herein to the contrary, Party A shall not be precluded from declaring an Event of Default or from exercising any other right or remedy as set forth in this Agreement or the Indenture.  This Part 6(j) shall survive termination of this Agreement.

(k)    **Change of Account**.  Section 2(b) of this Agreement is hereby amended by the addition of the words "to another account in the same legal and tax jurisdiction as the original account" following the word "delivery" in the first line thereof.

(l)    **Notice of Certain Events or Circumstances**.  Each party agrees, upon learning of the occurrence or existence of any event or condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default or Termination Event with respect to such party, promptly to give the other party notice of such event or condition (or, in lieu of giving notice of such event or condition

    NY1 1088067v8

in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to the party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event); *provided* that failure to provide notice of such event or condition pursuant to this Part 6(l) shall not constitute an Event of Default or a Termination Event. Each party agrees to provide to the other party any other notice reasonably expected to be provided to facilitate compliance with the terms of this Agreement and the Credit Support Document.

(m)     **Regarding Party A**. Party B acknowledges and agrees that Party A has had and will have no involvement in and, accordingly Party A accepts no responsibility for: (i) the establishment, structure, or choice of assets of Party B; (ii) the selection of any person performing services for or acting on behalf of Party B; (iii) the selection of Party A as the Counterparty; (iv) the terms of the Notes, (v) other than with respect to the Prospectus Information (as defined herein), the preparation of or passing on the disclosure and other information contained in any offering circular or offering document for the Notes, the Basic Documents, or any other agreements or documents used by Party B or any other party in connection with the marketing and sale of the Notes; (vi) the ongoing operations and administration of Party B, including the furnishing of any information to Party B which is not specifically required under this Agreement or (vii) any other aspect of Party B's existence.

(n)     **Compliance with Regulation AB.**

(i)      Party A has been advised by Party B that AmeriCredit Financial Services, Inc. (the "Sponsor"), AFS SenSub Corp. (the "Depositor") and Party B are required under Regulation AB under the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended ("Regulation AB"), to disclose certain information regarding Party A. Such information may include financial information to the extent required under Item 1115 of Regulation AB.

(ii)     If required, upon written request, Party A shall provide to Party B, the Depositor or the Sponsor the applicable financial information described under Item 1115(b) of Regulation AB (the "Reg AB Financial Information") within ten (10) Business Days of receipt of a written request for such Reg AB Financial Information by the Sponsor, the Depositor or Party B (the "Response Period"), so long as the Sponsor, the Depositor or Party B has reasonably determined, in good faith, that such information is required under Regulation AB. In the event that Party A does not provide any such Reg AB Financial Information by the end of the related Response Period, Party A shall promptly, but in no event later than ten (10) Local Business Days following the end of such Response Period shall either, at Party A's own expense (1) find a replacement counterparty that (A) has the ability to provide its applicable Reg AB Financial Information, (B) satisfies the Rating Agency Condition, (C) is acceptable to Party B and FSA and (D) enters into an agreement with Party B substantially in the form of this Agreement (such replacement counterparty, a "Reg AB Approved Entity"); (2) obtain a guaranty of Party A's obligations under this Agreement from an affiliate of Party A that complies with the financial information disclosure requirements of Item 1115 of Regulation AB, and cause such affiliate to provide Swap Financial Disclosure and any future Swap Financial Disclosure and other information pursuant to clause (1), such that disclosure provided in respect of such affiliate will satisfy any disclosure requirements applicable to the Swap Provider, or (3) transfer Eligible Collateral to Party B's Custodian in an amount (taking into account any amount posted pursuant to Part 5(b) herein, if any) which is sufficient, as reasonably determined in good faith by the Sponsor, to reduce the aggregate significance percentage below 10% (or, so long as Party A is able to provide the Swap Financial Disclosure required pursuant to Item 1115(b)(1) of Regulation AB, below 20%, in the event Party A is requested to provide the Swap Financial Disclosure required pursuant to Item 1115(b)(2) of Regulation AB).

(iii)    If Party B, the Depositor or the Sponsor request (in writing) the Reg AB Financial Information from Party A, then the Sponsor, the Depositor or Party B will promptly (and in any event within one (1) Business Day of the date of the request for the Reg AB Financial Information) provide Party A with a written explanation of how the significance percentage was calculated.

(iv) Party A represents and warrants that the statements appearing in the Preliminary Prospectus Supplement, dated April 10, 2007, or in the Prospectus Supplement, dated April 11, 2007, each relating to AmeriCredit Automobile Receivables Trust 2007-B-F under the headings "The Swap Counterparty" (the "Prospectus Information") are true and correct in all material respects and do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

(v) (A) Party A shall indemnify and hold harmless Party B, the Sponsor, the Depositor, their respective directors or officers and any person controlling Party B, the Depositor or the Sponsor, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Information or in any Reg AB Financial Information that Party A provides to Party B or the Sponsor pursuant to this Part 6(y) (the "Party A Information") or caused by any omission or alleged omission to state in the Party A Information a material fact required to be stated therein or necessary to make the statements therein not misleading.

(B) The Sponsor shall indemnify and hold harmless Party A, its respective directors or officers and any person controlling Party A, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Prospectus Supplement referred to in clause (iv) above (together with the accompanying base Prospectus), the Prospectus Supplement referred to in clause (iv) above (together with the accompanying base Prospectus) (collectively, the "Prospectus Disclosure") or caused by any omission or alleged omission to state in the Prospectus Disclosure a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the Sponsor shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement in or omission or alleged omission made in any such Prospectus Disclosure in the Party A Information.

(vi) Promptly after the indemnified party under Part 6(n)(v) receives notice of the commencement of any such action, the indemnified party will, if a claim in respect thereof is to be made pursuant to Part 6(n)(v), promptly notify the indemnifying party in writing of the commencement thereof. In case any such action is brought against the indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought (in which case the indemnifying party shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the indemnified party except as set forth below); provided, however, that such counsel shall be reasonably satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) such indemnified party shall have been advised by such counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the indemnifying party and in the reasonable judgment of such counsel it is advisable for such indemnified party to employ separate counsel, (ii) a conflict or potential conflict exists (based on advice of counsel to the indemnified party) between the indemnified party and the indemnifying party, (iii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. The indemnifying party will not, without the prior written consent of the indemnified party, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party

19 NY1 1088067v8

from all liability arising out of such claim, action, suit or proceeding. No indemnified party will settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder without the consent of the indemnifying party, which consent shall not be unreasonably withheld.

(o)  **Subrogation**. Each of Party A and Party B hereby acknowledges that, to the extent of payments made by FSA to Party A under the Swap Policy, FSA shall be fully subrogated to the rights of Party A against Party B under the Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies against Party B. Party A hereby agrees to assign to FSA its right to receive payment from Party B under any Transaction to the extent of any payment thereunder by FSA to Party A. Party B hereby acknowledges and consents to the assignment by Party A to FSA of any rights and remedies that Party A has under any Transaction or any other document executed in connection herewith.

(p)  **Expenses.** Party B agrees to reimburse FSA immediately and unconditionally upon demand for all reasonable expenses incurred by FSA in connection with the issuance of the Swap Policy and the enforcement by FSA of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by FSA which are related to or resulting from any breach by Party B of its obligations hereunder. Party A agrees that, for the purpose of calculating amounts that are owed by Party A pursuant to Section 11 of this Agreement, to the extent that FSA incurs any such amounts in connection with its enforcement and protection of its or Party B's rights under this Agreement or any Credit Support Document, such amounts, to the extent they are not duplicative of costs incurred by Party B, shall be reimbursable to FSA by Party A.

(q)  **Notices.** A copy of each notice or other communication between the parties with respect to this Agreement must be sent at the same time to FSA.

(r)  **Article 76.** Party A and Party B acknowledge that the Swap Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

## Part 7.    Definitions.

All capitalized terms used herein and not defined herein shall have the definitions ascribed to them in the Indenture.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:
     Allyson M. Carine
     Authorized Signatory

AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F

BY: AMERICREDIT FINANCIAL SERVICES, INC.,
as Attorney-In-Fact

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:_____ _____ _____
Name:
Title:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F**

**BY: AMERICREDIT FINANCIAL SERVICES, INC.,**
as Attorney-In-Fact

By: Sun B Shuffield
Name: Susan B. Sheffield
Title: Senior Vice President, Structured Finance

[Swap Schedule]

# ISDA®

### International Swap Dealers Association, Inc.

### CREDIT SUPPORT ANNEX

### to the Schedule to the

### ISDA MASTER AGREEMENT

### dated as of <u>April 19, 2007</u>

### between

<u>Lehman Brothers Special Financing Inc.</u>              <u>AmeriCredit Automobile Receivables Trust 2007-B-F</u>
("Party A")                    and                       ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1    Interpretation**

(a)    ***Definitions and Inconsistency.***    Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    ***Secured Party and Pledgor.***  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the Pledgor will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2    Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor or Posted Collateral, the

1

security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

**Paragraph 3    Credit Support Obligations**

(a)    ***Delivery Amount.***  Subject to Paragraphs 4 and 5, upon demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13).  Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

   (i)    the Credit Support Amount

   exceeds

   (ii)    the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    ***Return Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

   (i)    the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

   exceeds

   (ii)    the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

2

**Paragraph 4    Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

   (i)    no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

   (ii)    no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time.  The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

(d)    *Substitutions.*

   (i)    Unless otherwise specified in Paragraph 13, upon notice to the Second Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

   (ii)    subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

3

**Paragraph 5    Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in case of (I) above or (Y) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

    (i)    In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

        (A)    utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

        (B)    calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction);

        (C)    utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

    (ii)    In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time.  The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6    Holding and Using Posted Collateral**

(a)     ***Care of Posted Collateral.***   Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property.  Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)     ***Eligibility to Hold Posted Collateral; Custodians.***

    (i)     ***General.***   Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party.  Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian.  The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

    (ii)    ***Failure to Satisfy Conditions.***   If the Secured Party or its Custodian fails to satisfy conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

    (iii)   ***Liability.***   The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)     ***Use of Posted Collateral.***   Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

    (i)     sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise  use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

      (ii)     register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     ***Distributions and Interest Amount.***

      (i)     ***Distributions.***  Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

      (ii)     ***Interest Amount.***  Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7    Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

      (i)     that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

      (ii)     that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii)    that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8    Certain Rights and Remedies

(a)    ***Secured Party's Rights and Remedies.*** If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)    all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)    the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv)    the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)    ***Pledgor's Rights and Remedies.*** If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i)    the Pledgor may exercise all rights and remedies available to a Pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

7

(ii)     the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

    (A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

    (B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    **_Deficiencies and Excess Proceeds._**  The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    **_Final Returns._**  When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9    Representations**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i)     it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii)    it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv)    the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**Paragraph 10    Expenses**

(a)    ***General.***  Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    ***Posted Credit Support.***  The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    ***Liquidation/Application of Posted Credit Support.***  All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11    Miscellaneous**

(a)    ***Default Interest.***  A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obliged to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that the Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    ***Further Assurances.***  Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien

9

granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    **_Further Protection._**  The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    **_Good Faith and Commercially Reasonable Manner._**  Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    **_Demands and Notices._**  All demands and notices given by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    **_Specifications of Certain Matters._**  Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

## Paragraph 12  Definitions

As used in this Annex:—

**_"Cash"_** means the lawful currency of the United States of America.

**_"Credit Support Amount"_** has the meaning specified in Paragraph 3.

**_"Custodian"_** has the meaning specified in Paragraphs 6(b)(i) and 13.

**_"Delivery Amount"_** has the meaning specified in Paragraph 3(a).

**_"Disputing Party"_** has the meaning specified in Paragraph 5.

**_"Distributions"_** means, with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

**_"Eligible Collateral"_** means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

      (x)     the amount of Cash on that day; multiplied by

      (y)     the Interest Rate in effect for that day; divided by

      (z)     360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day,"* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i)    in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii)    in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii)    in the case of securities that can be paid or delivered in book-entry, the giving of written instruments to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv)    in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 5 in the case of a dispute, with respect to:

(i)    Eligible Collateral or Posted Collateral that is:

    (A)    Cash, the amount thereof; and

    (B)    a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii)    Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii)    Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**Elections and Variables
to the 1994 ISDA Credit Support Annex**

**dated as of**

April 19, 2007

**between**

| | | |
|---|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | and | **AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F** |

("Party A")                                              ("Party B")

**Paragraph 13.**

(a)    *Security Interest for "Obligations".*

The term "Obligations" as used in this Annex includes the following additional obligations: None.

(b)    *Credit Support Obligations.*

     (i)    Delivery Amount, Return Amount and Credit Support Amount.

          (A)    "Delivery Amount" has the meaning specified in Paragraph 3(a), except that the words "upon a demand made by the Secured Party on or promptly following a Valuation Date" shall be deleted and replaced by the words "on each Valuation Date;" *provided*, that the Delivery Amount shall be calculated, with respect to collateral posting required by each Rating Agency, by using (i) such Rating Agency's Valuation Percentages as provided below to determine Value and (ii) the Credit Support Amount related to such Rating Agency. The Delivery Amount shall be the greatest of such calculated amounts.

          (B)    "Return Amount" has the meaning specified in Paragraph 3(b); *provided*, that the Return Amount shall be calculated, with respect to collateral posting required by each Rating Agency, by using (i) such Rating Agency's Valuation Percentages as provided below to determine Value and (ii) the Credit Support Amount related to such Rating Agency. The Return Amount shall be the least of such calculated amounts.

          (C)    "Credit Support Amount" has the meaning specified in Paragraph 13(j)(iii).

     (ii)    *Eligible Collateral.* The Valuation Percentages[1] listed below shall apply to the following Eligible Collateral:

---

[1] With respect to collateral types not listed below, such assets will be subject to review by each of S&P, Fitch and Moody's.

1

| Instrument | Valuation Percentages applicable with respect to calculating Moody's First Trigger Credit Support Amount | Valuation Percentages applicable with respect to calculating Moody's Second Trigger Credit Support Amount | Valuation Percentages applicable with respect to calculating S&P Credit Support Amount and Fitch Credit Support Amount | |

| | Moody's | Moody's | S&P | Fitch |
|---|---|---|---|---|
| U.S. Dollar Cash | 100% | 100% | 100% | |
| Euro Cash | 97% | 93% | 89.8% | |
| Sterling Cash | 97% | 94% | 91.9% | |
| Fixed Rate Negotiable Treasury Debt issued by U.S. Treasury Department with Remaining Maturity: | | | | |
| <1 Year | 100% | 100% | 98.6% | |
| 1 to 2 years | 100% | 99% | 97.3% | |
| 2 to 3 years | 100% | 98% | 95.8% | |
| 3 to 5 years | 100% | 97% | 93.8% | |
| 5 to 7 years | 100% | 95% | 91.4% | |
| 7 to 10 years | 100% | 94% | 90.3% | |
| 10 to 20 years | 100% | 89% | 87.9% | |
| > 20 years | 100% | 87% | 84.6% | |

| Floating-Rate Negotiable U.S. Dollar Denominated Treasury Debt Issued by The U.S. Treasury Department | | | | |
|---|---|---|---|---|
| All Maturities | 100% | 99% | 0% | |
| Fixed-Rate U.S. Dollar Denominated U.S. Agency Debentures with Remaining Maturity: | | | | |
| < 1 Year | 100% | 99% | 98% | |
| 1 to 2 years | 100% | 98% | 96.8% | |
| 2 to 3 years | 100% | 97% | 96.3% | |
| 3 to 5 years | 100% | 96% | 92.5% | |
| 5 to 7 years | 100% | 94% | 90.3% | |
| 7 to 10 years | 100% | 93% | 86.9% | |
| 10 to 20 years | 100% | 88% | 82.6% | |
| > 20 years | 100% | 86% | 77.9% | |
| Floating-Rate U.S. Dollar Denominated U.S. Agency Debentures | | | | |
| All maturities | 100% | 98% | 0% | |
| Fixed-Rate Euro Denominated Euro-Zone Government Bonds Rated "Aa3" or Above by Moody's and "AAA" by S&P with Remaining Maturity: | | | | |
| < 1 Year | 97% | 93% | 98% | |
| 1 to 2 years | 97% | 92% | 96.3% | |
| 2 to 3 years | 97% | 91% | 95.8% | |
| 3 to 5 years | 97% | 89% | 89.3% | |
| 5 to 7 years | 97% | 87% | 85.7% | |
| 7 to 10 years | 97% | 86% | 80.7% | |
| 10 to 20 years | 97% | 82% | 72.5% | |
| > 20 years | 97% | 80% | 0% | |
| Floating-Rate Euro Denominated Euro-Zone Government Bonds Rated "Aa3" or Above by Moody's and "AAA" by S&P | | | | |
| All maturities: | 97% | 92% | 0% | |
| Qualified Commercial Paper | | | | |
| | 0%* | 0%* | 99% | |

2

For the purposes of the above table, "Qualified Commercial Paper" means commercial paper with a rating of at least "P-1" by Moody's and "A-1+" by S&P and having a remaining maturity of not more than one month.

*or such other percentage in respect of which Moody's has provided a rating affirmation.

(iii)    **Thresholds**.

    (A)    "Independent Amount" means with respect to Party A: Zero

        "Independent Amount" means with respect to Party B: Zero

    (B)    "Threshold" means with respect to Party A: infinity; *provided* that the Threshold with respect to Party A shall be zero for so long as no Relevant Entity has the First Trigger Required Ratings or a Collateralization Event is occurring and (i) no Relevant Entity has had the First Trigger Required Ratings since this Annex was executed, or (ii) at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the First Trigger Required Ratings, or (iii) no Relevant Entity has met the Hedge Counterparty Ratings Requirement since this Annex was executed, or (iv) at least 30 calendar days have elapsed since the last time a Collateralization Event occurred or (v) a Ratings Event is occurring.

        "Threshold" means with respect to Party B:  infinity.

    (C)    "Minimum Transfer Amount" means with respect to Party A: USD $100,000; *provided, however*, that if S&P is rating the Certificates and the aggregate Certificate Principal Balances of the rated Certificates falls below $50,000,000, then the Minimum Transfer Amount shall mean USD $50,000.

    (D)    "Minimum Transfer Amount" means with respect to Party B: USD $100,000 (or if the Posted Collateral is less than $100,000, the aggregate Value of Posted Collateral), *provided, however*, that if S&P is rating the Certificates and the aggregate Certificate Principal Balances of the rated Certificates falls below $50,000,000, then the Minimum Transfer Amount shall mean USD $50,000 (or if the Posted Collateral is less than $50,000, the aggregate Value of Posted Collateral).

    (E)    **Rounding**.  The Delivery Amount will be rounded up to the nearest integral multiple of USD $10,000.  The Return Amount will be rounded down to the nearest integral multiple of USD $10,000.

(iv)    "Exposure" has the meaning specified in Paragraph 12, except that (1) after the word "Agreement" the words "(assuming, for this purpose only, that Part 1(k) of the Schedule is deleted)" shall be inserted and (2) at the end of such definition, the words "with terms substantially the same as those of this Agreement."

(c)    **Valuation and Timing.**

(i)    "Valuation Agent" means Party A in all circumstances.

(ii)    "Valuation Date" means [the first any Local Business Day in each week].

NY1 1088131v6

(iii) "Valuation Time" means the close of business in the location where the relevant product is traded, provided that the calculations of Value and Exposure will made as of approximately the same time on the same date.

(iv) "Notification Time" means 3:00 p.m., New York time, on a Local Business Day.

(d) **Conditions Precedent and Secured Party's Rights and Remedies.** None.

(e) **Substitution.**

(i) "Substitution Date" has the meaning specified in Paragraph 4(d)(ii).

(ii) **Consent**. The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f) **Dispute Resolution.**

(i) "Resolution Time" means 1:00 p.m., New York time on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

(ii) **Value**. For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Eligible Credit Support or Posted Credit Support as of the relevant Valuation Date or date of Transfer will be calculated as follows:

(A) with respect to any Eligible Credit Support or Posted Credit Support comprising securities ("Securities") the sum of (a)(x) the last bid price on such date for such Securities on the principal national securities exchange on which such Securities are listed, multiplied by the applicable Valuation Percentage; or (y) where any Securities are not listed on a national securities exchange, the bid price for such Securities quoted as at the close of business on such date by any principal market maker (which shall not be and shall be independent from the Valuation Agent) for such Securities chosen by the Valuation Agent, multiplied by the applicable Valuation Percentage; or (z) if no such bid price is listed or quoted for such date, the last bid price listed or quoted (as the case may be), as of the day next preceding such date on which such prices were available, multiplied by the applicable Valuation Percentage; plus (b) the accrued interest where applicable on such Securities (except to the extent that such interest shall have been paid to the Pledgor pursuant to Paragraph 5(c)(ii) or included in the applicable price) as of such date; and

(B) with respect to any Cash, the face amount thereof.

(iii) **Alternative.** The provisions of Paragraph 5 will apply.

(g) **Holding and Using Posted Collateral.**

(i) **Eligibility to Hold Posted Collateral; Custodians**:

A Custodian will be entitled to hold Posted Collateral on behalf of Party B pursuant to Paragraph 6(b); *provided* that:

4

(1)      Posted Collateral may be held only in the following jurisdiction: United States.

(2)      The Custodian for Party B (A) is a commercial bank or trust company which is unaffiliated with Party B and organized under the laws of the United States or state thereof, having assets of at least $500 million and a long term debt or a deposit rating of at least (i) "Baa2" from Moody's and (ii) "A-1" from S&P, or is the Trustee, and a short term rating from Fitch of at least "F1" and (B) shall hold all Eligible Credit Support in the appropriate account under the Basic Documents.

(3)      Initially, the Custodian for Cash and Securities for Party B is: The Trustee under the Indenture, or any successor trustee thereto.

(ii)     *Use of Posted Collateral.*  The provisions of Paragraph 6(c) will not apply to Party B.   The Trustee shall invest Cash Posted Credit Support in such overnight (or redeemable within two Local Business Days of demand) investments rated at least "Prime-1" and "Aaa" by Moody's and either "AAAm" or "AAAm-G" by S&P (or such other investments as may be affirmed in writing by S&P and Moody's) as directed by Party A (unless (x) an Event of Default or an Additional Termination Event has occurred with respect to which Party A is the defaulting or sole Affected Party and (y) an Early Termination Date has been designated by Party B, in which case such investment shall be at the direction of Party B) with gains and losses incurred in respect of such investments to be for the account of Party A.

(iii)    *Notice.* If a party or its Custodian fails to meet the criteria for eligibility to hold (or, in the case of a party, to use) Posted Collateral set forth in this Paragraph 13(g), such party shall promptly notify the other party of such ineligibility.

(h)      *Distributions and Interest Amount.*

(i)      *Interest Rate.* The "Interest Rate" will be the actual rate of interest earned by Party B or the Custodian if the Cash is invested at the direction of Party A in accordance with Paragraph 13(g)(ii) above, otherwise the "Interest Rate" will be the federal funds overnight rate as published by the Board of Governors of the Federal Reserve System in H.15 (519) or its successor publication, or such other rate as the parties may agree from time to time.

(ii)     *Transfer of Interest Amount.*  The transfer of the Interest Amount will be made on the second Local Business Day following the end of each calendar month and on any other Local Business Day on which Posted Collateral in the form of Cash is transferred to the Pledgor pursuant to Paragraph 3(b), in each case to the extent that a Delivery Amount would not be created or increased by that transfer, *provided* that Party B shall not be obliged to so transfer any Interest Amount unless and until it has earned and received such interest.

(iii)    *Alternative to Interest Amount.*  The provisions of Paragraph 6(d)(ii) will apply.

(i)      *Address for Transfers.*

Party A:  To be notified to Party B by Party A at the time of the request for the transfer.

Party B:  To be notified to Party A by Party B upon request by Party A.

5

(j)    **Other Provisions.**

(i)    **Costs of Transfer on Exchange.**

Notwithstanding Paragraph 10, the Pledgor will be responsible for, and will reimburse the Secured Party for, all transfer and other taxes and other costs involved in the transfer of Eligible Credit Support either from the Pledgor to the Secured Party or from the Secured Party to the Pledgor.

(ii)   **Cumulative Rights.**

The rights, powers and remedies of the Secured Party under this Annex shall be in addition to all rights, powers and remedies given to the Secured Party by the Agreement or by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of the Secured Party in the Posted Credit Support created pursuant to this Annex.

(iii)  **Ratings Criteria.**

"Credit Support Amount" shall be (a) in respect of S&P, the S&P Credit Support Amount, (b) in respect of Fitch, the Fitch Credit Support Amount, and (c) in respect of Moody's, the Moody's First Trigger Credit Support Amount, or the Moody's Second Trigger Credit Support Amount, as applicable.

With respect to Fitch:

"*Fitch Credit Support Amount*" means, for any Valuation Date, the excess, if any, of:

(I)    (A)    for any Valuation Date (x) on which a Collateralization Event with respect to Fitch has occurred and been continuing for at least 30 calendar days or (y) on which a Ratings Event with respect to Fitch has occurred and is continuing, an amount equal to the sum of (1) the aggregate Secured Party's Exposure for such Valuation Date with respect to all Transactions and (2) the aggregate of the products of the Volatility Buffer for each Transaction and the Notional Amount of each Transaction for the Calculation Period of each such Transaction which includes such Valuation Date, or

(B)    for any other Valuation Date, zero, over

(II)   the Threshold for Party A for such Valuation Date.

"Volatility Buffer" shall mean the percentage set forth in the following table with respect to any Transaction (other than a Transaction identified in the related Confirmation as a Timing Hedge):

| Notes' Rating | Weighted Average Life (Years) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | >=15 |
| **USD Interest Rate Swaps** | | | | | | | | | | | | | | | |
| "AA-" or Better | 0.8 | 1.7 | 2.5 | 3.3 | 4.0 | 4.7 | 5.3 | 5.9 | 6.5 | 7.0 | 7.5 | 8.0 | 8.5 | 9.0 | 9.5 |
| "A+"/"A" | 0.6 | 1.2 | 1.8 | 2.3 | 2.8 | 3.3 | 3.8 | 4.2 | 4.6 | 5.0 | 5.3 | 5.7 | 6.0 | 6.4 | 6.7 |
| "A-"/"BBB+" | 0.5 | 1.0 | 1.6 | 2.0 | 2.5 | 2.9 | 3.3 | 3.6 | 4.0 | 4.3 | 4.7 | 5.0 | 5.3 | 5.6 | 5.9 |

6

With respect to Moody's:

> "Moody's First Trigger Credit Support Amount" means, for any Valuation Date, the excess, if any, of

> (I)   (A)   for any Valuation Date on which (I) a First Trigger Failure Condition has occurred and has been continuing (x) for at least 30 Local Business Days or (y) since this Annex was executed and (II) it is not the case that a Moody's Second Trigger Event has occurred and been continuing for at least 30 Local Business Days, an amount equal to the greater of (a) zero and (b) the sum of the Secured Party's aggregate Exposure for all Transactions and the aggregate of Moody's Additional Collateralized Amounts for all Transactions.

> For the purposes of this definition, the "Moody's Additional Collateralized Amount" with respect to any Transaction shall mean:

> [the lesser of (x) the product of the Moody's First Trigger DV01 Multiplier and DV01 for such Transaction and such Valuation Date and (y) the product of Moody's First Trigger Notional Amount Multiplier and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;][2]

> [the product of the applicable Moody's First Trigger Factor set forth in Table 1 and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;][3] or

> (B)   for any other Valuation Date, zero, over

> (II)   the Threshold for Party A such Valuation Date.

> "First Trigger Failure Condition" means that no Relevant Entity has credit ratings from Moody's at least equal to the Moody's First Trigger Required Ratings.

> "DV01" means, with respect to a Transaction and any date of determination, the sum of the estimated change in the Secured Party's Exposure with respect to such Transaction that would result from a one basis point change in the relevant swap curve on such date, as determined by the Valuation Agent in good faith and in a commercially reasonable manner. The Valuation Agent shall, upon request of Party B, provide to Party B a statement showing in reasonable detail such calculation.

> "Moody's First Trigger DV01 Multiplier" means [(A) if each Local Business Day is a Valuation Date, 15, or (B) otherwise, 25].

> "Moody's First Trigger Notional Amount Multiplier" means [(A) if each Local Business Day is a Valuation Date, 2%, or (B) otherwise, 4%].

---

[2] If Moody's First Trigger Credit Support Amount is calculated using DV01.

[3] If Moody's First Trigger Credit Support Amount is calculated without using DV01.

7

"Moody's Second Trigger Credit Support Amount" means, for any Valuation Date, the excess, if any, of

(III)   (A)    for any Valuation Date on which it is the case that a Second Trigger Failure Condition has occurred and been continuing for at least 30 Local Business Days, an amount equal to the greatest of (a) zero, (b) the aggregate amount of the Next Payments for all Next Payment Dates and (c) the sum of the Secured Party's aggregate Exposure and the aggregate of Moody's Additional Collateralized Amounts for all Transactions.

For the purposes of this definition:

"Next Payment" means, in respect of each Next Payment Date, the greater of (i) the amount of any payments due to be made by Party A under Section 2(a) on such Next Payment Date less any payments due to be made by Party B under Section 2(a) on such Next Payment Date (in each case, after giving effect to any applicable netting under Section 2(c)) and (ii) zero.

"Next Payment Date" means each date on which the next scheduled payment under any Transaction is due to be paid.

"Moody's Additional Collateralized Amount" with respect to any Transaction shall mean:

if such Transaction is not a Transaction-Specific Hedge,

[the lesser of (i) the product of the Moody's Second Trigger DV01 Multiplier and DV01 for such Transaction and such Valuation Date and (ii) the product of the Moody's Second Trigger Notional Amount Multiplier and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;][4]

[the product of the applicable Moody's Second Trigger Factor set forth in Table 2 and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;][5] or

if such Transaction is a Transaction-Specific Hedge,

[the lesser of (i) the product of the Moody's Second Trigger Transaction-Specific Hedge DV01 Multiplier and DV01 for such Transaction and such Valuation Date and (ii) the product of the Moody's Second Trigger Transaction-Specific Hedge Notional Amount Multiplier and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;][6]

---

[4] If Moody's Second Trigger Credit Support Amount for a fixed schedule swap is calculated using DV01.
[5] If Moody's Second Trigger Credit Support Amount for a fixed schedule swap is calculated without using DV01.
[6] If Moody's Second Trigger Credit Support Amount for a Transaction-Specific Hedge is calculated using DV01.

[the product of the applicable Moody's Second Trigger Factor set forth in Table 3 and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date;][7] or

    (B)    for any other Valuation Date, zero, over

(IV)    the Threshold for Party A for such Valuation Date.

"Transaction-Specific Hedge" means any Transaction that is an interest rate cap, interest rate floor or interest rate swaption, or an interest rate swap if (x) the notional amount of the interest rate swap is "balance guaranteed" or (y) the notional amount of the interest rate swap for any Calculation Period otherwise is not a specific dollar amount that is fixed at the inception of the Transaction.

"Second Trigger Failure Condition" means that no Relevant Entity has credit ratings from Moody's at least equal to the Moody's Second Trigger Ratings Threshold.

"Moody's Second Trigger DV01 Multiplier" means [(A) if each Local Business Day is a Valuation Date, 50, or (B) otherwise, 60].

"Moody's Second Trigger Transaction-Specific Hedge DV01 Multiplier" means [(A) if each Local Business Day is a Valuation Date, 65, or (B) otherwise, 75].

"Moody's Second Trigger Transaction-Specific Hedge Notional Amount Multiplier" means [(A) if each Local Business Day is a Valuation Date, 10%, or (B) otherwise, 11%].

"Moody's Second Trigger Notional Amount Multiplier" means [(A) if each Local Business Day is a Valuation Date, 8% or (B) otherwise, 9%].

With respect to S&P:

"S&P Credit Support Amount" means, for any Valuation Date, the excess, if any, of:

(I)    (A)    for any Valuation Date (x) on which a Collateralization Event with respect to S&P has occurred and been continuing for at least 30 calendar days or (y) on which a Ratings Event with respect to S&P has occurred and is continuing, an amount equal to the sum of (1) the aggregate Secured Party's Exposure for such Valuation Date with respect to all Transactions and (2) the aggregate of the products of the Volatility Buffer for each Transaction and the Notional Amount of each Transaction for the Calculation Period of each such Transaction which includes such Valuation Date, or

    (B)    for any other Valuation Date, zero, over

(II)    the Threshold for Party A for such Valuation Date.

---

[7] If Moody's Second Trigger Credit Support Amount for a Transaction-Specific Hedge is calculated without using DV01.

9

"Volatility Buffer" shall mean the percentage set forth in the following table with respect to any Transaction (other than a Transaction identified in the related Confirmation as a Timing Hedge):

| Short-term credit rating of Party A's Credit Support Provider | Remaining Weighted Average Life Maturity up to 3 years | Remaining Weighted Average Life Maturity up to 5 years | Remaining Weighted Average Life Maturity up to 10 years | Remaining Weighted Average Life Maturity up to 30 years |
|---|---|---|---|---|
| At least "A-2" | 2.75 | 3.25 | 4.00 | 4.75 |
| "A-3" | 3.25 | 4.00 | 5.00 | 6.25 |
| "BB+" or lower | 3.50 | 4.50 | 6.75 | 7.50 |

(iv) **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, save that any demand, specification or notice:

(A) shall be given to or made at the following addresses:

If to Party A:

As set forth in Part 4(a) of the Schedule.

If to Party B:

As set forth in Part 4(a) of the Schedule.

or at such other address as the relevant party may from time to time designate by giving notice (in accordance with the terms of this subparagraph) to the other party;

(B) shall be deemed to be effective at the time such notice is actually received unless such notice is received on a day which is not a Local Business Day or after the Notification Time on any Local Business Day in which event such notice shall be deemed to be effective on the next succeeding Local Business Day.

Pursuant to the related Basic Document, the monthly report to Noteholders shall be made available to Party A in the manner and form specified therein.

(v) **Agreement as to Single Secured Party and Pledgor**

Party A and Party B agree that, notwithstanding anything to the contrary in the first sentence of this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, except with respect to Party B's obligations under Paragraph 3(b), (a) the term "Secured Party" as used in this Annex means only Party B, (b) the term "Pledgor" as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgement in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder. Party A and Party B further agree that, notwithstanding anything to the contrary in the recital to this Annex or Paragraph 7, this Annex will constitute a Credit Support Document only with respect to Party A.

10

(vi)    *Trustee Capacity.*

It is expressly understood and agreed by the parties hereto that (i) this Annex is executed and delivered by the Trustee not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by the Trustee but is made and intended for the purpose of binding only the Trust, (iii) nothing herein contained shall be construed as creating any liability on the part of the Trustee, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (iv) under no circumstances shall the Trustee be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Annex.

(vii)   *External Marks.*

At such time as the long-term senior debt rating of Party A's Credit Support Provider is "BBB" or lower from S&P, Party A in its capacity as Valuation Agent shall get external verification of its calculation of Exposure on a monthly basis. This verification shall be at Party A's expense and may not be verified by the same entity more than four (4) times in any twelve (12)-month period. The external mark should reflect the higher of two (2) bids from counterparties that would be willing and eligible to provide the swap in the absence of the current provider. Such bids and any external marks received by the Valuation Agent shall be provided to S&P. The calculation of Exposure should be based on the greater of the internal and external marks.

(viii)  *Event of Default.*

Subclause (iii) of Paragraph 7 shall not apply to Party B.

*[Signature page follows]*

11

IN WITNESS WHEREOF, the parties have executed this document by their duly authorized officers with effect from the date specified on the first page hereof.

**LEHMAN BROTHERS SPECIAL**
**FINANCING INC.**

**AMERICREDIT AUTOMOBILE RECEIVABLES**
**TRUST 2007-B-F**

BY:   AMERICREDIT FINANCIAL SERVICES, INC.,
as Attorney-In-Fact

By: _____
Name:
Title:

By: _____
Name:
Title:

Allyson M. Carine
Authorized Signatory

IN WITNESS WHEREOF, the parties have executed this document by their duly authorized officers with effect from the date specified on the first page hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F**

**BY:  AMERICREDIT FINANCIAL SERVICES, INC.,** as Attorney-In-Fact

By: _____
Name:
Title:

By: _____
Name: Susan B. Sheffield
Title:  Senior Vice President, Structured Finance

[Credit Support Annex – Elections and Variables]

Table 1

**Moody's First Trigger Factor**
[If "Valuation Date" means each Local Business Day, the "Daily Collateral Posting" column will apply and the Weekly Collateral Posting Column will be deleted.]
[If "Valuation Date" means the first Local Business Day in each week, the "Weekly Collateral Posting" column will apply and the Daily Collateral Posting Column will be deleted.]

| Remaining Weighted Average Life of Hedge in Years | [Daily Collateral Posting | [Weekly Collateral Posting |
|---|---|---|
| 1 or less | 0.15% | 0.25% |
| More than 1 but not more than 2 | 0.30% | 0.50% |
| More than 2 but not more than 3 | 0.40% | 0.70% |
| More than 3 but not more than 4 | 0.60% | 1.00% |
| More than 4 but not more than 5 | 0.70% | 1.20% |
| More than 5 but not more than 6 | 0.80% | 1.40% |
| More than 6 but not more than 7 | 1.00% | 1.60% |
| More than 7 but not more than 8 | 1.10% | 1.80% |
| More than 8 but not more than 9 | 1.20% | 2.00% |
| More than 9 but not more than 10 | 1.30% | 2.20% |
| More than 10 but not more than 11 | 1.40% | 2.30% |
| More than 11 but not more than 12 | 1.50% | 2.50% |
| More than 12 but not more than 13 | 1.60% | 2.70% |
| More than 13 but not more than 14 | 1.70% | 2.80% |
| More than 14 but not more than 15 | 1.80% | 3.00% |
| More than 15 but not more than 16 | 1.90% | 3.20% |
| More than 16 but not more than 17 | 2.00% | 3.30% |
| More than 17 but not more than 18 | 2.00% | 3.50% |
| More than 18 but not more than 19 | 2.00% | 3.60% |
| More than 19 but not more than 20 | 2.00% | 3.70% |
| More than 20 but not more than 21 | 2.00% | 3.90% |
| More than 21 but not more than 22 | 2.00% | 4.00% |
| More than 22 but not more than 23 | 2.00% | 4.00% |
| More than 23 but not more than 24 | 2.00% | 4.00% |
| More than 24 but not more than 25 | 2.00% | 4.00% |
| More than 25 but not more than 26 | 2.00% | 4.00% |
| More than 26 but not more than 27 | 2.00% | 4.00% |
| More than 27 but not more than 28 | 2.00% | 4.00% |
| More than 28 but not more than 29 | 2.00% | 4.00% |
| More than 29 | 2.00%] | 4.00%] |

NY1 1088131v6

Table 2

**Moody's Second Trigger Factor for Interest Rate Swaps with Fixed Notional Amounts**
[If "Valuation Date" means each Local Business Day, the "Daily Collateral Posting" column will
apply and the Weekly Collateral Posting Column will be deleted.]
[If "Valuation Date" means the first Local Business Day in each week, the "Weekly Collateral
Posting" column will apply and the Daily Collateral Posting Column will be deleted.]

| Remaining Weighted Average Life of Hedge in Years | [Daily Collateral Posting | [Weekly Collateral Posting |
|---|---|---|
| 1 or less | 0.50% | 0.60% |
| More than 1 but not more than 2 | 1.00% | 1.20% |
| More than 2 but not more than 3 | 1.50% | 1.70% |
| More than 3 but not more than 4 | 1.90% | 2.30% |
| More than 4 but not more than 5 | 2.40% | 2.80% |
| More than 5 but not more than 6 | 2.80% | 3.30% |
| More than 6 but not more than 7 | 3.20% | 3.80% |
| More than 7 but not more than 8 | 3.60% | 4.30% |
| More than 8 but not more than 9 | 4.00% | 4.80% |
| More than 9 but not more than 10 | 4.40% | 5.30% |
| More than 10 but not more than 11 | 4.70% | 5.60% |
| More than 11 but not more than 12 | 5.00% | 6.00% |
| More than 12 but not more than 13 | 5.40% | 6.40% |
| More than 13 but not more than 14 | 5.70% | 6.80% |
| More than 14 but not more than 15 | 6.00% | 7.20% |
| More than 15 but not more than 16 | 6.30% | 7.60% |
| More than 16 but not more than 17 | 6.60% | 7.90% |
| More than 17 but not more than 18 | 6.90% | 8.30% |
| More than 18 but not more than 19 | 7.20% | 8.60% |
| More than 19 but not more than 20 | 7.50% | 9.00% |
| More than 20 but not more than 21 | 7.80% | 9.00% |
| More than 21 but not more than 22 | 8.00% | 9.00% |
| More than 22 but not more than 23 | 8.00% | 9.00% |
| More than 23 but not more than 24 | 8.00% | 9.00% |
| More than 24 but not more than 25 | 8.00% | 9.00% |
| More than 25 but not more than 26 | 8.00% | 9.00% |
| More than 26 but not more than 27 | 8.00% | 9.00% |
| More than 27 but not more than 28 | 8.00% | 9.00% |
| More than 28 but not more than 29 | 8.00% | 9.00% |
| More than 29 | 8.00%] | 9.00%] |

NY1 1088131v6

Table 3

**Moody's Second Trigger Factor for Transaction-Specific Hedges**
[If "Valuation Date" means each Local Business Day, the "Daily Collateral Posting" column will
apply and the Weekly Collateral Posting Column will be deleted.]
[If "Valuation Date" means the first Local Business Day in each week, the "Weekly Collateral
Posting" column will apply and the Daily Collateral Posting Column will be deleted.]

| Remaining Weighted Average Life of Hedge in Years | [Daily Collateral Posting | [Weekly Collateral Posting |
|---|---|---|
| 1 or less | 0.65% | 0.75% |
| More than 1 but not more than 2 | 1.30% | 1.50% |
| More than 2 but not more than 3 | 1.90% | 2.20% |
| More than 3 but not more than 4 | 2.50% | 2.90% |
| More than 4 but not more than 5 | 3.10% | 3.60% |
| More than 5 but not more than 6 | 3.60% | 4.20% |
| More than 6 but not more than 7 | 4.20% | 4.80% |
| More than 7 but not more than 8 | 4.70% | 5.40% |
| More than 8 but not more than 9 | 5.20% | 6.00% |
| More than 9 but not more than 10 | 5.70% | 6.60% |
| More than 10 but not more than 11 | 6.10% | 7.00% |
| More than 11 but not more than 12 | 6.50% | 7.50% |
| More than 12 but not more than 13 | 7.00% | 8.00% |
| More than 13 but not more than 14 | 7.40% | 8.50% |
| More than 14 but not more than 15 | 7.80% | 9.00% |
| More than 15 but not more than 16 | 8.20% | 9.50% |
| More than 16 but not more than 17 | 8.60% | 9.90% |
| More than 17 but not more than 18 | 9.00% | 10.40% |
| More than 18 but not more than 19 | 9.40% | 10.80% |
| More than 19 but not more than 20 | 9.70% | 11.00% |
| More than 20 but not more than 21 | 10.00% | 11.00% |
| More than 21 but not more than 22 | 10.00% | 11.00% |
| More than 22 but not more than 23 | 10.00% | 11.00% |
| More than 23 but not more than 24 | 10.00% | 11.00% |
| More than 24 but not more than 25 | 10.00% | 11.00% |
| More than 25 but not more than 26 | 10.00% | 11.00% |
| More than 26 but not more than 27 | 10.00% | 11.00% |
| More than 27 but not more than 28 | 10.00% | 11.00% |
| More than 28 but not more than 29 | 10.00% | 11.00% |
| More than 29 | 10.00%] | 11.00%] |

# LEHMAN BROTHERS

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F ("Party B") have entered into a Master Agreement dated as of April 19, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until the first to occur of (i) receipt by Party B of a written notice of termination from Guarantor or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

1

# LEHMAN BROTHERS

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By:

Name:   James J. Killerlane III

Title:   Vice President

Date:   April 17, 2007

2

## SWAP TRANSACTION CONFIRMATION

**Date:**      April 19, 2007

**To:**        AmeriCredit Automobile Receivables Trust 2007-B-F ("**Party B**")
               AmeriCredit Financial Services, Inc.
               Attn: Derivatives Operations
               801 Cherry Street, Suite 3900
               Fort Worth, Texas 76102
               (817) 302-7951

**From:**      Lehman Brothers Special Financing Inc. ("Party A")

**Ref. No.**   Effort ID: 1324981, Global ID: 2993572

Dear Sir or Madam:

The purpose of this letter (this "<u>Confirmation</u>") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "<u>Transaction</u>"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "<u>ISDA Definitions</u>"), as published by the International Swaps and Derivatives Association, Inc. are incorporated into this Confirmation. In the event of any inconsistency between the definitions in the ISDA Definitions and this Confirmation, this Confirmation will govern. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for purposes of the ISDA Definitions. Capitalized terms used but not defined herein have the meanings ascribed to them in the Indenture.

Capitalized terms not defined herein shall have the meaning assigned to them in the Indenture dated as of April 11, 2007 (the "Indenture") between Party B and Wells Fargo Bank, National Association, as Indenture Trustee relating to the issuance by Party B of certain debt obligations. In the event of any inconsistency between the definitions in the ISDA Definitions and the Indenture, the Indenture will govern.

This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement dated as of April 19, 2007 (including the Schedule thereto) as amended and supplemented from time to time (the "<u>Agreement</u>") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified herein.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

2. The terms of the particular Transaction to which the Confirmation relates are as follows:

**Transaction Type:**              Interest Rate Swap

**Currency for Payments:**       U.S. Dollars

**Notional Amount:**           For the purpose of the initial Calculation Period, the Notional Amount will be equal to the outstanding principal balance of the Class A-4 Notes of Party B as of the Closing Date. The Notional Amount shall reset on each Distribution Date and will at all times be equal to the outstanding principal balance of the Class A-4 Notes of Party B; provided, however, that if (a) an Event of Default occurs under Section 5.1 of the Indenture, (b) the Insurer exercises its rights to declare the Notes immediately due and payable pursuant to Section 5.2 of the Indenture and (c) as a result the principal balance of the Class A-4 Notes is reduced to zero, (collectively, an "Acceleration Event"), then notwithstanding the foregoing, the Notional Amount for the Calculation Period in which such Distribution Date falls and for each Calculation Period thereafter, through and including the Termination Date shall mean the Notional Amount set forth on the attached Schedule A ( the "Scheduled Notional Amount" for such Calculation Period, assuming that Schedule A has been adjusted in accordance with the next two sentences.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, immediately following an Acceleration Event, if the Notional Amount (calculated as equal to the outstanding principal balance of the Class A-4 Notes without giving effect to any principal reduction that occurs solely as a consequence of such Acceleration Event (the "Note Balance Notional Amount")) is smaller than the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date, then (1) the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date shall be reduced to equal the Note Balance Notional Amount calculated above and (2) the Scheduled Notional Amount for each subsequent Calculation Period shall be equal to the Scheduled Notional Amount set forth on Schedule A for such Calculation Period multiplied by a percentage equivalent of a fraction equal to: (a) the Note Balance Notional Amount over (b) the Scheduled Notional Amount for the Calculation Period in respect of the Distribution Date immediately following the Acceleration Event.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, following an Acceleration Event, if the Note Balance Notional Amount is greater than or equal to the Scheduled Notional Amount, no adjustment to the Scheduled Notional Amount shall be made.

For the purposes of determining the Settlement Amount in the event of an Early Termination of this Transaction pursuant to Section 6 of the Agreement, notwithstanding anything to the contrary contained in the Agreement, Market Quotation will be determined as if this Transaction were a fixed amortization swap transaction with an initial Notional

2

Amount as of the Early Termination Date equal to the Scheduled Notional Balance corresponding to the Calculation Period in which such Early Termination Date occurs and amortizing according to Schedule A, subject to adjustment to the Scheduled Notional Amount in accordance with the methodology set forth above.

With respect to any Distribution Date, the outstanding balance of the Notes will be determined by reference to the Servicer's Certificate issued with respect to such Distribution Date (before giving effect to all distributions to be made on such Distribution Date).

Term:

Trade Date: April 11, 2007

Effective Date: April 19, 2007

Termination Date:

The earliest of (i) December 06, 2013, (ii) the date on which the outstanding principal balance of the Class A-4 Notes is reduced to zero (unless such outstanding principal balance is reduced to zero due to the occurrence of an Acceleration Event) and (iii) the Early Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Fixed Amounts:

Fixed Rate Payer: Party B

Period End Dates:

Monthly on the 6th of each month, commencing May 7, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Payment Dates:

Monthly on the 6th of each month, commencing May 7, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Business Day: New York

Fixed Rate: 5.095%

Fixed Rate Day Count Fraction: Actual/360

Floating Amounts:

Floating Rate Payer: Party A

Period End Dates:

Monthly on the 6th of each month, commencing May 7, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Payment Dates:

Monthly on the 6th of each month, commencing May 7, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Business Day: New York

Floating Rate Option: USD-LIBOR-BBA

3

| | |
|---|---|
| Designated Maturity: | 1 Month |
| Spread: | Plus 5 basis points (0.05%). |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |
| Compounding: | Inapplicable |

3. Additional Provisions:

"Credit Support Document" means, with respect to Party B, Financial Guaranty Insurance Policy (Policy No 51831B-N) (the "Policy") issued by Financial Security Assurance Inc.

"Credit Support Provider" means, with respect to Party B, Financial Security Assurance Inc. and its successors and assigns.

Fixed Rate Payer Payment Dates shall be deemed to be included in the definition of Scheduled Payments under the Policy.

4. The additional provisions of this Confirmation are as follows:

Calculation Agent:                     Party A or as otherwise defined in the Agreement

Payments to Party A:                   [Payment Info]

Payments to Party B:                   Wells Fargo Corporate Trust
                                       ABA: 12-1000248
                                       Account:
                                       FFC:

4

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:

Name:    Robert E. Guglielmo
Title:    Senior Vice President

Accepted and confirmed as of the date first above written:

**AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-B-F**
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By:
Name:
Title:

[Class A-4 Note Swap Confirmation]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:_____
Name:
Title:

Accepted and confirmed as of the date first above written:

**AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-B-F**
BY: AmeriCredit Financial Services, Inc., as Attorney-In-Fact

By: _Sun B Sheffield_
Name: Susan B. Sheffield
Title: Senior Vice President, Structured Finance

[Class A-4 Note Swap Confirmation]

# LEHMAN BROTHERS

### Schedule A

| Calculation Period | | | USD Notional Amount | USD Notional Reduction |
|---|---|---|---|---|
| (from and including, to but excluding) | | | | (at end of period) |
| 19 Apr 07 | to | 07 May 07 | 450,000,000.00 | |
| 07 May 07 | to | 06 Jun 07 | 450,000,000.00 | |
| 06 Jun 07 | to | 06 Jul 07 | 450,000,000.00 | |
| 06 Jul 07 | to | 06 Aug 07 | 450,000,000.00 | |
| 06 Aug 07 | to | 06 Sep 07 | 450,000,000.00 | |
| 06 Sep 07 | to | 09 Oct 07 | 450,000,000.00 | |
| 09 Oct 07 | to | 06 Nov 07 | 450,000,000.00 | |
| 06 Nov 07 | to | 06 Dec 07 | 450,000,000.00 | |
| 06 Dec 07 | to | 07 Jan 08 | 450,000,000.00 | |
| 07 Jan 08 | to | 06 Feb 08 | 450,000,000.00 | |
| 06 Feb 08 | to | 06 Mar 08 | 450,000,000.00 | |
| 06 Mar 08 | to | 07 Apr 08 | 450,000,000.00 | |
| 07 Apr 08 | to | 06 May 08 | 450,000,000.00 | |
| 06 May 08 | to | 06 Jun 08 | 450,000,000.00 | |
| 06 Jun 08 | to | 07 Jul 08 | 450,000,000.00 | |
| 07 Jul 08 | to | 06 Aug 08 | 450,000,000.00 | |
| 06 Aug 08 | to | 08 Sep 08 | 450,000,000.00 | |
| 08 Sep 08 | to | 06 Oct 08 | 450,000,000.00 | |
| 06 Oct 08 | to | 06 Nov 08 | 450,000,000.00 | |
| 06 Nov 08 | to | 08 Dec 08 | 450,000,000.00 | |
| 08 Dec 08 | to | 06 Jan 09 | 450,000,000.00 | |
| 06 Jan 09 | to | 06 Feb 09 | 450,000,000.00 | |
| 06 Feb 09 | to | 06 Mar 09 | 450,000,000.00 | |
| 06 Mar 09 | to | 06 Apr 09 | 450,000,000.00 | |
| 06 Apr 09 | to | 06 May 09 | 450,000,000.00 | |
| 06 May 09 | to | 08 Jun 09 | 450,000,000.00 | |
| 08 Jun 09 | to | 06 Jul 09 | 450,000,000.00 | |
| 06 Jul 09 | to | 06 Aug 09 | 450,000,000.00 | |
| 06 Aug 09 | to | 08 Sep 09 | 450,000,000.00 | |
| 08 Sep 09 | to | 06 Oct 09 | 450,000,000.00 | |
| 06 Oct 09 | to | 06 Nov 09 | 428,900,581.51 | |
| 06 Nov 09 | to | 07 Dec 09 | 405,762,896.68 | |
| 07 Dec 09 | to | 06 Jan 10 | 383,469,435.56 | |
| 06 Jan 10 | to | 08 Feb 10 | 361,923,960.38 | |
| 08 Feb 10 | to | 08 Mar 10 | 341,809,528.47 | |
| 08 Mar 10 | to | 06 Apr 10 | 322,346,352.63 | |
| 06 Apr 10 | to | 06 May 10 | 303,851,380.13 | |
| 06 May 10 | to | 07 Jun 10 | 286,016,554.86 | |
| 07 Jun 10 | to | 06 Jul 10 | 269,016,593.82 | |
| 06 Jul 10 | to | 06 Aug 10 | 253,124,852.39 | |
| 06 Aug 10 | to | 07 Sep 10 | 238,153,672.64 | |
| 07 Sep 10 | to | 06 Oct 10 | 223,806,288.31 | |
| 06 Oct 10 | to | 08 Nov 10 | 209,966,594.14 | |
| 08 Nov 10 | to | 06 Dec 10 | 196,171,207.21 | |
| 06 Dec 10 | to | 06 Jan 11 | 182,953,163.07 | |
| 06 Jan 11 | to | 07 Feb 11 | 170,261,158.88 | |
| 07 Feb 11 | to | 07 Mar 11 | 158,421,850.83 | |
| 07 Mar 11 | to | 06 Apr 11 | 147,042,503.53 | |
| 06 Apr 11 | to | 06 May 11 | 0.00 | |
| 06 May 11 | to | 06 Jun 11 | 0.00 | |
| 06 Jun 11 | to | 06 Jul 11 | 0.00 | |
| 06 Jul 11 | to | 06 Aug 11 | 0.00 | |

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

11-02003-jmp Doc 1-1 Filed 02/14/11 Entered 02/14/11 04:36:29 Main Document Pg 182 of 302

| Calculation Period | | | USD Notional Amount | USD Notional Reduction |
|---|---|---|---|---|
| (from and including, to but excluding) | | | | (at end of period) |
| 06 Aug 11 | to | 06 Sep 11 | 0.00 | |
| 06 Sep 11 | to | 06 Oct 11 | 0.00 | |
| 06 Oct 11 | to | 06 Nov 11 | 0.00 | |
| 06 Nov 11 | to | 06 Dec 11 | 0.00 | |
| 06 Dec 11 | to | 06 Jan 12 | 0.00 | |
| 06 Jan 12 | to | 06 Feb 12 | 0.00 | |
| 06 Feb 12 | to | 06 Mar 12 | 0.00 | |
| 07 Mar 12 | to | 06 Apr 12 | 0.00 | |
| 06 Apr 12 | to | 06 May 12 | 0.00 | |
| 06 May 12 | to | 06 Jun 12 | 0.00 | |
| 06 Jun 12 | to | 06 Jul 12 | 0.00 | |
| 06 Jul 12 | to | 06 Aug 12 | 0.00 | |
| 06 Aug 12 | to | 06 Sep 12 | 0.00 | |
| 06 Sep 12 | to | 06 Oct 12 | 0.00 | |
| 06 Oct 12 | to | 06 Nov 12 | 0.00 | |
| 06 Nov 12 | to | 06 Dec 12 | 0.00 | |
| 06 Dec 12 | to | 06 Dec 13 | 0.00 | |
| 06 Dec 13 | to | 06 Jan 13 | 0.00 | |
| 06 Jan 13 | to | 06 Feb 13 | 0.00 | |
| 06 Feb 13 | to | 06 Mar 13 | 0.00 | |
| 06 Mar 13 | to | 06 Apr 13 | 0.00 | |
| 06 Apr 13 | to | 06 May 13 | 0.00 | |
| 06 May 13 | to | 06 Jun 13 | 0.00 | |
| 06 Jun 13 | to | 06 Jul 13 | 0.00 | |
| 06 Jul 13 | to | 06 Aug 13 | 0.00 | |
| 06 Aug 13 | to | 06 Sep 13 | 0.00 | |
| 06 Sep 13 | to | 06 Oct 13 | 0.00 | |
| 06 Oct 13 | to | 06 Nov 13 | 0.00 | |
| 06 Nov 13 | to | 06 Dec 13 | 0.00 | |

## SWAP TRANSACTION CONFIRMATION

Date:       April 19, 2007

To:         AmeriCredit Automobile Receivables Trust 2007-B-F ("Party B")
            AmeriCredit Financial Services, Inc.
            Attn: Derivatives Operations
            801 Cherry Street, Suite 3900
            Fort Worth, Texas 76102
            (817) 302-7951

From:       Lehman Brothers Special Financing Inc. ("Party A")

Ref. No.    Effort ID: 1324984, Global ID: 2993475

Dear Sir or Madam:

The purpose of this letter (this "Confirmation") is to confirm the terms and conditions of the Transaction entered
into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a
"Confirmation" as referred to in the ISDA Master Agreement specified below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "ISDA Definitions"), as published by
the International Swaps and Derivatives Association, Inc. are incorporated into this Confirmation. In the event of
any inconsistency between the definitions in the ISDA Definitions and this Confirmation, this Confirmation will
govern. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for purposes
of the ISDA Definitions. Capitalized terms used but not defined herein have the meanings ascribed to them in the
Indenture.

Capitalized terms not defined herein shall have the meaning assigned to them in the Indenture dated as of April 11,
2007 (the "Indenture") between Party B and Wells Fargo Bank, National Association, as Indenture Trustee relating
to the issuance by Party B of certain debt obligations. In the event of any inconsistency between the definitions in
the ISDA Definitions and the Indenture, the Indenture will govern.

This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement dated as of
April 19, 2007 (including the Schedule thereto) as amended and supplemented from time to time (the "Agreement")
between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly
modified herein.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and
does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is
a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its
decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in
connection with this Transaction regardless of whether the other party provides it with market information or its
views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic
consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice
received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction
is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents
that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,
enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors'
rights generally and to equitable principles of general application.

2. The terms of the particular Transaction to which the Confirmation relates are as follows:

Transaction Type:                    Interest Rate Swap

Currency for Payments:               U.S. Dollars

Notional Amount:                     For the purpose of the initial Calculation Period, the Notional Amount will be equal to the outstanding principal balance of the Class A-3-B Notes of Party B as of the Closing Date. The Notional Amount shall reset on each Distribution Date and will at all times be equal to the outstanding principal balance of the Class A-3-B Notes of Party B; provided, however, that if (a) an Event of Default occurs under Section 5.1 of the Indenture, (b) the Insurer exercises its rights to declare the Notes immediately due and payable pursuant to Section 5.2 of the Indenture and (c) as a result the principal balance of the Class A-3-B Notes is reduced to zero, (collectively, an "Acceleration Event" ), then notwithstanding the foregoing, the Notional Amount for the Calculation Period in which such Distribution Date falls and for each Calculation Period thereafter, through and including the Termination Date shall mean the Notional Amount set forth on the attached Schedule A ( the "Scheduled Notional Amount" for such Calculation Period, assuming that Schedule A has been adjusted in accordance with the next two sentences.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, immediately following an Acceleration Event, if the Notional Amount (calculated as equal to the outstanding principal balance of the Class A-3-B Notes without giving effect to any principal reduction that occurs solely as a consequence of such Acceleration Event (the "Note Balance Notional Amount")) is smaller than the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date, then (1) the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date shall be reduced to equal the Note Balance Notional Amount calculated above and (2) the Scheduled Notional Amount for each subsequent Calculation Period shall be equal to the Scheduled Notional Amount set forth on Schedule A for such Calculation Period multiplied by a percentage equivalent of a fraction equal to: (a) the Note Balance Notional Amount over (b) the Scheduled Notional Amount for the Calculation Period in respect of the Distribution Date immediately following the Acceleration Event.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, following an Acceleration Event, if the Note Balance Notional Amount is greater than or equal to the Scheduled Notional Amount, no adjustment to the Scheduled Notional Amount shall be made.

For the purposes of determining the Settlement Amount in the event of an Early Termination of this Transaction pursuant to Section 6 of the Agreement, notwithstanding anything to the contrary contained in the Agreement, Market Quotation will be determined as if this Transaction

2

were a fixed amortization swap transaction with an initial Notional
Amount as of the Early Termination Date equal to the Scheduled
Notional Balance corresponding to the Calculation Period in which such
Early Termination Date occurs and amortizing according to Schedule A,
subject to adjustment to the Scheduled Notional Amount in accordance
with the methodology set forth above.

With respect to any Distribution Date, the outstanding balance of the
Notes will be determined by reference to the Servicer's Certificate
issued with respect to such Distribution Date (before giving effect to all
distributions to be made on such Distribution Date).

Term:

Trade Date: April 11, 2007

Effective Date: April 19, 2007

Termination Date:

The earliest of (i) April 06, 2012, (ii) the date on which the outstanding
principal balance of the Class A-3-B Notes is reduced to zero (unless
such outstanding principal balance is reduced to zero due to the
occurrence of an Acceleration Event) and (iii) the Early Termination
Date, subject to adjustment in accordance with the Following Business
Day Convention.

Fixed Amounts:

Fixed Rate Payer: Party B

Period End Dates:

Monthly on the 6th of each month, commencing May 7, 2007, through
and including the Termination Date, subject to adjustment in accordance
with the Following Business Day Convention.

Payment Dates:

Monthly on the 6th of each month, commencing May 7, 2007, through
and including the Termination Date, subject to adjustment in accordance
with the Following Business Day Convention.

Business Day: New York

Fixed Rate: 5.103%

Fixed Rate Day Count
Fraction: Actual/360

Floating Amounts:

Floating Rate Payer: Party A

Period End Dates: Monthly on the 6th of each month, commencing May 7, 2007, through
and including the Termination Date, subject to adjustment in accordance
with the Following Business Day Convention.

Payment Dates: Monthly on the 6th of each month, commencing May 7, 2007, through
and including the Termination Date, subject to adjustment in accordance
with the Following Business Day Convention.

Business Day: New York

Floating Rate Option: USD-LIBOR-BBA

3

09/25/2007    17:18    LEHMAN → 916468859551                                    NO.345    P04

11·3002·0003·jrmp  DDoc1·0-1 FilEiledt102·7511431·1 ErEermendetd102·75114312·014635·429 MaiExHiDoictAmePtg
                                          Pty4·9·8of @B402

| Designated Maturity: | 1 Month |
| Spread: | Plus 2 basis points (0.02%). |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |
| Compounding: | Inapplicable |

3. Additional Provisions:

"Credit Support Document" means, with respect to Party B, Financial Guaranty Insurance Policy (Policy No 51831B-N) (the "Policy") issued by Financial Security Assurance Inc.

"Credit Support Provider" means, with respect to Party B, Financial Security Assurance Inc. and its successors and assigns.

Fixed Rate Payer Payment Dates shall be deemed to be included in the definition of Scheduled Payments under the Policy.

4. The additional provisions of this Confirmation are as follows:

| Calculation Agent: | Party A or as otherwise defined in the Agreement |
| Payments to Party A: | [Payment Info] |
| Payments to Party B: | Wells Fargo Corporate Trust<br>ABA: 12-1000248<br>Account:<br>FFC: |

4

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:
Name:
Title:

Robert F. Guglielmo
Senior Vice President

Accepted and confirmed as of the date first above written:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F**
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By:
Name:
Title:

[Class A-3-B Note Swap Confirmation]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:

Accepted and confirmed as of the date first above written:

AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-B-F
BY: AmeriCredit Financial Services, Inc., as Attorney-In-Fact

By: _____
Name: Susan B. Sheffield
Title: Senior Vice President, Structured Finance

[Class A-3-B Note Swap Confirmation]

# LEHMAN BROTHERS

### Schedule A

| Calculation Period | | | USD Notional Amount | USD Notional Reduction |
|---|---|---|---|---|
| (from and including, to but excluding) | | | | (at end of period) |
| 19 Apr 07 | to | 07 May 07 | 190,000,000.00 | |
| 07 May 07 | to | 06 Jun 07 | 190,000,000.00 | |
| 06 Jun 07 | to | 06 Jul 07 | 190,000,000.00 | |
| 06 Jul 07 | to | 06 Aug 07 | 190,000,000.00 | |
| 06 Aug 07 | to | 06 Sep 07 | 190,000,000.00 | |
| 06 Sep 07 | to | 09 Oct 07 | 190,000,000.00 | |
| 09 Oct 07 | to | 06 Nov 07 | 190,000,000.00 | |
| 06 Nov 07 | to | 06 Dec 07 | 190,000,000.00 | |
| 06 Dec 07 | to | 07 Jan 08 | 190,000,000.00 | |
| 07 Jan 08 | to | 06 Feb 08 | 190,000,000.00 | |
| 06 Feb 08 | to | 06 Mar 08 | 190,000,000.00 | |
| 06 Mar 08 | to | 07 Apr 08 | 190,000,000.00 | |
| 07 Apr 08 | to | 06 May 08 | 190,000,000.00 | |
| 06 May 08 | to | 06 Jun 08 | 190,000,000.00 | |
| 06 Jun 08 | to | 07 Jul 08 | 190,000,000.00 | |
| 07 Jul 08 | to | 06 Aug 08 | 190,000,000.00 | |
| 06 Aug 08 | to | 08 Sep 08 | 190,000,000.00 | |
| 08 Sep 08 | to | 06 Oct 08 | 190,000,000.00 | |
| 06 Oct 08 | to | 06 Nov 08 | 182,747,256.61 | |
| 06 Nov 08 | to | 08 Dec 08 | 163,138,819.46 | |
| 08 Dec 08 | to | 06 Jan 09 | 144,069,788.67 | |
| 06 Jan 09 | to | 06 Feb 09 | 125,469,235.94 | |
| 06 Feb 09 | to | 06 Mar 09 | 108,038,448.20 | |
| 06 Mar 09 | to | 06 Apr 09 | 91,040,578.43 | |
| 06 Apr 09 | to | 06 May 09 | 74,321,069.08 | |
| 06 May 09 | to | 08 Jun 09 | 58,096,775.06 | |
| 08 Jun 09 | to | 06 Jul 09 | 42,556,005.41 | |
| 06 Jul 09 | to | 06 Aug 09 | 28,000,941.36 | |
| 06 Aug 09 | to | 08 Sep 09 | 14,258,757.33 | |
| 08 Sep 09 | to | 06 Oct 09 | 1,032,913.37 | |
| 06 Oct 09 | to | 06 Nov 09 | 0.00 | |
| 06 Nov 09 | to | 07 Dec 09 | 0.00 | |
| 07 Dec 09 | to | 06 Jan 10 | 0.00 | |
| 06 Jan 10 | to | 08 Feb 10 | 0.00 | |
| 08 Feb 10 | to | 08 Mar 10 | 0.00 | |
| 08 Mar 10 | to | 06 Apr 10 | 0.00 | |
| 06 Apr 10 | to | 06 May 10 | 0.00 | |
| 06 May 10 | to | 07 Jun 10 | 0.00 | |
| 07 Jun 10 | to | 06 Jul 10 | 0.00 | |
| 06 Jul 10 | to | 06 Aug 10 | 0.00 | |
| 06 Aug 10 | to | 07 Sep 10 | 0.00 | |
| 07 Sep 10 | to | 06 Oct 10 | 0.00 | |
| 06 Oct 10 | to | 07 Nov 10 | 0.00 | |
| 07 Nov 10 | to | 06 Dec 10 | 0.00 | |
| 06 Dec 10 | to | 06 Jan 11 | 0.00 | |
| 06 Jan 11 | to | 06 Feb 11 | 0.00 | |
| 06 Feb 11 | to | 06 Mar 11 | 0.00 | |
| 06 Mar 11 | to | 06 Apr 11 | 0.00 | |
| 06 Apr 11 | to | 06 May 11 | 0.00 | |
| 06 May 11 | to | 07 Jun 11 | 0.00 | |
| 07 Jun 11 | to | 06 Jul 11 | 0.00 | |
| 06 Jul 11 | to | 06 Aug 11 | 0.00 | |

LEHMAN BROTHERS SPECIAL FINANCING INC.
LEHMAN BROTHERS INC.
745 SEVENTH AVENUE, NEW YORK NY 10019

11-002003-jmp  DDoc 10-1 Filed 10/25/11 Entered 10/25/11 21:46:29 Main Doc Amendg Pt 5 Pg 190 of 302

| | Calculation Period | | USD Notional Amount | USD Notional Reduction |
|---|---|---|---|---|
| | (from and including, to but excluding) | | | (at end of period) |
| 06 Aug 11 | to | 07 Sep 11 | 0.00 | |
| 07 Sep 11 | to | 06 Oct 11 | 0.00 | |
| 06 Oct 11 | to | 07 Nov 11 | 0.00 | |
| 07 Nov 11 | to | 06 Dec 11 | 0.00 | |
| 06 Dec 11 | to | 06 Jan 12 | 0.00 | |
| 06 Jan 12 | to | 06 Feb 12 | 0.00 | |
| 06 Feb 12 | to | 06 Mar 12 | 0.00 | |
| 06 Mar 12 | to | 06 Apr 12 | 0.00 | |

Risk ID: 1491199L / Effort ID: 1324984 / Global Deal ID: 2993475

(Multicurrency – Cross Border)



**International Swap Dealers Association, Inc.**

# MASTER AGREEMENT

dated as of September 20, 2007

LEHMAN BROTHERS SPECIAL FINANCING INC. and AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

## 1.   Interpretation

(a)   *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)   *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)   *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

## 2.   Obligations

(a)   *General Conditions.*

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)   Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)  *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)  *Netting.* If on any date amounts would otherwise be payable: —

    (i)  in the same currency; and

    (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)  **Deduction or Withholding for Tax.**

    (i)  *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will: —

        (1)  promptly notify the other party ("Y") of such requirement;

        (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for: —

            (A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)    *Liability.* If: —

> (1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);
>
> (2)    X does not so deduct or withhold; and
>
> (3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that: —

(a)    *Basic Representations.*

> (i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;
>
> (ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;
>
> (iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;
>
> (iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and
>
> (v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

### 4.     Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party: —

(a)     *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs: —

   (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)     any other documents specified in the Schedule or any Confirmation; and

   (iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.  Events of Default and Termination Events

(a)  *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: —

(i)  *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)  *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)  *Credit Support Default.*

(1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)  the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)  the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)  *Misrepresentation.*  A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)  *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)  *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)   *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:–

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof, (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)   *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: –

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date. it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); of

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6. Early Termination

(a) *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

### (b) *Right to Terminate Following Termination Event.*

(i) *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate.* If:—

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

### (c) *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

### (d) *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7. Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8. Contractual Currency

(a)     *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)     *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)     *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                                                            ISDA® 1992

## 9. Miscellaneous

(a) *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10. Offices; Multibranch Parties

(a) If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b) Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c) If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11. Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

12                                      ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12. Notices

(a) *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b) *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to all

## 13. Governing Law and Jurisdiction

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c) *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)  *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.  Definitions

As used in this Agreement: —

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means: —

(a)  in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)  in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)  in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)  in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different. in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(c)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:-

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction. for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F** |
| (Name of Party) | (Name of Party)<br>**By: AMERICREDIT FINANCIAL SERVICES, INC., as Attorney-In-Fact** |
| By: _____ <br> Name: Locke McMurray <br> Title: Managing Director <br> Date: | By _____ <br> Name: <br> Title: <br> Date: |

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL FINANCING INC.

(Name of Party)

By: _____
Name:
Title:
Date:

AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F

(Name of Party)
By: AMERICREDIT FINANCIAL SERVICES, INC., as Attorney-In-Fact

By _____
Name: Susan B. Sheffield
Title: Senior Vice President, Structured Finance
Date: September 20, 2007

ISDA® 1992

**SCHEDULE**
to the
**MASTER AGREEMENT**
dated as of September 20, 2007 between

**LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A")**

and

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F ("Party B")**

Part 1.   *Termination Provisions*

(a)   "Specified Entity" means, with respect to Party A for all purposes of this Agreement, none, and with respect to Party B for all purposes of this Agreement, none.

(b)   "Specified Transaction" has its meaning as defined in Section 14 of this Agreement.

(c)   The "**Automatic Early Termination**" provision of Section 6(a) of this Agreement does not apply to Party A or Party B.

(d)   [Reserved].

(e)   **Payments on Early Termination.**  Except as otherwise provided in this Schedule, "Market Quotation" and the "Second Method" apply.

(f)   "Termination Currency" means United States Dollars.

(g)   **Timing of Party B Termination Payment.**  If an amount calculated as being due in respect of an Early Termination Date under Section 6(e) of this Agreement is an amount to be paid by Party A to Party B then, notwithstanding the provisions of Section 6(d)(ii) of this Agreement, such amount will be payable on the first Distribution Date following the date on which the payment would have been payable as determined in accordance with Section 6(d)(ii); *provided* that if the date on which the payment would have been payable as determined in accordance with Section 6(d)(ii) is a Distribution Date, then the payment will be payable on the date determined in accordance with Section 6(d)(ii).

(h)   **Limitation on Defaults by Party A and Party B.**  The Events of Default specified in Section 5 of this Agreement shall not apply to Party A or Party B except for the following:

   (i)   With respect to both Party A and Party B, Section 5(a)(i) of this Agreement (Failure to Pay or Deliver) subject to the provisions of the last paragraph hereof;

   (ii)   With respect to Party A only, Section 5(a)(ii) of this Agreement (Breach of Agreement); *provided* that Section 5(a)(ii) will not apply to Party A with respect to Party A's failure to comply with its obligations under Part 5(b)(ii) or 5(b)(iii) herein or under the Credit Support Annex;

   (iii)   With respect to Party A only, Section 5(a)(iii) of this Agreement (Credit Support Default) subject to the provisions of the last paragraph hereof; *provided* that Section 5(a)(iii)(1) shall apply to Party B with respect to Party B's obligations under Paragraph 3(b) of any Credit Support Annex;

   (iv)   With respect to Party A only, Section 5(a)(iv) of this Agreement (Misrepresentation);

   (v)   With respect to Party A only, Section 5(a)(vi) of this Agreement (Cross Default).  For the purposes of this Part 1(h)(v), "Threshold Amount" shall mean, with respect to Party A, the lesser of (i) USD 100,000,000 and (ii) three percent (3%) of the Stockholders' Equity (excluding

deposits) of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency). "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"Specified Indebtedness," with respect to Party A, shall have the meaning specified in Section 14,

(vi)   With respect to both Party A and Party B, Section 5(a)(vii) of this Agreement (Bankruptcy); *provided* that clauses (2), (7) and (9) thereof shall not apply with respect to Party B, *provided* further that clause (4) shall not apply to Party B to the extent that it refers to proceedings or petitions instituted or presented by Party A or any of its Affiliates, *provided* further that clause (6) shall not apply to Party B to the extent that it refers to (i) any appointment that is effected by or pursuant to the Basic Documents or (ii) any appointment to which Party B has not become subject, and *provided* further that clause (8) shall not apply to Party B to the extent that clause (8) relates to clauses (2), (4), (6) and (7) (except to the extent that such provisions are not disapplied to Party B); and

(vii)  With respect to both Party A and Party B, Section 5(a)(viii) of this Agreement (Merger Without Assumption).

Notwithstanding Sections 5(a)(i) and 5(a)(iii) of this Agreement, any failure by Party A to comply with or perform any obligation to be complied with or performed by Party A under the Credit Support Annex shall not be an Event of Default unless (A) (i) the Second Rating Trigger Requirements apply and at least 30 Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply and (ii) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A, or (B) (i) a Ratings Event has occurred and is continuing and at least 10 Local Business Days (or 30 calendar days, in the case of Fitch) have elapsed since the date on which a Ratings Event occurred and (ii) such failure is not remedied on or before the third Local Business Day after notice of such failure is given to Party A.

(i)   **Limitation on Termination Events by Party A and Party B.** The Termination Events specified in Section 5 of this Agreement shall not apply to Party A or Party B except for the following:

(i)    With respect to both Party A and Party B, Section 5(b)(i) of this Agreement (Illegality);

(ii)   With respect to both Party A and Party B, Section 5(b)(ii) of this Agreement (Tax Event); and

(iii)  With respect to both Party A and Party B, Section 5(b)(iii) of this Agreement (Tax Event Upon Merger); *provided* that Party A shall not be entitled to designate an Early Termination Date by reason of a Tax Event Upon Merger in respect of which it is the Affected Party.

(j)   **Additional Termination Events.** The occurrence of any of the following events shall be an Additional Termination Event.

(i)    **First Rating Trigger.** If at any time no Relevant Entity maintains the First Trigger Required Ratings and the Second Rating Trigger Requirements do not apply and Party A has failed to (A) comply with or perform any obligation to be complied with or performed by Party A in accordance with the Credit Support Annex or Part 5(b) hereof (after giving effect to the relevant time frame specified in Part 5(b) hereof), (B) furnish an Eligible Guarantee of Party A's obligations under this Agreement from a guarantor that maintains the First Trigger Required Ratings and/or the Second Trigger Required Ratings (provided, that if such guarantor maintains only the Second Trigger Required Ratings, it must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the

2

amounts required to be posted by Moody's, S&P and Fitch) at the time that such Eligible Guarantee is so furnished) or (C) obtain an Eligible Replacement pursuant to Part 6(a) that (1) upon satisfaction of the Rating Agency Condition (as defined below) assumes the obligations of Party A under this Agreement (through a novation or other assignment and assumption agreement in form and substance reasonably satisfactory to Party B) or (2) having provided prior written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with transactions on identical terms, except that Party A shall be replaced as counterparty (provided that such Eligible Replacement, as of the date of such assumption or replacement, will not, as a result thereof, be required to withhold or deduct on account of tax under the Agreement or the new Transactions, as applicable, and such assumption or replacement will not lead to a Termination Event or Event of Default occurring under the Agreement or new Transactions, as applicable). With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(ii) **Second Rating Trigger**. (1) The Second Rating Trigger Requirements apply and 30 or more Local Business Days have elapsed since the last time the Second Rating Trigger Requirements did not apply and (2) either (A) (x) at least one Eligible Replacement has made a Firm Offer (which remains capable of becoming legally binding upon acceptance) to be the transferee of a transfer to be made in accordance with Part 6(a) below and/or (y) at least one entity with the First Trigger Required Ratings and/or the Second Trigger Required Ratings has made a Firm Offer (which remains capable of becoming legally binding upon acceptance by the offeree) to provide an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement or (B) Party A has not used commercially reasonable efforts to obtain any such Firm Offer. With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(iii) **Ratings Event**. Party A fails to comply with any downgrade provisions as set forth in Part 5(b)(ii) or 5(b)(iii), as applicable, after giving effect to the relevant time frame specified therein. With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(iv) **Regulation AB Matters**. Party A fails to comply with Part 6(n)(ii) of this Agreement. With respect to the foregoing Additional Termination Event, Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(v) **Termination**. Party B is dissolved. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(vi) **Acceleration**. The Trustee declares the Notes due and payable for any reason and such declaration is (or becomes) unrescindable or irrevocable. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(vii) **Redemption**. Any mandatory redemption, auction call redemption, optional redemption, tax redemption, clean-up call or other prepayment in full or repayment in full of all Notes outstanding occurs under the Indenture (or any notice is given to that effect and such mandatory redemption, auction call redemption, optional redemption, tax redemption, clean-up call or other prepayment or repayment is not capable of being rescinded). With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(viii) **Default**. Any Event of Default (as defined in the Indenture) occurs under the Indenture (or any notice is given by the Trustee or any other authorized party to that effect), the Notes have been declared due and payable under the Indenture (and such declaration has not been rescinded and annulled in accordance with the Indenture), and the Trustee, the Noteholders or any other party authorized under the terms of the Basic Documents or by law: (1) initiates procedures to sell,

liquidate or dispose of any of the Collateral under the Indenture; (2) institutes Proceedings for the collection of all amounts payable under the Indenture; (3) institutes Proceedings for the complete or partial foreclosure of the Indenture with respect to the Collateral; or (4) exercises any remedies of a secured party under the UCC with respect to the Collateral, and any such action is not to judgment or final decree. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions; *provided, however*, in connection with the foregoing Additional Termination Event, for purposes of designating any Early Termination Date, notwithstanding anything contained in Section 6(a) of the Agreement to the contrary, either Party A or Party B shall be permitted to designate an Early Termination Date.

(ix) **Amendment.** Any Basic Document is amended or modified without the prior written consent of Party A if the consent of Party A is required pursuant to the terms of the related Basic Document; *provided, however*, that it shall not be an Additional Termination Event where such amendment or modification involves the appointment of any successor trustee, securities administrator, master servicer or servicer pursuant to the terms of the Indenture. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(x) **FSA Rating.** FSA fails, at any time during the term of this Agreement, to have (a) a claims paying ability rating of "A-" or above from S&P, (b) a financial strength rating of "A3" or above from Moody's or (c) a financial strength rating of "A-" or above from Fitch and either (x) an Event of Default under this Agreement has occurred and is continuing with respect to which Party B is the Defaulting Party or (y) a Termination Event has occurred and is continuing with respect to which Party B is the Affected Party. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

(xi) **FSA Payment Default.** FSA fails to meet its payment obligations under the Swap Policy with respect to Fixed Amounts (as defined in the related Confirmation) (other than Termination Payments) due from Party B and such failure is continuing under the Swap Policy. With respect to the foregoing Additional Termination Event, Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions.

Notwithstanding anything to the contrary in Section 6 of this Agreement, if either an Event of Default or Termination Event has occurred and is continuing, (other than with respect to Section 5(b)(i) or an Additional Termination Event described in Part 1(j)(iv), (x) or (xi)), neither Party A nor Party B shall have the right to designate an Early Termination Date unless either (a) FSA has failed to pay any payment due to Party A under the terms and conditions of the Swap Policy with respect to Fixed Amounts (other than Termination Payments), which failure is continuing, or (b) FSA has otherwise consented to such designation in writing. Any purported designation in violation of this provision will, at the election of FSA, be void and of no effect.

If any Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party, then FSA (so long as it has not failed to pay any payment due to Party A under the terms and conditions of the Swap Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by FSA under the Swap Policy. The parties acknowledge that, except as the Swap Policy may be otherwise endorsed, unless FSA so directs Party A to designate an Early Termination Date or consents to such designation by one of the parties, payments due from Party B because an Early Termination Date has been designated will not be insured.

4

(k) **Calculations.** Notwithstanding Section 6 of this Agreement, for so long as Party A is (A) the sole Affected Party in respect of an Additional Termination Event or a Tax Event Upon Merger or (B) the Defaulting Party in respect of any Event of Default, the following shall apply:

(i) The definition of "Market Quotation" shall be deleted in its entirety and replaced with the following:

"Market Quotation" means, with respect to one or more Terminated Transactions, a Firm Offer which is (1) made by a Reference Market-maker that is an Eligible Replacement, (2) for an amount that would be paid to Party B (expressed as a negative number) or by Party B (expressed as a positive number) in consideration of an agreement between Party B and such Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transactions or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date, (3) made on the basis that Unpaid Amounts in respect of the Terminated Transaction or group of Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included and (4) made in respect of a Replacement Transaction with terms substantially the same as those of this Agreement (save for the exclusion of provisions relating to Transactions that are not intended to be replacements for Terminated Transactions).

(ii) The definition of "Settlement Amount" shall be deleted in its entirety and replaced with the following:

"Settlement Amount" means, with respect to any Early Termination Date, an amount (as determined by Party B) equal to the Termination Currency Equivalent of the amount (whether positive or negative) of any Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions that is accepted by Party B so as to become legally binding; *provided* that:

(A) If, on the day falling ten Local Business Days after the day on which the Early Termination Date is designated or such later day as Party B may specify in writing to Party A (but in either case no later than the Early Termination Date) (such day the "Latest Settlement Amount Determination Day"), no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions has been accepted by Party B so as to become legally binding and one or more Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal the Termination Currency Equivalent of the amount (whether positive or negative) of the lowest of such Market Quotations (for the avoidance of doubt, the lowest negative number shall equal the largest absolute value such that, for example, negative 3 shall be lower than negative 2); or

(B) If, on the Latest Settlement Amount Determination Day, no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by Party B so as to become legally binding and no Market Quotations have been made and remain capable of becoming legally binding upon acceptance, the Settlement Amount shall equal Party B's Loss (whether positive or negative and without reference to any Unpaid amounts) for the relevant Terminated Transaction or group of Terminated Transactions.

(iii) For the purpose of clause (4) of the definition of Market Quotation, Party B shall determine in its sole discretion, acting in a commercially reasonable manner, whether a Firm Offer is made in respect of a Replacement Transaction with commercial terms substantially the same as those of

this Agreement (save for the exclusion of provisions relating to Transactions that are not Terminated Transactions); *provided, however*, that notwithstanding the provisions of this Part 1(k), nothing in this Agreement shall preclude Party A from obtaining Market Quotations.

(iv)    At any time on or before the Latest Settlement Amount Determination Day at which two or more Market Quotations remain capable of becoming legally binding upon acceptance, Party B shall be entitled to accept only the lowest of such Market Quotations.

(v)     If Party B requests Party A in writing to obtain Market Quotations, Party A shall use its reasonable efforts to do so before the Latest Settlement Amount Determination Day.

(vi)    If the Settlement Amount is a negative number, Section 6(e)(i)(3) of this Agreement shall be deleted in its entirety and replaced with the following:

*Second Method and Market Quotation.* If Second Method and Market Quotation apply, (1) Party B shall pay to Party A an amount equal to the absolute value of the Settlement Amount in respect of the Terminated Transactions, (2) Party B shall pay to Party A the Termination Currency Equivalent of the Unpaid Amounts owing to Party A and (3) Party A shall pay to Party B the Termination Currency Equivalent of the Unpaid Amounts owing to Party B; *provided* that, (i) the amounts payable under (2) and (3) shall be subject to netting in accordance with Section 2(c) of this Agreement and (ii) notwithstanding any other provision of this Agreement, any amount payable by Party A under (3) shall not be netted-off against any amount payable by Party B under (1).

(l)     **Designation of Early Termination Date; Amendments.**  Notwithstanding any other provision of this Agreement, Party B shall not designate an Early Termination Date, and no transfer of any rights or obligations under this Agreement shall be made, unless each Rating Agency has been given prior written notice of such amendment, designation or transfer. Furthermore, this Agreement will not be amended unless the Rating Agency Condition is satisfied.

(m)    **No Suspension of Payments.**  Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under a Transaction under Section 2(a)(iii) unless FSA is in default in respect of any payment obligations under the Swap Policy.

(n)     [Reserved].

**Part 2.**    *Tax Provisions*

(a)     **Payer Tax Representations.**  For the purpose of Section 3(e) of this Agreement, each party makes the following representation: None.

(b)     **Gross Up.**  Section 2(d)(i)(4) shall not apply to Party B as X, and Section 2(d)(ii) shall not apply to Party B as Y, in each case such that Party B shall not be required to pay any additional amounts referred to therein.

(c)     **Indemnifiable Tax.**  The definition of "Indemnifiable Tax" in Section 14 is deleted in its entirety and replaced with the following:

"Indemnifiable Tax" means, in relation to payments by Party A, any Tax and, in relation to payments by Party B, no Tax; provided that nothing herein will modify a party's right to terminate by reason of a Tax Event Upon Merger.

(d)     **Payee Tax Representations.**  For the purpose of Section 3(f) of this Agreement:

(i)     Party A makes the following representation(s): None

6

(ii) Party B makes the following representation(s): None.

(e) **Tax Forms**.

(i) **Delivery of Tax Forms**. For the purpose of Section 4(a)(i), and without limiting Section 4(a)(iii), each party agrees to duly complete, execute and deliver to the other party the tax forms specified below with respect to it (A) before the first Payment Date under this Agreement and (B) promptly upon reasonable demand by the other party.

In addition, in the case of any tax form that is a Periodic Tax Form required to be delivered by Party B under this Agreement, Party B agrees to renew such tax form prior to its expiration by completing, executing and delivering to Party A that tax form ("Renewal Tax Form") in each succeeding third year following the year of execution of any such tax form or Renewal Tax Form delivered by Party B to Party A under this Agreement so that Party A receives each Renewal Tax Form not later than December 31 of the relevant year. "Periodic Tax Form" means any U.S. IRS Form W-8BEN, W-8IMY or W-8EXP that is delivered by Party B to Party A without a U.S. Taxpayer Identification Number.

(ii) **Tax Forms to be Delivered by Party A**:

None specified.

(iii) **Tax forms to be Delivered by Party B**:

Party B will deliver a correct, complete and duly executed U.S. IRS Form W-9 (or successor thereto) that eliminates U.S. federal back-up withholding tax on payments to Party B under this Agreement.

## Part 3. *Documents*

(a) **Delivery of Documents**. When it delivers this Agreement, each party shall also deliver its Closing Documents to the other party, and from time to time after it delivers this Agreement, each party shall deliver its Other Documents to the other party, in each case in form and substance reasonably satisfactory to the other party. For each Transaction, a party shall deliver, promptly upon request, a duly executed incumbency certificate for the person(s) executing the Confirmation for that Transaction on behalf of that party.

(b) **Closing Documents**.

(i) For Party A, "Closing Documents" means:

(A) an opinion of Party A's counsel addressed to Party B and FSA in form and substance acceptable to Party B, FSA and the Rating Agencies;

(B) a duly executed incumbency certificate for each person executing this Agreement for Party A, or in lieu thereof, a copy of the relevant pages of its official signature book; and

(C) each Credit Support Document (if any) specified for Party A in this Schedule, together with a duly executed incumbency certificate for the person(s) executing that Credit Support Document, or in lieu thereof, a copy of the relevant pages of its official signature book.

        (ii)     For Party B, "Closing Documents" means:

               (A)     an opinion of Party B's counsel addressed to Party A, FSA and the Rating Agencies in form and substance acceptable to Party A and the Rating Agencies;

               (B)     a duly executed incumbency certificate with respect to each signatory to this Agreement;

               (C)     a duly executed copy of the Indenture and the other operative documents relating thereto and referred to therein, executed and delivered by the parties thereto; and

               (D)     the duly executed Swap Policy.

(c)    **Other Documents**.

        (i)     For Party A, "Other Documents" means: none.

        (i)     For Party B, "Other Documents" means: a copy of each Servicer's Certificate that is delivered to the Trustee.

## Part 4.   *Miscellaneous*

(a)    **Addresses for Notices**. For purposes of Section 12(a) of this Agreement, all notices to a party shall, with respect to any particular Transaction, be sent to its address, telex number or facsimile number specified in the relevant Confirmation, *provided* that any notice under Section 5 or 6 of this Agreement, and any notice under this Agreement not related to a particular Transaction, shall be sent to a party at its address, telex number or facsimile number specified below; *provided, further*, that any notice under the Credit Support Annex shall be sent to a party at its address, telex number or facsimile number specified in the Credit Support Annex.

To Party A:

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, New York 10019

Attention:       Documentation Manager
Telephone No.:   (212) 526-7187
Facsimile No.:   (212) 526-7672
                 For all purposes.

with a copy to:

**FINANCIAL SECURITY ASSURANCE INC.**
31 West 52nd Street
New York, New York 10019
Attention: Transaction Oversight Department
Re: Policy No.   51875B-N, AmeriCredit Automobile Receivables Trust 2007-D-F
Telephone No.:   (212) 826-0100
Facsimile Nos.:  (212) 339-3518, (212) 339-3529

To Party B:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F**
c/o Wilmington Trust Company, as Owner Trustee
1100 North Market Street
Wilmington, Delaware 19890

with a copy to:

**AMERICREDIT FINANCIAL SERVICES, INC.**
801 Cherry Street, Suite 3900
Fort Worth, Texas 76102
Attention: Derivatives Operations

with a copy to:

**FINANCIAL SECURITY ASSURANCE INC.**
31 West 52nd Street
New York, New York 10019
Attention: Transaction Oversight Department
Re: Policy No.   51875B-N, AmeriCredit Automobile Receivables Trust 2007-D-F
Telephone No.:   (212) 826-0100
Facsimile Nos.:  (212) 339-3518, (212) 339-3529

(b)       **Process Agent**. For the purpose of Section 13(c) of this Agreement:

          Party A appoints as its Process Agent: Not applicable

Party B appoints as its Process Agent: Not applicable.

(c)       **Offices**. The provisions of Section 10(a) will apply to this Agreement.

9

(d)     **Multibranch Party.**  For the purpose of Section 10(c) of this Agreement, neither party is a Multibranch Party.

(e)     "Calculation Agent" means Party A; *provided* that if Party A is the Defaulting Party, the Calculation Agent shall be any designated party mutually agreed to by the parties and FSA (so long as no Swap Insurer Default has occurred and is continuing) until such time as Party A is no longer the Defaulting Party.

        "Swap Insurer Default" shall have the meaning given to "Insurer Default" (as defined in the Sale and Servicing Agreement); *provided* that any reference therein to "Note Policy" shall be deemed to refer instead to "Swap Policy".

(f)     **Credit Support Document.**

        (i)     For Party A, the following is a Credit Support Document: (i) the Credit Support Annex dated the date hereof (the "Credit Support Annex") and duly executed and delivered by Party A and Party B; (ii) the guarantee of Party A's obligations hereunder that is annexed hereto as Exhibit A and any replacement guarantee of Party A's obligations hereunder that is substantially in the form of such Exhibit A;  and (iii) any Eligible Guarantee, if applicable.

        (ii)    For Party B, the Financial Guaranty Insurance Policy (Policy No. 51875B-N) (the "Swap Policy") issued by Financial Security Assurance Inc. ("FSA").  Fixed Rate Payer Payment Dates shall be deemed to be included in the definition of "Scheduled Payments" under the Swap Policy.

(g)     **Credit Support Provider.**

        (i)     For Party A, Credit Support Provider means:  Lehman Brothers Holdings Inc., so long as any subsidiary of Holdings is Party A, or any other guarantor, if applicable, under an Eligible Guarantee.

        (ii)    For Party B, Credit Support Provider means: FSA and its successors and assigns.

(h)     **Governing Law.**  This Agreement will be governed by and construed in accordance with the law (and not the law of conflicts except with respect to §§ 5-1401 and 5-1402 of the New York General Obligations Law) of the State of New York.

(i)     **Waiver of Jury Trial.**  To the extent permitted by applicable law, each party irrevocably waives any and all right to trial by jury in any legal proceeding in connection with this Agreement, any Credit Support Document to which it is a party, or any Transaction.

(j)     **Netting of Payments.**  Section 2(c)(ii) of this Agreement will apply to all Transactions.

(k)     "Affiliate" has its meaning as defined in Section 14 of this Agreement, *provided* that Party B shall be deemed to have no Affiliates and with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(l)     **Severability.**  If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement *provided, however*, that this severability provision shall not be applicable if any provision of Sections 1(c), 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or in connection with any such Section) shall be held to be invalid or unenforceable.

**Part 5.**     *Other Provisions*

(a)     **2000 ISDA Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions
(including its Annex) published by the International Swaps and Derivatives Association, Inc. (together, the
"2000 ISDA Definitions") and will be governed by the provisions of the 2000 ISDA Definitions. The
provisions of the 2000 ISDA Definitions are incorporated by reference in, and shall form part of, this
Agreement and each Confirmation. Any reference to a "Swap Transaction" in the 2000 ISDA Definitions
is deemed to be a reference to a "Transaction" for purposes of this Agreement or any Confirmation, and any
reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap
Transaction" for purposes of the 2000 ISDA Definitions. The provisions of this Agreement (exclusive of
the 2000 ISDA Definitions) shall prevail in the event of any conflict between such provisions and the 2000
ISDA Definitions.

(b)     **Downgrade Provisions.**

   (i)     **Second Trigger Failure Condition.** So long as the Second Rating Trigger Requirements apply,
Party A shall, at its own expense use commercially reasonable efforts, as soon as reasonably
practicable (but not later than thirty days after the Second Rating Trigger Requirements first
apply), to either:

      (A)     furnish an Eligible Guarantee of Party A's obligations under this Agreement from a
guarantor that maintains the First Trigger Required Ratings and/or the Second Trigger
Required Ratings (provided, that if such guarantor maintains only the Second Trigger
Required Ratings, it must post collateral in the amount required to be posted pursuant to
the terms of the Credit Support Annex (such amount which is the greatest of the amounts
required to be posted by Moody's, S&P and Fitch) at the time that such Eligible
Guarantee is so furnished); or

      (B)     obtain an Eligible Replacement pursuant to Part 6(a) that (1) upon satisfaction of the
Rating Agency Condition (as defined below) assumes the obligations of Party A under
this Agreement (through a novation or other assignment and assumption agreement in
form and substance reasonably satisfactory to Party B) or (2) having provided prior
written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with
transactions on identical terms, except that Party A shall be replaced as counterparty,
*provided* that such Eligible Replacement, as of the date of such assumption or
replacement, will not, as a result thereof, be required to withhold or deduct on account of
tax under the Agreement or the new Transactions, as applicable, and such assumption or
replacement will not lead to a Termination Event or Event of Default occurring under the
Agreement or new Transactions, as applicable.

   (ii)    **Collateralization Event.** Within 10 calendar days from the date a Collateralization Event has
occurred and so long as such Collateralization Event is continuing, Party A shall, at its sole
expense, either:

      (A)     post collateral in an amount required to be posted pursuant to terms of the Credit Support
Annex (such amount which is the greater of amounts required to be posted by Moody's,
S&P and Fitch); or

      (B)     obtain an Eligible Replacement pursuant to Part 6(a) that (1) upon satisfaction of the
Rating Agency Condition (as defined below), assumes the obligations of Party A under
this Agreement (through a novation or other assignment and assumption agreement in
form and substance reasonably satisfactory to Party B) or (2) having provided prior
written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with
transactions on identical terms, except that Party A shall be replaced as counterparty;
*provided* that such Eligible Replacement, as of the date of such assumption or
replacement, will not, as a result thereof, be required to withhold or deduct on account of

11

tax under the Agreement or the new Transactions, as applicable, and such assumption or replacement will not lead to a Termination Event or Event of Default occurring under the Agreement or new Transactions, as applicable.

(iii) **Ratings Event.**

(A) Upon the occurrence of a Ratings Event, Party A shall, at its sole expense, immediately post collateral in an amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch).

(B) Within 10 Local Business Days from the date a Ratings Event has occurred and so long as such Ratings Event is continuing, Party A shall, at its sole expense, obtain an Eligible Replacement that (1) upon satisfaction of the Rating Agency Condition, assumes the obligations of Party A under this Agreement (through a novation or other assignment and assumption agreement in form and substance reasonably satisfactory to Party B) or (2) having provided prior written notice to S&P and Fitch, replaces the outstanding Transactions hereunder with transactions on identical terms, except that Party A shall be replaced as counterparty; *provided* that such Eligible Replacement, as of the date of such assumption or replacement, will not, as a result thereof, be required to withhold or deduct on account of tax under the Agreement or the new Transactions, as applicable, and such assumption or replacement will not lead to a Termination Event or Event of Default occurring under the Agreement or new Transactions, as applicable.

(iv) **Downgrade Definitions.**

(A) "Collateralization Event" means that:

(1) , with respect to a Relevant Entity that is a Financial Institution, either (a) the unsecured, short-term debt obligations of the Relevant Entity are not rated "A-1" or above by S&P or (b) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of a Relevant Entity are not rated "A+" or above by S&P (or such lower long-term rating as satisfies the Rating Agency Condition with respect to S&P and is acceptable to FSA (in its sole discretion)); or

(2) the unsecured, long-term senior debt obligations or financial strength ratings of the Relevant Entity are not rated "A" or above by Fitch, or the short-term senior debt obligations or financial strength ratings of the Relevant Entity are not rated "F1" or above by Fitch. For the avoidance of doubt, the parties hereby acknowledge and agree that notwithstanding the occurrence of a Collateralization Event, this Agreement and each Transaction hereunder shall continue to be a Swap Agreement for purposes of the Basic Documents.

(B) "Eligible Guarantee" means an unconditional and irrevocable guarantee (a) in a form identical to that attached hereto as Exhibit A (except for the name, address and the jurisdiction of the guarantor), and subject to notice to the Rating Agencies, or that otherwise satisfies the Rating Agency Condition or (b) that is provided by a guarantor as principal debtor rather than surety and is directly enforceable by Party B, where either:

(1) a law firm has given a legal opinion confirming that none of the guarantor's payments to Party B under such guarantee will be subject to withholding for Tax; or

12

(2) such guarantee provides that, in the event that any of such guarantor's payments to Party B are subject to withholding for Tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by Party B (free and clear of any withholding tax) will equal the full amount Party B would have received had no such withholding been required.

(C)  "Eligible Replacement" means a transferee:

(1) either (a) with the First Trigger Required Ratings and/or the Second Trigger Required Ratings (provided, that if such transferee maintains only the Second Trigger Required Ratings, it must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch) at the time that it becomes a transferee) or (b) whose present and future obligations owing to Party B are guaranteed pursuant to an Eligible Guarantee provided by a guarantor with the First Trigger Required Ratings and/or the Second Trigger Required Ratings (provided, that if such guarantor maintains only the Second Trigger Required Ratings, it must post collateral in the amount required to be posted pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch) at the time that such Eligible Guarantee is so furnished);

(2) that satisfies the Hedge Counterparty Ratings Requirement below; and

(3) if such transferee is a "structured investment vehicle" or a "derivative product company" that is a special-purpose entity whose credit ratings given by S&P, Moody's or Fitch for purposes of acting as a swap counterparty would be based entirely or primarily upon recourse to specified, rated, financial assets owned by or pledged to such special-purpose entity and such credit ratings are not based entirely or primarily upon any guarantee from a parent company, such transferee is acceptable to FSA (in its sole discretion). For purposes of illustration, Party A is not a "structured investment vehicle" or a "derivative product company".

(D)  "Financial Institution" means a bank, broker/dealer, insurance company, structured investment vehicle or derivative product counterparty.

(E)  "Firm Offer" means an offer which, when made, was capable of becoming legally binding upon acceptance.

(F)  "First Trigger Required Ratings" means with respect to an entity, either:

(1) where the entity is the subject of a Moody's Short-term Rating, such entity's Moody's Short-term Rating is "Prime-1" and the entity's long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A2" or above by Moody's; or

(2) where the entity is not the subject of a Moody's Short-term Rating, its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A1" or above by Moody's.

(G)  "Fitch" means Fitch, Inc.

(H)  "Hedge Counterparty Ratings Requirement" means with respect to an entity both:

(1) either (a) the unsecured, short-term debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "A-1" or above by S&P or (b) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "A+" or above by S&P; and

(2) either (a) the unsecured, long-term senior debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "A" or above by Fitch or (b) the unsecured, short-term debt obligations of the Relevant Entity (or its Credit Support Provider) are rated "F1" or above by Fitch.

For the purpose of this definition, no direct or indirect recourse against one or more shareholders of the substitute counterparty (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of the substitute counterparty.

(I)    "Hedge Counterparty Ratings Threshold" means that both:

    (1) either

        (a) with respect to a Relevant Entity that is a Financial Institution, either (i) the unsecured, short-term debt obligations of the Relevant Entity are rated "A-2" or above by S&P or (ii) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of the Relevant Entity are rated "BBB+" or above by S&P (or such lower long-term rating as satisfies the Rating Agency Condition with respect to S&P and is acceptable to FSA (in its sole discretion)); or

        (b) with respect to a Relevant Entity that is not a Financial Institution, either (i) the unsecured, short-term debt obligations of the Relevant Entity are rated "A-1" or above by S&P or (ii) if the Relevant Entity does not have a short-term rating from S&P, the unsecured, long-term senior debt obligations of a Relevant Entity are rated "A+" or above by S&P (or such lower long-term rating as satisfies the Rating Agency Condition with respect to S&P and is acceptable to FSA (in its sole discretion)); and

    (2) either (a) the unsecured, senior debt obligations or financial strength ratings of the Relevant Entity, are rated "BBB+" or above by Fitch or (b) the unsecured, short-term debt obligations (if any) of the Relevant Entity, are rated "F2" or above by Fitch.

(J)    "Moody's" means Moody's Investors Service, Inc.

(K)    "Moody's Short-term Rating" means a rating assigned by Moody's under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

(L)    "Rating Agency Condition" means first receiving prior written confirmation from S&P and Fitch that their then-current ratings of the rated Notes (without giving effect to the Note Policy) will not be downgraded or withdrawn by such Rating Agency.

(M)    "Ratings Event" means that on any date the Relevant Entity shall fail to satisfy the Hedge Counterparty Ratings Threshold or the Relevant Entity is no longer rated by S&P.

      (N)    "Relevant Entity" means Party A or any guarantor under an Eligible Guarantee in respect of all of Party A's present and future obligations under this Agreement.

      (O)    "S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

      (P)    "S&P Short-term Rating" means a rating assigned by S&P under its short-term rating scale in respect of an entity's short-term, unsecured and unsubordinated debt obligations.

      (Q)    "Second Rating Trigger Requirements" shall apply at any time that no Relevant Entity maintains the Second Trigger Required Ratings.

      (Q)    "Second Trigger Required Ratings" means with respect to an entity:

            (1) where the entity is the subject of a Moody's Short-term Rating, such entity's Moody's Short-term Rating is "Prime-2" or above and its long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's; and

            (2) where such entity is not the subject of a Moody's Short-term Rating, if the entity's long-term, unsecured and unsubordinated debt or counterparty obligations are rated "A3" or above by Moody's.

(c)    **Additional Representations.** Section 3 of this Agreement is hereby amended by adding the following Sections 3(g) and (h):

    "(g)    **Non-Reliance.** For any Relevant Agreement: (i) it acts as principal and not as agent, (ii) it acknowledges that the other party acts only arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement, (iii) it is relying solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) and upon advice from its own professional advisors, (iv) it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, (v) it has not relied and will not be relying upon any evaluation or advice (including any recommendation, opinion, or representation) from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder); and (vi) if a party is acting as a Calculation Agent or Valuation Agent, it does so not as the other party's agent or fiduciary, but on an arm's length basis for the purpose of performing an administrative function in good faith.

    "Relevant Agreement" means this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating thereto or to any Transaction.

    (h)    **Eligibility.** It is an "eligible contract participant" within the meaning of the Commodity Exchange Act (as amended by the Commodity Futures Modernization Act of 2000)."

(d)    **Recorded Conversations.** Each party and any of its Affiliates may electronically record any of its telephone conversations with the other party or with any of the other party's Affiliates in connection with this Agreement or any Transaction, and any such recordings may be submitted in evidence in any proceeding to establish any matters pertinent to this Agreement or any Transaction.

**Part 6.** *Additional Terms*

(a) **Transfers by Party A.**

(i) Notwithstanding anything to the contrary in Section 7 of the Agreement, Party A may assign all of its rights and obligations under the Agreement (in one or more transactions to one or more other entities, provided that all of its rights and obligations relating to any single Transaction must be assigned to a single entity), (1) to any Affiliate of Holdings effective upon delivery to Party B of a guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, (x) that is identical to the guarantee then in effect of the obligations of the transferor (except for the name, address and the jurisdiction of such Affiliate) or (y) that otherwise satisfies the Rating Agency Condition and is satisfactory in form and substance to FSA in its sole discretion, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer, in each case provided that (A) the transferee is an Eligible Replacement and (B) in the case of a transfer of less than all of Party A's obligations under this Agreement to a single entity, as determined by Party B acting in a commercially reasonable manner. In the event of any such transfer, this Agreement shall be replaced with an Agreement having identical terms except that Party A shall be replaced as a counterparty or, solely with respect to clause (2) above, with an agreement that otherwise satisfies the Rating Agency Condition and is satisfactory in form and substance to FSA in its sole discretion. Notwithstanding the foregoing, any assignment hereunder shall not be permitted if, as a result thereof, a payment becomes subject to any deduction or withholding for or on account of any tax which would not have arisen had such assignment not been effected or such transfer would cause an Event of Default or Termination event to occur. Party A will provide prior written notice to each Rating Agency of any such assignment. If an entity has made a Firm Offer (which remains capable of becoming legally binding upon acceptance) to be the transferee of a transfer, Party B shall at Party A's written request take any reasonable steps required to be taken by it to effect such transfer. The costs of any transfer pursuant to this Part 6(a)(i) shall be at the expense of Party A.

(ii) All collateral posted by Party A shall be returned to Party A immediately upon the assumption by a substitute counterparty of all of Party A's obligations hereunder and the posting by such substitute counterparty of collateral in the amount required to be posted, if any, pursuant to the terms of the Credit Support Annex (such amount which is the greatest of the amounts required to be posted by Moody's, S&P and Fitch).

(b) **Permitted Security Interest.** For purposes of Section 7 of this Agreement, Party A hereby consents to the Permitted Security Interest, subject to the provisions of paragraph (c) below.

"Permitted Security Interest" means the collateral assignment by Party B of the Swap Collateral to the Trustee pursuant to the Indenture, and the granting to the Trustee of a security interest in the Swap Collateral pursuant to the Indenture.

"Swap Collateral" means all right, title and interest of Party B in this Agreement, each Transaction hereunder, and all present and future amounts payable by Party A to Party B under or in connection with this Agreement or any Transaction governed by this Agreement, whether or not evidenced by a Confirmation, including, without limitation, any transfer or termination of any such Transaction.

"Trustee" means Wells Fargo Bank, National Association or any successor acting as indenture trustee pursuant to the Indenture.

(c) **Effect of Permitted Security Interest.**

(i) Notwithstanding the Permitted Security Interest, Party B shall not be released from any of its obligations under this Agreement or any Transaction, and Party A may exercise its rights and remedies under this Agreement without notice to, or the consent of the Trustee or any Noteholder except as otherwise expressly provided in this Agreement.

16

        (ii)     Party A's consent to the Permitted Security Interest is expressly limited to the Trustee for the benefit of the secured parties under the Indenture, and Party A does not consent to the sale or transfer by the Trustee of the Swap Collateral to any other person or entity (other than a successor to the Trustee under the Indenture acting in that capacity).

        (iii)    Party B hereby acknowledges that, as a result of the Permitted Security Interest, all of its rights under this Agreement, including any Transaction, have been assigned to the Trustee pursuant to the Indenture and notwithstanding any other provision in this Agreement, Party B may not take any action hereunder to exercise any of such rights without the prior written consent of the Trustee, including, without limitation, providing any notice under this Agreement the effect of which would be to cause an Early Termination Date to occur or be deemed to occur. If Party B gives any notice to Party A for the purposes of exercising any of Party B's rights under this Agreement, Party A shall have the option of treating that notice as void unless that notice is signed by the Trustee acknowledging its consent to the provisions of that notice. Nothing herein shall be construed as requiring the consent of the Owner Trustee, the Trustee or any Noteholder for the performance by Party B of any of its obligations hereunder.

        (iv)    Except as expressly provided in this Agreement, Party A and Party B may not enter into any agreement to dispose of any Transaction, whether in the form of a termination, unwind, transfer or otherwise without the prior written consent of the Trustee and FSA.

        (v)     Except as expressly provided in this Agreement, no amendment, modification, or waiver in respect of this Agreement will be effective unless (A) evidenced by a writing executed by each party hereto, and (B) each of FSA and the Trustee has acknowledged its consent thereto in writing and each Rating Agency (other than Moody's) confirms that the amendment, modification or waiver will not cause the reduction or withdrawal of its then current rating on any Notes under the Indenture (without giving effect to the Note Policy). Notwithstanding the foregoing, so long as no Swap Insurer Default shall have occurred and be continuing, no Transactions may be entered into by Party A and Party B pursuant to this Agreement other than the three Transactions memorialized by Confirmations dated as of September 20, 2007, and no waiver, amendment or modification of any provision of either such Confirmation or any of the other terms of this Agreement may be made without the prior written consent of FSA (so long as no Swap Insurer Default has occurred and is continuing).

(d)     **Payments**. All payments to Party B under this Agreement or any Transaction shall be made to the appropriate account under the Basic Documents.

(e)     **Set-off**. Except as otherwise provided in this Schedule, Party A and Party B hereby waive any and all right of set-off with respect to any amounts due under this Agreement or any Transaction, *provided* that nothing herein shall be construed to waive or otherwise limit the netting provisions contained in Sections 2(c) and 6 of this Agreement or the setoff rights contained in the Credit Support Annex. Section 6(e) shall be amended by the deletion of the following sentence: "The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off".

(f)     **Indenture.**

        (i)     Party B hereby acknowledges that Party A is a secured party under the Indenture with respect to this Agreement and a third-party beneficiary under the Indenture and that Party A has the benefit of the consent rights with respect to proposed amendments of the Basic Documents (as defined in the Indenture) as set forth in each related Basic Document.

        "Indenture" means that certain Indenture, by and among Party B as Issuer, and the Trustee, dated as of September 12, 2007, as the same may be amended, modified, supplemented or restated from time to time.

(ii)    On the date Party B executes and delivers this Agreement and on each date on which a Transaction is entered into, Party B hereby represents and warrants to Party A: that the Indenture is in full force and effect; that Party B is not party to any separate agreement with any of the parties to the Indenture that has not been disclosed to Party A prior to such date and that would have the effect of diminishing or impairing the rights, interests or benefits that have been granted to Party A under, and which are expressly set forth in, the Indenture; that Party B's obligations under this Agreement are secured under the Indenture; that this Agreement constitutes a "Swap Agreement" under the Basic Documents applicable to it; that each Transaction entered into under this Agreement is a Swap Agreement under the Basic Documents applicable to it; that Party A constitutes a Swap Provider under the Basic Documents applicable to it; that no Event of Default has occurred and is continuing as defined in the Basic Documents applicable to it; that nothing herein violates or conflicts with any of the provisions of the Basic Documents applicable to it or any other documents executed in connection therewith. In addition, on each date on which a Transaction is entered into, Party B hereby represents and warrants to Party A: that the Transaction meets all of the requirements under the Basic Documents applicable to it and does not violate or conflict with any of the provisions of the Basic Documents applicable to it or any other documents executed in connection therewith; and that under the terms of the Basic Documents applicable to it, neither the consent of the Owner Trustee, the Trustee nor of any of the Noteholders under the Basic Documents is required for Party B to enter into that Transaction or for Party A to be entitled for that Transaction to the rights, interests and benefits granted to Party A under the Basic Documents.

(iii)   Party B will provide at least five Business Days' prior written notice, or lesser time period as agreed to by Party A and Party B, to Party A of any proposed amendment or modification to the Basic Documents.

(g)  **Consent to Notice & Communications.** Party B hereby consents to the giving to the Trustee of notice by Party A of Party A's address and telecopy and telephone numbers for all purposes of the Basic Documents, and in addition, Party A shall also be entitled at any time to provide the Trustee with copies of this Agreement, including all Confirmations. In addition, Party A shall not be precluded from communicating with the Trustee or any party to, or any third party beneficiary under, the Basic Documents for the purpose of exercising, enforcing or protecting any of Party A's rights or remedies under this Agreement or any rights, interests or benefits granted to Party A under the Basic Documents.

(h)  **No Bankruptcy Petition.** Without impairing any right afforded to it under the Basic Documents as a third party beneficiary, Party A shall not institute against or cause any other person to institute against, or join any other person in instituting against Party B any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy, dissolution or similar law, for a period of one year and one day (or any longer period as set forth in any such federal or state law) following indefeasible payment in full of the Notes and all payments due to FSA under the Insurance Agreement. Nothing shall preclude, or be deemed to stop, Party A (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by Party B or (B) any involuntary insolvency proceeding filed or commenced by a Person other than Party A, or (ii) from commencing against Party B or any of the Collateral any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding. This Part 6(h) shall survive termination of this Agreement.

(i)  **Limitation of Liability.** It is expressly understood and agreed by the parties hereto that (i) this Agreement is executed and delivered by the Trustee not individually or personally but solely as trustee of the Trust, in the exercise of the powers and authority conferred and vested in it, (ii) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as a personal representation, undertaking or agreement by the Trustee but is made and intended for the purpose of binding only the Trust, (iii) nothing herein contained shall be construed as creating any liability on the part of the Trustee, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming

by, through or under the parties hereto and (iv) under no circumstances shall the Trustee be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Agreement.

(j)     **Party A Rights Solely Against Collateral.** The liability of Party B to Party A hereunder is limited in recourse to the assets of the Trust, and to distributions of interest proceeds and principal proceeds thereon applied in accordance with the terms of the Indenture. Upon application of and exhaustion of all of the assets of the Trust (and proceeds thereof) in accordance with the Indenture, Party A shall not be entitled to take any further steps against Party B to recover any sums due but still unpaid hereunder or thereunder, all claims in respect of which shall be extinguished. This Part 6(j) shall survive termination of this Agreement.

(k)     **Change of Account.** Section 2(b) of this Agreement is hereby amended by the addition of the words "to another account in the same legal and tax jurisdiction as the original account" following the word "delivery" in the first line thereof.

(l)     **Notice of Certain Events or Circumstances.** Each party agrees, upon learning of the occurrence or existence of any event or condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default or Termination Event with respect to such party, promptly to give the other party notice of such event or condition (or, in lieu of giving notice of such event or condition in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to the party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event); *provided* that failure to provide notice of such event or condition pursuant to this Part 6(l) shall not constitute an Event of Default or a Termination Event. Each party agrees to provide to the other party any other notice reasonably expected to be provided to facilitate compliance with the terms of this Agreement and the Credit Support Document.

(m)     **Regarding Party A.** Party B acknowledges and agrees that Party A has had and will have no involvement in and, accordingly, Party A accepts no responsibility for: (i) the establishment, structure, or choice of assets of Party B; (ii) the selection of any person performing services for or acting on behalf of Party B; (iii) the selection of Party A as the Counterparty; (iv) the terms of the Notes, (v) other than with respect to the Prospectus Information (as defined herein), the preparation of or passing on the disclosure and other information contained in any offering circular or offering document for the Notes, the Basic Documents, or any other agreements or documents used by Party B or any other party in connection with the marketing and sale of the Notes; (vi) the ongoing operations and administration of Party B, including the furnishing of any information to Party B which is not specifically required under this Agreement or (vii) any other aspect of Party B's existence.

(n)     **Compliance with Regulation AB.**

(i)     Party A has been advised by Party B that AmeriCredit Financial Services, Inc. (the "Sponsor"), AFS SenSub Corp. (the "Depositor") and Party B are required under Regulation AB under the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended ("Regulation AB"), to disclose certain information regarding Party A. Such information may include financial information to the extent required under Item 1115 of Regulation AB.

(ii)    If required, and only for so long as any Notes are registered with the Securities and Exchange Commission and Party B is required to file periodic reports as a result of such registration, upon written request, Party A shall provide to Party B, the Depositor or the Sponsor the applicable financial information described under Item 1115(b) of Regulation AB (the "Reg AB Financial Information") within ten (10) Business Days of receipt of a written request for such Reg AB Financial Information by the Sponsor, the Depositor or Party B (the "Response Period"), so long as the Sponsor, the Depositor or Party B has reasonably determined, in good faith, that such information is required under Regulation AB. In the event that Party A does not provide any such Reg AB Financial Information by the end of the related Response Period, Party A shall promptly,

but in no event later than ten (10) Local Business Days following the end of such Response Period either, at Party A's own expense (1) find a replacement counterparty that (A) has the ability to provide its applicable Reg AB Financial Information, (B) satisfies the Rating Agency Condition, (C) is acceptable to Party B and FSA and (D) enters into an agreement with Party B substantially in the form of this Agreement (such replacement counterparty, a "Reg AB Approved Entity"); (2) obtain a guaranty of Party A's obligations under this Agreement from an affiliate of Party A that complies with the financial information disclosure requirements of Item 1115 of Regulation AB, and cause such affiliate to provide Swap Financial Disclosure and any future Swap Financial Disclosure and other information pursuant to clause (1), such that disclosure provided in respect of such affiliate will satisfy any disclosure requirements applicable to the Swap Provider, or (3) transfer Eligible Collateral to Party B's Custodian in an amount (taking into account any amount posted pursuant to Part 5(b) herein, if any) which is sufficient, as reasonably determined in good faith by the Sponsor, to reduce the aggregate significance percentage below 10% (or, so long as Party A is able to provide the Swap Financial Disclosure required pursuant to Item 1115(b)(1) of Regulation AB, below 20%, in the event Party A is requested to provide the Swap Financial Disclosure required pursuant to Item 1115(b)(2) of Regulation AB).

(iii) If Party B, the Depositor or the Sponsor request (in writing) the Reg AB Financial Information from Party A, then the Sponsor, the Depositor or Party B will promptly (and in any event within one (1) Business Day of the date of the request for the Reg AB Financial Information) provide Party A with a written explanation of how the significance percentage was calculated.

(iv) Party A represents and warrants that the statements appearing in the Preliminary Prospectus Supplement, dated September 10, 2007, or in the Prospectus Supplement, dated September 11, 2007, each relating to AmeriCredit Automobile Receivables Trust 2007-D-F under the headings "The Swap Counterparty" (the "Prospectus Information") are true and correct in all material respects and do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

(v) (A) Party A shall indemnify and hold harmless Party B, the Sponsor, the Depositor, their respective directors or officers and any person controlling Party B, the Depositor or the Sponsor, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Information or in any Reg AB Financial Information that Party A provides to Party B or the Sponsor pursuant to this Part 6(n) (the "Party A Information") or caused by any omission or alleged omission to state in the Party A Information a material fact required to be stated therein or necessary to make the statements therein not misleading.

(B) The Sponsor shall indemnify and hold harmless Party A, its respective directors or officers and any person controlling Party A, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Prospectus Supplement referred to in clause (iv) above (together with the accompanying base Prospectus), the Prospectus Supplement referred to in clause (iv) above (together with the accompanying base Prospectus) (collectively, the "Prospectus Disclosure") or caused by any omission or alleged omission to state in the Prospectus Disclosure a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided, however,* that the Sponsor shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement in or omission or alleged omission made in any such Prospectus Disclosure in the Party A Information.

(vi) Promptly after the indemnified party under Part 6(n)(v) receives notice of the commencement of any such action, the indemnified party will, if a claim in respect thereof is to be made pursuant to Part 6(n)(v), promptly notify the indemnifying party in writing of the commencement thereof. In case any such action is brought against the indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to appoint counsel of

20

the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought (in which case the indemnifying party shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the indemnified party except as set forth below); *provided, however,* that such counsel shall be reasonably satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) such indemnified party shall have been advised by such counsel that there may be one or more legal defenses available to it which are different from or additional to those available to the indemnifying party and in the reasonable judgment of such counsel it is advisable for such indemnified party to employ separate counsel, (ii) a conflict or potential conflict exists (based on advice of counsel to the indemnified party) between the indemnified party and the indemnifying party, (iii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. The indemnifying party will not, without the prior written consent of the indemnified party, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding. No indemnified party will settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder without the consent of the indemnifying party, which consent shall not be unreasonably withheld.

(o)     **Expenses.** Party B agrees to reimburse FSA immediately and unconditionally upon demand for all reasonable expenses incurred by FSA in connection with the issuance of the Swap Policy and the enforcement by FSA of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including professional fees), costs and expenses incurred by FSA which are related to or resulting from any breach by Party B of its obligations hereunder. Party A agrees that, for the purpose of calculating amounts that are owed by Party A pursuant to Section 11 of this Agreement, to the extent that FSA incurs any such amounts in connection with its enforcement and protection of its or Party B's rights under this Agreement or any Credit Support Document, such amounts, to the extent they are not duplicative of costs incurred by Party B, shall be reimbursable to FSA by Party A.

(p)     **Notices.** A copy of each notice or other communication between the parties with respect to this Agreement must be sent at the same time to FSA.

(q)     **Article 76.** Party A and Party B acknowledge that the Swap Policy is not covered by the property/casualty insurance security fund specified in Article 76 of the New York Insurance Law.

(r)     **Representations and Agreements.** Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of FSA.

(s)     **Third-Party Beneficiary.** Party A and Party B hereby each acknowledge and agree that FSA shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and the obligations of such party under any Transaction, and as such, entitled to enforce the Agreement and the terms of any such Transaction against such party on its own behalf and/or on behalf of the holders of the related Obligations and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by FSA including, but not limited to, fees (including legal, accounting and other professional fees), costs and expenses incurred by FSA

21

which are related to, or resulting from any breach by such party of its obligations hereunder (subject to the limitations set forth in the Agreement, including but not limited to Part 6(o)).

(t)     [Reserved].

(u)     **Subrogation.** Party A and Party B hereby acknowledge that to the extent of payments made by FSA to Party A under the Swap Policy, FSA shall be fully subrogated to the rights of Party A against Party B under the Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to FSA its right to receive payment from Party B under any Transaction to the extent of any payment thereunder by FSA to Party A. Party B hereby acknowledges and consents to the assignment by Party A to FSA of any rights and remedies that Party A has under any Transaction or any other document executed in connection herewith.

(v)     **Amendments and Waivers.** Section 9(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof, (B) adding the phrase "and the Controlling Party, " following the word "parties" in the third line thereof and (C) adding the phrase "and unless the Rating Agency Condition has been met with respect to such amendments, modifications or waiver" after the word "system" in the third line thereof.

(w)     [Reserved].

(x)     **Credit Support Document Provisions.** Party B shall promptly deliver any notices or take any other action necessary to compel performance by any Credit Support Provider of Party A pursuant to any related Credit Support Document.

**Part 7.     Definitions.**

All capitalized terms used herein and not defined herein shall have the definitions ascribed to them in the Indenture.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

22

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:_____
Name: Locke McMurray
Title: Managing Director

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F**

**BY: AMERICREDIT FINANCIAL SERVICES, INC.,**
as Attorney-In-Fact

By:_____
Name:
Title:

23

IN WITNESS WHEREOF, the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:_____
Name:
Title:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F**

BY: AMERICREDIT FINANCIAL SERVICES, INC.,
as Attorney-In-Fact

By: _____
Name: Susan B. Sheffield
Title: Senior Vice President, Structured Finance

Execution Copy

## Elections and Variables
## to the 1994 ISDA Credit Support Annex

### dated as of

September 20, 2007

between

| LEHMAN BROTHERS SPECIAL FINANCING INC. | and | AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F |
|---|---|---|
| ("Party A") | | ("Party B") |

### Paragraph 13.

(a)     *Security Interest for "Obligations".*

The term "Obligations" as used in this Annex includes the following additional obligations: None.

(b)     *Credit Support Obligations.*

   (i)     Delivery Amount, Return Amount and Credit Support Amount.

      (A)     "Delivery Amount" has the meaning specified in Paragraph 3(a), except that the words "upon a demand made by the Secured Party on or promptly following a Valuation Date" shall be deleted and replaced by the words "on each Valuation Date;" *provided*, that the Delivery Amount shall be calculated, with respect to collateral posting required by each Rating Agency, by using (i) such Rating Agency's Valuation Percentages as provided below to determine Value and (ii) the Credit Support Amount related to such Rating Agency. The Delivery Amount shall be the greatest of such calculated amounts.

      (B)     "Return Amount" has the meaning specified in Paragraph 3(b); *provided*, that the Return Amount shall be calculated, with respect to collateral posting required by each Rating Agency, by using (i) such Rating Agency's Valuation Percentages as provided below to determine Value and (ii) the Credit Support Amount related to such Rating Agency. The Return Amount shall be the least of such calculated amounts.

      (C)     "Credit Support Amount" has the meaning specified in Paragraph 13(j)(iii).

   (ii)     *Eligible Collateral.* The Valuation Percentages[1] listed below shall apply to the following Eligible Collateral:

---

[1] With respect to collateral types not listed below, such assets will be subject to review by each of S&P, Fitch and Moody's.

1

| Instrument | Valuation Percentages applicable with respect to calculating Moody's First Trigger Credit Support Amount | Valuation Percentages applicable with respect to calculating Moody's Second Trigger Credit Support Amount | Valuation Percentages applicable with respect to calculating S&P Credit Support Amount when a Collateralization Event has occurred and is continuing | Valuation Percentages applicable with respect to calculating S&P Credit Support Amount when a Ratings Event has occurred and is continuing | Valuation Percentages applicable with respect to calculating Fitch Credit Support Amount |
|---|---|---|---|---|---|

|  | Moody's | Moody's | S&P | S&P | Fitch |
|---|---|---|---|---|---|
| U.S. Dollar Cash | 100% | 100% | 100% | 80% | 100% |
| Euro Cash | 97% | 93% | 95.1% | 76.1% | 94.36% |
| Sterling Cash | 97% | 94% | 96.1% | 76.9% | 95.18% |
| Fixed Rate Negotiable Treasury Debt issued by U.S. Treasury Department with Remaining Maturity: | | | | | |
| < 1 Year | 100% | 100% | 98.9% | 79.1% | 99.5% |
| 1 to 2 years | 100% | 99% | 98.0% | 78.4% | 98.2% |
| 2 to 3 years | 100% | 98% | 98.0% | 78.4% | 98.2% |
| 3 to 5 years | 100% | 97% | 98.0% | 78.4% | 96.6% |
| 5 to 7 years | 100% | 95% | 93.7% | 75.0% | 95.3% |
| 7 to 10 years | 100% | 94% | 92.6% | 74.1% | 93.9% |
| 10 to 20 years | 100% | 89% | 91.1% | 72.9% | n/a |
| 10 to 15 years | n/a | n/a | n/a | n/a | 92.7% |
| 15 to 20 years | n/a | n/a | n/a | n/a | 0% |
| > 20 years | 100% | 87% | 88.6% | 70.9% | 0% |

| Floating-Rate Negotiable U.S. Dollar Denominated Treasury Debt Issued by The U.S. Treasury Department | | | | | |
|---|---|---|---|---|---|
| All Maturities | 100% | 99% | 0% | 0% | 99.5% |
| Fixed-Rate U.S. Dollar Denominated U.S. Agency Debentures with Remaining Maturity: | | | | | |
| < 1 Year | 100% | 99% | 98.5% | 78.8% | 98.51% |
| 1 to 2 years | 100% | 98% | 98.0% | 78.4% | 97.22% |
| 2 to 3 years | 100% | 97% | 98.0% | 78.4% | 97.22% |
| 3 to 5 years | 100% | 96% | 98.0% | 78.4% | 95.63% |
| 5 to 7 years | 100% | 94% | 92.6% | 74.1% | 94.35% |
| 7 to 10 years | 100% | 93% | 92.6% | 74.1% | 92.96% |
| 10 to 20 years | 100% | 88% | 87.7% | 70.2% | n/a |
| 10 to 15 years | n/a | n/a | n/a | n/a | 91.77% |
| 15 to 20 years | n/a | n/a | n/a | n/a | 0% |
| > 20 years | 100% | 86% | 84.4% | 67.5% | 0% |
| Floating-Rate U.S. Dollar Denominated U.S. Agency Debentures | | | | | |
| All maturities | 100% | 98% | 0% | 0% | 98.51% |
| Fixed-Rate Euro Denominated Euro-Zone Government Bonds Rated "Aa3" or Above by Moody's and "AAA" by S&P with Remaining Maturity: | | | | | |
| < 1 Year | 97% | 93% | 98.8% | 79.0% | 93.47% |
| 1 to 2 years | 97% | 92% | 97.9% | 78.3% | 93% |
| 2 to 3 years | 97% | 91% | 96.9% | 77.5% | 93% |
| 3 to 5 years | 97% | 89% | 95.2% | 76.2% | 92.7% |
| 5 to 7 years | 97% | 87% | 88.7% | 71.0% | 92.4% |
| 7 to 10 years | 97% | 86% | 87.0% | 69.6% | 92.1% |
| 10 to 20 years | 97% | 82% | 75.5% | 60.4% | n/a |
| 10 to 15 years | n/a | n/a | n/a | n/a | 91.6% |

| 15 to 20 years | n/a | n/a | n/a | n/a | 0% |
| > 20 years | 97% | 80% | 0% | 0% | 0% |
| Floating-Rate Euro Denominated Euro-Zone Government Bonds Rated "Aa3" or Above by Moody's and "AAA" by S&P | | | | | |
| All maturities: | 97% | 92% | 0% | 0% | 93.47% |
| Qualified Commercial Paper | | | | | |
| | 0%* | 0%* | 0% | 0% | 99.50% |

For the purposes of the above table, "Qualified Commercial Paper" means commercial paper with a rating of at least "P-1" by Moody's and "A-1+" by S&P and having a remaining maturity of not more than one month.

*or such other percentage in respect of which Moody's has provided a rating affirmation.

(iii) **Thresholds**.

(A) "Independent Amount" means with respect to Party A: Zero

"Independent Amount" means with respect to Party B: Zero

(B) "Threshold" means with respect to Party A: infinity; *provided* that the Threshold with respect to Party A shall be zero for so long as (i) a Ratings Event is occurring or (ii) for so long as no Relevant Entity has the First Trigger Required Ratings or a Collateralization Event is occurring and (a) no Relevant Entity has had the First Trigger Required Ratings since this Annex was executed, or (b) at least 30 Local Business Days have elapsed since the last time a Relevant Entity had the First Trigger Required Ratings, or (c) no Relevant Entity has met the Hedge Counterparty Ratings Requirement since this Annex was executed or (d) at least 10 calendar days have elapsed since the last time a Collateralization Event occurred.

"Threshold" means with respect to Party B: infinity.

(C) "Minimum Transfer Amount" means with respect to Party A: USD $100,000; *provided, however*, that if S&P is rating the Notes and the aggregate principal amount of the rated Notes falls below $50,000,000, then the Minimum Transfer Amount shall mean USD $50,000.

(D) "Minimum Transfer Amount" means with respect to Party B: USD $100,000 (or if the Posted Collateral is less than $100,000, the aggregate Value of Posted Collateral), *provided, however*, that if S&P is rating the Notes and the aggregate principal amount of the rated Notes falls below $50,000,000, then the Minimum Transfer Amount shall mean USD $50,000 (or if the Posted Collateral is less than $50,000, the aggregate Value of Posted Collateral).

(E) **Rounding**. The Delivery Amount will be rounded up to the nearest integral multiple of USD $10,000. The Return Amount will be rounded down to the nearest integral multiple of USD $10,000.

(iv) "Exposure" has the meaning specified in Paragraph 12, except that (1) after the word "Agreement" the words "(assuming, for this purpose only, that Part 1(k) of the Schedule is deleted)" shall be inserted and (2) at the end of such definition, the words "with terms substantially the same as those of this Agreement."

3

(c)  *Valuation and Timing.*

    (i)    "Valuation Agent" means Party A in all circumstances.

    (ii)    "Valuation Date" means any Local Business Day in each week.

    (iii)    "Valuation Time" means the close of business in the location where the relevant product is traded, provided that the calculations of Value and Exposure will made as of approximately the same time on the same date.

    (iv)    "Notification Time" means 3:00 p.m., New York time, on a Local Business Day.

(d)  *Conditions Precedent and Secured Party's Rights and Remedies.* None.

(e)  *Substitution.*

    (i)    "Substitution Date" has the meaning specified in Paragraph 4(d)(ii).

    (ii)    *Consent*. The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)  *Dispute Resolution.*

    (i)    "Resolution Time" means 1:00 p.m., New York time on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5.

    (ii)    *Value*. For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Eligible Credit Support or Posted Credit Support as of the relevant Valuation Date or date of Transfer will be calculated as follows:

        (A)    with respect to any Eligible Credit Support or Posted Credit Support comprising securities ("Securities") the sum of (a)(x) the last bid price on such date for such Securities on the principal national securities exchange on which such Securities are listed, multiplied by the applicable Valuation Percentage; or (y) where any Securities are not listed on a national securities exchange, the bid price for such Securities quoted as at the close of business on such date by any principal market maker (which shall not be and shall be independent from the Valuation Agent) for such Securities chosen by the Valuation Agent, multiplied by the applicable Valuation Percentage; or (z) if no such bid price is listed or quoted for such date, the last bid price listed or quoted (as the case may be), as of the day next preceding such date on which such prices were available, multiplied by the applicable Valuation Percentage; plus (b) the accrued interest where applicable on such Securities (except to the extent that such interest shall have been paid to the Pledgor pursuant to Paragraph 5(c)(ii) or included in the applicable price) as of such date; and

        (B)    with respect to any Cash, (i) the face amount thereof or (ii) for purposes of calculating any S&P Credit Support Amount, the face amount thereof multiplied by applicable Valuation Percentage.

    (iii)    *Alternative.* The provisions of Paragraph 5 will apply.

4

(g) **Holding and Using Posted Collateral.**

    (i) **Eligibility to Hold Posted Collateral; Custodians:**

        A Custodian will be entitled to hold Posted Collateral on behalf of Party B pursuant to Paragraph 6(b); *provided* that:

        (1)    Posted Collateral may be held only in the following jurisdiction: United States.

        (2)    The Custodian for Party B (A) is a commercial bank or trust company which is unaffiliated with Party B and organized under the laws of the United States or any state thereof, having assets of at least $500 million and (i) a long term debt or a deposit rating of at least "Baa2" from Moody's and (ii) a short term rating from S&P of at least "A-1", or is the Trustee, and a short term rating from Fitch of at least "F1" and (B) shall hold all Eligible Credit Support in the appropriate account under the Basic Documents (and, provided further, that if the Custodian is not the Trustee and no longer has a short term rating of at least "A-1" from S&P, the Custodian shall be replaced within 60 days of the first date on which it fails to have such rating).

        (3)    Initially, the Custodian for Cash and Securities for Party B is: The Trustee under the Indenture, or any successor trustee thereto.

    (ii) **Use of Posted Collateral.** The provisions of Paragraph 6(c) will not apply to Party B. The Trustee shall invest Cash Posted Credit Support in such overnight (or redeemable within two Local Business Days of demand) investments rated at least "Prime-1" and "Aaa" by Moody's and either "AAAm" or "AAAm-G" by S&P (or such other investments as may be affirmed in writing by S&P and Moody's) as directed by Party A (unless (x) an Event of Default or an Additional Termination Event has occurred with respect to which Party A is the defaulting or sole Affected Party and (y) an Early Termination Date has been designated by Party B, in which case such investment shall be at the direction of Party B) with gains and losses incurred in respect of such investments to be for the account of Party A.

    (iii) **Notice.** If a party or its Custodian fails to meet the criteria for eligibility to hold (or, in the case of a party, to use) Posted Collateral set forth in this Paragraph 13(g), such party shall promptly notify the other party of such ineligibility.

(h) **Distributions and Interest Amount.**

    (i) **Interest Rate.** The "Interest Rate" will be the actual rate of interest earned by Party B or the Custodian if the Cash is invested at the direction of Party A in accordance with Paragraph 13(g)(ii) above, otherwise the "Interest Rate" will be the federal funds overnight rate as published by the Board of Governors of the Federal Reserve System in H.15 (519) or its successor publication, or such other rate as the parties may agree from time to time.

    (ii) **Transfer of Interest Amount.** The transfer of the Interest Amount will be made on the second Local Business Day following the end of each calendar month and on any other Local Business Day on which Posted Collateral in the form of Cash is transferred to the Pledgor pursuant to Paragraph 3(b), in each case to the extent that a Delivery Amount would not be created or increased by that transfer, *provided* that Party B shall not be obliged to so transfer any Interest Amount unless and until it has earned and received such interest.

(iii)  *Alternative to Interest Amount.*  The provisions of Paragraph 6(d)(ii) will apply.

(i)  *Address for Transfers.*

    Party A:  To be notified to Party B by Party A at the time of the request for the transfer.

    Party B:  To be notified to Party A by Party B upon request by Party A.

(j)  *Other Provisions.*

    (i)  *Costs of Transfer on Exchange.*

        Notwithstanding Paragraph 10, the Pledgor will be responsible for, and will reimburse the Secured Party for, all transfer and other taxes and other costs involved in the transfer and maintenance of Eligible Credit Support either from the Pledgor to the Secured Party or from the Secured Party to the Pledgor.

    (ii)  *Cumulative Rights.*

        The rights, powers and remedies of the Secured Party under this Annex shall be in addition to all rights, powers and remedies given to the Secured Party by the Agreement or by virtue of any statute or rule of law, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the rights of the Secured Party in the Posted Credit Support created pursuant to this Annex.

    (iii)  *Ratings Criteria.*

        "Credit Support Amount" shall be (a) in respect of S&P, the S&P Credit Support Amount, (b) in respect of Fitch, the Fitch Credit Support Amount, and (c) in respect of Moody's, the Moody's First Trigger Credit Support Amount, or the Moody's Second Trigger Credit Support Amount, as applicable.

With respect to Fitch:

    "*Fitch Credit Support Amount*" means, for any Valuation Date, the excess, if any, of:

    (I)    (A)    for any Valuation Date (x) on which a Collateralization Event with respect to Fitch has occurred and been continuing for at least 30 calendar days or (y) on which a Ratings Event with respect to Fitch has occurred and is continuing, an amount equal to the sum of (1) the aggregate Secured Party's Exposure for such Valuation Date with respect to all Transactions and (2) the aggregate of the products of the Volatility Cushion for each Transaction and the Notional Amount of each Transaction for the Calculation Period of each such Transaction which includes such Valuation Date, or

        (B)    for any other Valuation Date, zero, over

    (II)    the Threshold for Party A for such Valuation Date.

"Volatility Cushion" shall mean the percentage set forth in the following table with respect to any Transaction (other than a Transaction identified in the related Confirmation as a Timing Hedge):

| | Weighted Average Life (Years) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Notes' Rating | | | | | | | | | | |
| USD Interest Rate Swaps | | | | | | | | | | |

6

| "AA-" or Better | 0.6 | 1.6 | 2.6 | 3.4 | 4.2 | 4.8 | 5.5 | 5.9 | 6.4 | 7.0 |
|---|---|---|---|---|---|---|---|---|---|---|
| "A+"/"A" | 0.3 | 0.8 | 1.3 | 1.7 | 2.1 | 2.4 | 2.8 | 3.0 | 3.3 | 3.6 |
| "A-"/"BBB+" | 0.2 | 0.6 | 1.0 | 1.3 | 1.6 | 1.9 | 2.1 | 2.3 | 2.5 | 2.7 |

With respect to Moody's:

>"Moody's First Trigger Credit Support Amount" means, for any Valuation Date, the excess, if any, of

>(I)    (A)    for any Valuation Date on which (I) a First Trigger Failure Condition has occurred and has been continuing (x) for at least 30 Local Business Days or (y) since this Annex was executed and (II) it is not the case that a Moody's Second Trigger Event has occurred and been continuing for at least 30 Local Business Days, an amount equal to the greater of (a) zero and (b) the sum of the Secured Party's aggregate Exposure for all Transactions and the aggregate of Moody's Additional Collateralized Amounts for all Transactions.

>For the purposes of this definition, the "Moody's Additional Collateralized Amount" with respect to any Transaction shall mean:

>the product of the applicable Moody's First Trigger Factor set forth in Table 1 and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; or

>(B)    for any other Valuation Date, zero, over

>(II)    the Threshold for Party A such Valuation Date.

>"First Trigger Failure Condition" means that no Relevant Entity has credit ratings from Moody's at least equal to the Moody's First Trigger Required Ratings.

>"Moody's Second Trigger Credit Support Amount" means, for any Valuation Date, the excess, if any, of

>(I)    (A)    for any Valuation Date on which it is the case that a Second Trigger Failure Condition has occurred and been continuing for at least 30 Local Business Days, an amount equal to the greatest of (a) zero, (b) the aggregate amount of the Next Payments for all Next Payment Dates and (c) the sum of the Secured Party's aggregate Exposure and the aggregate of Moody's Additional Collateralized Amounts for all Transactions.

>For the purposes of this definition:

>"Next Payment" means, in respect of each Next Payment Date, the greater of (i) the amount of any payments due to be made by Party A under Section 2(a) on such Next Payment Date less any payments due to be made by Party B under Section 2(a) on such Next Payment Date (in each case, after giving effect to any applicable netting under Section 2(c)) and (ii) zero.

>"Next Payment Date" means each date on which the next scheduled payment under any Transaction is due to be paid.

7

"Moody's Additional Collateralized Amount" with respect to any Transaction shall mean:

if such Transaction is not a Transaction-Specific Hedge,

the product of the applicable Moody's Second Trigger Factor set forth in Table 2 and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; or

if such Transaction is a Transaction-Specific Hedge,

the product of the applicable Moody's Second Trigger Factor set forth in Table 3 and the Notional Amount for such Transaction for the Calculation Period which includes such Valuation Date; or

(B)    for any other Valuation Date, zero, over

(II)    the Threshold for Party A for such Valuation Date.

"Transaction-Specific Hedge" means any Transaction that is an interest rate cap, interest rate floor or interest rate swaption, or an interest rate swap if (x) the notional amount of the interest rate swap is "balance guaranteed" or (y) the notional amount of the interest rate swap for any Calculation Period otherwise is not a specific dollar amount that is fixed at the inception of the Transaction.

"Second Trigger Failure Condition" means that no Relevant Entity has credit ratings from Moody's at least equal to the Second Trigger Required Ratings.

With respect to S&P:

"S&P Credit Support Amount" means, for any Valuation Date, the excess, if any, of:

(I)    (A)    for any Valuation Date on which a Collateralization Event with respect to S&P has occurred and been continuing for at least 10 calendar days, an amount equal to the aggregate Secured Party's Exposure for such Valuation Date with respect to all Transactions;

(B)    for any Valuation Date on which a Ratings Event with respect to S&P has occurred and is continuing, an amount equal to 125% of the aggregate Secured Party's Exposure for such Valuation Date with respect to all Transactions; or

(C)    for any other Valuation Date, zero, over

(II)    the Threshold for Party A for such Valuation Date.

(iv)    *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, save that any demand, specification or notice:

8

    (A)    shall be given to or made at the following addresses:

          If to Party A:

                As set forth in Part 4(a) of the Schedule.

          If to Party B:

                As set forth in Part 4(a) of the Schedule.

          or at such other address as the relevant party may from time to time designate by giving notice (in accordance with the terms of this subparagraph) to the other party;

    (B)    shall be deemed to be effective at the time such notice is actually received unless such notice is received on a day which is not a Local Business Day or after the Notification Time on any Local Business Day in which event such notice shall be deemed to be effective on the next succeeding Local Business Day.

    Pursuant to the related Basic Document, the monthly report to Noteholders shall be made available to Party A in the manner and form specified therein.

    (v)    *Agreement as to Single Secured Party and Pledgor*

          Party A and Party B agree that, notwithstanding anything to the contrary in the first sentence of this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, except with respect to Party B's obligations under Paragraph 3(b), (a) the term "Secured Party" as used in this Annex means only Party B, (b) the term "Pledgor" as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgement in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder. Party A and Party B further agree that, notwithstanding anything to the contrary in the recital to this Annex or Paragraph 7, this Annex will constitute a Credit Support Document only with respect to Party A.

    (vi)    *Event of Default.*

          Subclause (iii) of Paragraph 7 shall not apply to Party B.

*[Signature page follows]*

9

IN WITNESS WHEREOF, the parties have executed this document by their duly authorized officers with effect from the date specified on the first page hereof.

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By:

Name: Locke McMurray
Title: Managing Director

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-D-F

BY: AMERICREDIT FINANCIAL SERVICES, INC.,
as Attorney-In-Fact

By: _____

Name:
Title:

[Credit Support Annex – Elections and Variables]

10

IN WITNESS WHEREOF, the parties have executed this document by their duly authorized officers with effect from the date specified on the first page hereof.

LEHMAN BROTHERS SPECIAL FINANCING INC.

AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F

BY: AMERICREDIT FINANCIAL SERVICES, INC., as Attorney-In-Fact

By: _____
Name:
Title:

By: _____
Name: Susan B. Sheffield
Title: Senior Vice President, Structured Finance

[Credit Support Annex – Elections and Variables]

## Table 1

**Moody's First Trigger Factor**

[If "Valuation Date" means each Local Business Day, the "Daily Collateral Posting" column will
apply and the Weekly Collateral Posting Column will be deleted.]
[If "Valuation Date" means the first Local Business Day in each week, the "Weekly Collateral
Posting" column will apply and the Daily Collateral Posting Column will be deleted.]

| Remaining Weighted Average Life of Hedge in Years | [Daily Collateral Posting | [Weekly Collateral Posting |
|---|---|---|
| 1 or less | 0.15% | 0.25% |
| More than 1 but not more than 2 | 0.30% | 0.50% |
| More than 2 but not more than 3 | 0.40% | 0.70% |
| More than 3 but not more than 4 | 0.60% | 1.00% |
| More than 4 but not more than 5 | 0.70% | 1.20% |
| More than 5 but not more than 6 | 0.80% | 1.40% |
| More than 6 but not more than 7 | 1.00% | 1.60% |
| More than 7 but not more than 8 | 1.10% | 1.80% |
| More than 8 but not more than 9 | 1.20% | 2.00% |
| More than 9 but not more than 10 | 1.30% | 2.20% |
| More than 10 but not more than 11 | 1.40% | 2.30% |
| More than 11 but not more than 12 | 1.50% | 2.50% |
| More than 12 but not more than 13 | 1.60% | 2.70% |
| More than 13 but not more than 14 | 1.70% | 2.80% |
| More than 14 but not more than 15 | 1.80% | 3.00% |
| More than 15 but not more than 16 | 1.90% | 3.20% |
| More than 16 but not more than 17 | 2.00% | 3.30% |
| More than 17 but not more than 18 | 2.00% | 3.50% |
| More than 18 but not more than 19 | 2.00% | 3.60% |
| More than 19 but not more than 20 | 2.00% | 3.70% |
| More than 20 but not more than 21 | 2.00% | 3.90% |
| More than 21 but not more than 22 | 2.00% | 4.00% |
| More than 22 but not more than 23 | 2.00% | 4.00% |
| More than 23 but not more than 24 | 2.00% | 4.00% |
| More than 24 but not more than 25 | 2.00% | 4.00% |
| More than 25 but not more than 26 | 2.00% | 4.00% |
| More than 26 but not more than 27 | 2.00% | 4.00% |
| More than 27 but not more than 28 | 2.00% | 4.00% |
| More than 28 but not more than 29 | 2.00% | 4.00% |
| More than 29 | 2.00%] | 4.00%] |

Table 2

**Moody's Second Trigger Factor for Interest Rate Swaps with Fixed Notional Amounts**
[If "Valuation Date" means each Local Business Day, the "Daily Collateral Posting" column will
apply and the Weekly Collateral Posting Column will be deleted.]
[If "Valuation Date" means the first Local Business Day in each week, the "Weekly Collateral
Posting" column will apply and the Daily Collateral Posting Column will be deleted.]

| Remaining Weighted Average Life of Hedge in Years | [Daily Collateral Posting | [Weekly Collateral Posting |
|---|---|---|
| 1 or less | 0.50% | 0.60% |
| More than 1 but not more than 2 | 1.00% | 1.20% |
| More than 2 but not more than 3 | 1.50% | 1.70% |
| More than 3 but not more than 4 | 1.90% | 2.30% |
| More than 4 but not more than 5 | 2.40% | 2.80% |
| More than 5 but not more than 6 | 2.80% | 3.30% |
| More than 6 but not more than 7 | 3.20% | 3.80% |
| More than 7 but not more than 8 | 3.60% | 4.30% |
| More than 8 but not more than 9 | 4.00% | 4.80% |
| More than 9 but not more than 10 | 4.40% | 5.30% |
| More than 10 but not more than 11 | 4.70% | 5.60% |
| More than 11 but not more than 12 | 5.00% | 6.00% |
| More than 12 but not more than 13 | 5.40% | 6.40% |
| More than 13 but not more than 14 | 5.70% | 6.80% |
| More than 14 but not more than 15 | 6.00% | 7.20% |
| More than 15 but not more than 16 | 6.30% | 7.60% |
| More than 16 but not more than 17 | 6.60% | 7.90% |
| More than 17 but not more than 18 | 6.90% | 8.30% |
| More than 18 but not more than 19 | 7.20% | 8.60% |
| More than 19 but not more than 20 | 7.50% | 9.00% |
| More than 20 but not more than 21 | 7.80% | 9.00% |
| More than 21 but not more than 22 | 8.00% | 9.00% |
| More than 22 but not more than 23 | 8.00% | 9.00% |
| More than 23 but not more than 24 | 8.00% | 9.00% |
| More than 24 but not more than 25 | 8.00% | 9.00% |
| More than 25 but not more than 26 | 8.00% | 9.00% |
| More than 26 but not more than 27 | 8.00% | 9.00% |
| More than 27 but not more than 28 | 8.00% | 9.00% |
| More than 28 but not more than 29 | 8.00% | 9.00% |
| More than 29 | 8.00%] | 9.00%] |

Table 3

**Moody's Second Trigger Factor for Transaction-Specific Hedges**
[If "Valuation Date" means each Local Business Day, the "Daily Collateral Posting" column will
apply and the Weekly Collateral Posting Column will be deleted.]
[If "Valuation Date" means the first Local Business Day in each week, the "Weekly Collateral
Posting" column will apply and the Daily Collateral Posting Column will be deleted.]

| Remaining Weighted Average Life of Hedge in Years | [Daily Collateral Posting | [Weekly Collateral Posting |
|---|---|---|
| 1 or less | 0.65% | 0.75% |
| More than 1 but not more than 2 | 1.30% | 1.50% |
| More than 2 but not more than 3 | 1.90% | 2.20% |
| More than 3 but not more than 4 | 2.50% | 2.90% |
| More than 4 but not more than 5 | 3.10% | 3.60% |
| More than 5 but not more than 6 | 3.60% | 4.20% |
| More than 6 but not more than 7 | 4.20% | 4.80% |
| More than 7 but not more than 8 | 4.70% | 5.40% |
| More than 8 but not more than 9 | 5.20% | 6.00% |
| More than 9 but not more than 10 | 5.70% | 6.60% |
| More than 10 but not more than 11 | 6.10% | 7.00% |
| More than 11 but not more than 12 | 6.50% | 7.50% |
| More than 12 but not more than 13 | 7.00% | 8.00% |
| More than 13 but not more than 14 | 7.40% | 8.50% |
| More than 14 but not more than 15 | 7.80% | 9.00% |
| More than 15 but not more than 16 | 8.20% | 9.50% |
| More than 16 but not more than 17 | 8.60% | 9.90% |
| More than 17 but not more than 18 | 9.00% | 10.40% |
| More than 18 but not more than 19 | 9.40% | 10.80% |
| More than 19 but not more than 20 | 9.70% | 11.00% |
| More than 20 but not more than 21 | 10.00% | 11.00% |
| More than 21 but not more than 22 | 10.00% | 11.00% |
| More than 22 but not more than 23 | 10.00% | 11.00% |
| More than 23 but not more than 24 | 10.00% | 11.00% |
| More than 24 but not more than 25 | 10.00% | 11.00% |
| More than 25 but not more than 26 | 10.00% | 11.00% |
| More than 26 but not more than 27 | 10.00% | 11.00% |
| More than 27 but not more than 28 | 10.00% | 11.00% |
| More than 28 but not more than 29 | 10.00% | 11.00% |
| More than 29 | 10.00%] | 11.00%] |

13

## EXHIBIT A to Schedule

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

**Lehman Brothers Special Financing Inc.** ("Party A") and **AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F** ("Party B") have entered into a Master Agreement dated as of **09/20/2007**, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g) Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h) Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that

i)    Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

ii)   Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

iii)  no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

iv)   this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

v)    the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i) Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j) No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k) If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement

LEHMAN BROTHERS HOLDINGS INC.

By:

Name : James J. Killerlane III
Title : Vice President
Date : September 19, 2007

**Execution Copy**

## SWAP TRANSACTION CONFIRMATION

**Date:**      September 20, 2007

**To:**        AmeriCredit Automobile Receivables Trust 2007-D-F ("Party B")
               AmeriCredit Financial Services, Inc.
               Attn: Derivatives Operations
               801 Cherry Street, Suite 3900
               Fort Worth, Texas 76102
               (817) 302-7951

**From:**      Lehman Brothers Special Financing Inc. ("Party A")

**Ref. No.**   Effort ID: N1607661 / Global Deal ID: 3344584

Dear Sir or Madam:

The purpose of this letter (this "Confirmation") is to confirm the terms and conditions of the Transaction entered
into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a
"Confirmation" as referred to in the ISDA Master Agreement specified below.

1.  The definitions and provisions contained in the 2000 ISDA Definitions (the "ISDA Definitions"), as published by
the International Swaps and Derivatives Association, Inc. are incorporated into this Confirmation. In the event of
any inconsistency between the definitions in the ISDA Definitions and this Confirmation, this Confirmation will
govern. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for purposes
of the ISDA Definitions.

Capitalized terms not defined herein shall have the meaning assigned to them in the Indenture dated as of September
12, 2007 (the "Indenture") between Party B and Wells Fargo Bank, National Association, as Indenture Trustee,
relating to the issuance by Party B of certain debt obligations or, if not defined in the Indenture, in the ISDA
Definitions. In the event of any inconsistency between the definitions in the ISDA Definitions and the Indenture,
the Indenture will govern.

This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement dated as of
September 20, 2007 (including the Schedule thereto) as amended and supplemented from time to time (the
"Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as
expressly modified herein.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly
authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of
any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the
other party in connection with its decision to enter into this Transaction, and neither party is acting as an
advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the
other party provides it with market information or its views; (b) it understands the risks of the Transaction
and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has
determined based upon its own judgment and upon any advice received from its own professional
advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such
party in light of its financial capabilities and objectives. Party A and Party B each represents that upon
due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

2. The terms of the particular Transaction to which the Confirmation relates are as follows:

Transaction Type:                    Interest Rate Swap

Currency for Payments:               U.S. Dollars

Notional Amount:                     For the purpose of the initial Calculation Period, the Notional Amount will be equal to the outstanding principal balance of the Class A-2-B Notes of Party B as of the Closing Date. The Notional Amount shall reset on each Distribution Date and will at all times be equal to the outstanding principal balance of the Class A-2-B Notes of Party B as of the first day of the relevant Calculation Period; provided, however, that if (a) an Event of Default occurs under Section 5.1 of the Indenture, (b) the Insurer exercises its rights to declare the Notes immediately due and payable pursuant to Section 5.2 of the Indenture and (c) as a result the principal balance of the Class A-2-B Notes is reduced to zero, (collectively, an "Acceleration Event"), then notwithstanding the foregoing, the Notional Amount for the Calculation Period in which such Distribution Date falls and for each Calculation Period thereafter, through and including the Termination Date, shall mean the Notional Amount set forth on the attached Schedule A (the "Scheduled Notional Amount") for such Calculation Period, assuming that Schedule A has been adjusted in accordance with the next two sentences.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, immediately following an Acceleration Event, if the Notional Amount (calculated as equal to the outstanding principal balance of the Class A-2-B Notes without giving effect to any principal reduction that occurs solely as a consequence of such Acceleration Event (the "Note Balance Notional Amount")) is smaller than the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date, then (1) the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date shall be reduced to equal the Note Balance Notional Amount calculated above and (2) the Scheduled Notional Amount for each subsequent Calculation Period shall be equal to the Scheduled Notional Amount set forth on Schedule A for such Calculation Period multiplied by the percentage equivalent of a fraction equal to: (a) the Note Balance Notional Amount over (b) the Scheduled Notional Amount for the Calculation Period in respect of the Distribution Date immediately following the Acceleration Event.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, following an Acceleration Event, if the Note Balance Notional Amount is greater than or equal to the Scheduled Notional Amount, no adjustment to the Scheduled Notional Amount shall be made.

2

for the purposes of determining the Settlement Amount in the event of an Early Termination of this Transaction pursuant to Section 6 of the Agreement, notwithstanding anything to the contrary contained in the Agreement, Market Quotation will be determined as if this Transaction were a fixed amortization swap transaction with an initial Notional Amount as of the Early Termination Date equal to the Scheduled Notional Balance corresponding to the Calculation Period in which such Early Termination Date occurs and amortizing according to Schedule A, subject to adjustment to the Scheduled Notional Amount in accordance with the methodology set forth above.

With respect to any Distribution Date, the outstanding balance of the Notes will be determined by reference to the Servicer's Certificate issued with respect to such Distribution Date (before giving effect to all distributions to be made on such Distribution Date).

**Term:**

Trade Date:                    September 11, 2007

Effective Date:                September 20, 2007
Termination Date:

The earliest of (i) January 06, 2011, (ii) the date on which the outstanding principal balance of the Class A-2-B Notes is reduced to zero (unless such outstanding principal balance is reduced to zero due to the occurrence of an Acceleration Event) and (iii) the Early Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

**Fixed Amounts:**

Fixed Rate Payer:              Party B

Fixed Rate Payer               Monthly on the 6th of each month, commencing October 6, 2007,
Period End Dates:              through and including the Termination Date, subject to adjustment in
                               accordance with the Following Business Day Convention.

Fixed Rate Payer               Monthly on the 6th of each month, commencing October 6, 2007,
Payment Dates:                 through and including the Termination Date, subject to adjustment in
                               accordance with the Following Business Day Convention.

Business Day:                  New York

Fixed Rate:                    5.454%

Fixed Rate Day Count
Fraction:                      Actual/360

**Floating Amounts:**

Floating Rate Payer:           Party A

Floating Rate Payer            Monthly on the 6th of each month, commencing October 6, 2007,
Period End Dates:              through and including the Termination Date, subject to adjustment in
                               accordance with the Following Business Day Convention.

Floating Rate Payer            Monthly on the 6th of each month, commencing October 6, 2007,
Payment Dates:                 through and including the Termination Date, subject to adjustment in

3

accordance with the Following Business Day Convention.

| | |
|---|---|
| Business Day: | New York |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 Month |
| Spread: | Plus 55 basis points (0.55%). |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |
| Compounding: | Inapplicable |

3. The additional provisions of this Confirmation are as follows:

| | |
|---|---|
| Calculation Agent: | Party A or as otherwise defined in the Agreement |
| Payments to Party A: | As advised separately in writing |
| Payments to Party B: | As advised separately in writing |

3. For the purpose of facilitating this Transaction, an Affiliate of Party A, which is organized in the United States of America (the "Agent"), has acted as agent for Party A. The Agent is not a principal with respect to this Transaction and shall have no responsibility or liability to the parties as a principal with respect to this Transaction.

4. Party A is authorized and regulated by the Financial Services Authority and has entered into this Transaction as principal. This time to which the above Transaction was executed will be notified to Party B on request.

4

09/20/2007    11:46                                                             NO.600    P05
11-02003-jmp  Doc 10-1  Filed 11/07/11  Entered 11/07/11 01:46:29  Main Document  Exhibit Pg
                                        Pg 255 of 302

09/19/2007    16:53                                                             NO.583    P05

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

Anatoly Kozlov

By:_____    Lehman Brothers Special Financing Inc.
Name:
Title:

Accepted and confirmed us of the date first above written:

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-D-F
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By:_____
Name:
Title

[Class A-2-B Note Swap Confirmation]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

Accepted and confirmed as of the date first above written:

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-D-F
BY: AmeriCredit Financial Services, Inc. as Attorney-in-Fact

By: _Susan B Sheffield_
Name:  Susan B. Sheffield
Title    Senior Vice President, Structured Finance

[Class A-2-B Note Swap Confirmation]

## Schedule A

| Calculation Period (from and including, to but excluding) | | | USD Notional Amount | USD Notional Reduction (at end of period) |
|---|---|---|---|---|
| 20 Sep 07 | to | 06 Oct 07 | 50,000,000 | |
| 06 Oct 07 | to | 06 Nov 07 | 50,000,000 | |
| 06 Nov 07 | to | 06 Dec 07 | 50,000,000 | |
| 06 Dec 07 | to | 06 Jan 08 | 50,000,000 | |
| 06 Jan 08 | to | 06 Feb 08 | 50,000,000 | |
| 06 Feb 08 | to | 06 Mar 08 | 50,000,000 | |
| 06 Mar 08 | to | 06 Apr 08 | 47,943,451 | |
| 06 Apr 08 | to | 06 May 08 | 42,284,940 | |
| 06 May 08 | to | 06 Jun 08 | 36,679,657 | |
| 06 Jun 08 | to | 06 Jul 08 | 31,128,925 | |
| 06 Jul 08 | to | 06 Aug 08 | 25,634,096 | |
| 06 Aug 08 | to | 06 Sep 08 | 20,196,547 | |
| 06 Sep 08 | to | 06 Oct 08 | 14,817,685 | |
| 06 Oct 08 | to | 06 Nov 08 | 9,498,942 | |
| 06 Nov 08 | to | 06 Dec 08 | 4,241,781 | |
| 06 Dec 08 | to | 06 Jan 09 | 0 | |
| 06 Jan 09 | to | 06 Feb 09 | 0 | |
| 06 Feb 09 | to | 06 Mar 09 | 0 | |
| 06 Mar 09 | to | 06 Apr 09 | 0 | |
| 06 Apr 09 | to | 06 May 09 | 0 | |
| 06 May 09 | to | 06 Jun 09 | 0 | |
| 06 Jun 09 | to | 06 Jul 09 | 0 | |
| 06 Jul 09 | to | 06 Aug 09 | 0 | |
| 06 Aug 09 | to | 06 Sep 09 | 0 | |
| 06 Sep 09 | to | 06 Oct 09 | 0 | |
| 06 Oct 09 | to | 06 Nov 09 | 0 | |
| 06 Nov 09 | to | 06 Dec 09 | 0 | |
| 06 Dec 09 | to | 06 Jan 10 | 0 | |
| 06 Jan 10 | to | 06 Feb 10 | 0 | |
| 06 Feb 10 | to | 06 Mar 10 | 0 | |
| 06 Mar 10 | to | 06 Apr 10 | 0 | |
| 06 Apr 10 | to | 06 May 10 | 0 | |
| 06 May 10 | to | 06 Jun 10 | 0 | |
| 06 Jun 10 | to | 06 Jul 10 | 0 | |
| 06 Jul 10 | to | 06 Aug 10 | 0 | |
| 06 Aug 10 | to | 06 Sep 10 | 0 | |
| 06 Sep 10 | to | 06 Oct 10 | 0 | |
| 06 Oct 10 | to | 06 Nov 10 | 0 | |
| 06 Nov 10 | to | 06 Dec 10 | 0 | |
| 06 Dec 10 | to | 06 Jan 11 | 0 | |
| 06 Jan 11 | to | 06 Feb 11 | 0 | |
| 06 Feb 11 | to | 06 Mar 11 | 0 | |
| 06 Mar 11 | to | 06 Apr 11 | 0 | |
| 06 Apr 11 | to | 06 May 11 | 0 | |
| 06 May 11 | to | 06 Jun 11 | 0 | |
| 06 Jun 11 | to | 06 Jul 11 | 0 | |

Execution Copy

## SWAP TRANSACTION CONFIRMATION

**Date:**     September 20, 2007

**To:**       AmeriCredit Automobile Receivables Trust 2007-D-F ("Party B")
              AmeriCredit Financial Services, Inc.
              Attn: Derivatives Operations
              801 Cherry Street, Suite 3900
              Fort Worth, Texas 76102
              (817) 302-7951

**From:**     Lehman Brothers Special Financing Inc. ("Party A")

**Ref. No.**  Effort ID: N1607659 / Global Deal ID: 3344588

Dear Sir or Madam:

The purpose of this letter (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "ISDA Definitions"), as published by the International Swaps and Derivatives Association, Inc. are incorporated into this Confirmation. In the event of any inconsistency between the definitions in the ISDA Definitions and this Confirmation, this Confirmation will govern. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for purposes of the ISDA Definitions.

Capitalized terms not defined herein shall have the meaning assigned to them in the Indenture dated as of September 12, 2007 (the "Indenture") between Party B and Wells Fargo Bank, National Association, as Indenture Trustee, relating to the issuance by Party B of certain debt obligations or, if not defined in the Indenture, in the ISDA Definitions. In the event of any inconsistency between the definitions in the ISDA Definitions and the Indenture, the Indenture will govern.

This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement dated as of September 20, 2007 (including the Schedule thereto) as amended and supplemented from time to time (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified herein.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

2. The terms of the particular Transaction to which the Confirmation relates are as follows:

Transaction Type:                    Interest Rate Swap

Currency for Payments:               U.S. Dollars

Notional Amount:                     For the purpose of the initial Calculation Period, the Notional Amount will be equal to the outstanding principal balance of the Class A-3-B Notes of Party B as of the Closing Date. The Notional Amount shall reset on each Distribution Date and will at all times be equal to the outstanding principal balance of the Class A-3-B Notes of Party B as of the first day of the relevant Calculation Period; provided, however, that if (a) an Event of Default occurs under Section 5.1 of the Indenture, (b) the Insurer exercises its rights to declare the Notes immediately due and payable pursuant to Section 5.2 of the Indenture and (c) as a result the principal balance of the Class A-3-B Notes is reduced to zero, (collectively, an "Acceleration Event"), then notwithstanding the foregoing, the Notional Amount for the Calculation Period in which such Distribution Date falls and for each Calculation Period thereafter, through and including the Termination Date, shall mean the Notional Amount set forth on the attached Schedule A (the "Scheduled Notional Amount") for such Calculation Period, assuming that Schedule A has been adjusted in accordance with the next two sentences.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, immediately following an Acceleration Event, if the Notional Amount (calculated as equal to the outstanding principal balance of the Class A-3-B Notes without giving effect to any principal reduction that occurs solely as a consequence of such Acceleration Event (the "Note Balance Notional Amount")) is smaller than the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date, then (1) the Scheduled Notional Amount for the Calculation Period in respect of such Distribution Date shall be reduced to equal the Note Balance Notional Amount calculated above and (2) the Scheduled Notional Amount for each subsequent Calculation Period shall be equal to the Scheduled Notional Amount set forth on Schedule A for such Calculation Period multiplied by the percentage equivalent of a fraction equal to: (a) the Note Balance Notional Amount over (b) the Scheduled Notional Amount for the Calculation Period in respect of the Distribution Date immediately following the Acceleration Event.

On the Distribution Date or, in the event the outstanding principal balance of the Notes is reduced to zero pursuant to an Acceleration Event, a date that but for the occurrence of an Acceleration Event would have been a scheduled Distribution Date, following an Acceleration Event, if the Note Balance Notional Amount is greater than or equal to the Scheduled Notional Amount, no adjustment to the Scheduled Notional Amount shall be made.

2

For the purposes of determining the Settlement Amount in the event of an Early Termination of this Transaction pursuant to Section 6 of the Agreement, notwithstanding anything to the contrary contained in the Agreement, Market Quotation will be determined as if this Transaction were a fixed amortization swap transaction with an initial Notional Amount as of the Early Termination Date equal to the Scheduled Notional Balance corresponding to the Calculation Period in which such Early Termination Date occurs and amortizing according to Schedule A, subject to adjustment to the Scheduled Notional Amount in accordance with the methodology set forth above.

With respect to any Distribution Date, the outstanding balance of the Notes will be determined by reference to the Servicer's Certificate issued with respect to such Distribution Date (before giving effect to all distributions to be made on such Distribution Date).

Term:

| | |
|---|---|
| Trade Date: | September 11, 2007 |
| Effective Date: | September 20, 2007 |
| Termination Date: | The earliest of (i) July 06, 2012, (ii) the date on which the outstanding principal balance of the Class A-3-B Notes is reduced to zero (unless such outstanding principal balance is reduced to zero due to the occurrence of an Acceleration Event) and (iii) the Early Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |

Fixed Amounts:

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Period End Dates: | Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate Payer Payment Dates: | Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Business Day: | New York |
| Fixed Rate: | 5.293% |
| Fixed Rate Day Count Fraction: | Actual/360 |

Floating Amounts:

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Period End Dates: | Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Floating Rate Payer Payment Dates: | Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in |

3

|  | accordance with the Following Business Day Convention. |
|---|---|
| Business Day: | New York |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 1 Month |
| Spread: | Plus 65 basis points (0.65%). |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |
| Compounding: | Inapplicable |

3. The additional provisions of this Confirmation are as follows:

| Calculation Agent: | Party A or as otherwise defined in the Agreement |
|---|---|
| Payments to Party A: | As advised separately in writing |
| Payments to Party B: | As advised separately in writing |

3. For the purpose of facilitating this Transaction, an Affiliate of Party A, which is organized in the United States of America (the "Agent"), has acted as agent for Party A. The Agent is not a principal with respect to this Transaction and shall have no responsibility or liability to the parties as a principal with respect to this Transaction.

4. Party A is authorized and regulated by the Financial Services Authority and has entered into this Transaction as principal. This time to which the above Transaction was executed will be notified to Party B on request.

4

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

Andre

By: _____    Lehman Brothers Special Financing Inc.
Name:
Title:                   Anatoly Ky

Accepted and confirmed as of the date first above written:

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-D-F
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By: _____
Name:
Title

[Class A-3-B Note Swap Confirmation]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this
Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

Accepted and confirmed as of the date first above written:

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-D-F
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By: _Susan B. Sheffield_
Name:  Susan B. Sheffield
Title:   Senior Vice President, Structured Finance

[Class A-3-B Note Swap Confirmation]

## Schedule A

| Calculation Period | | | USD Notional Amount | USD Notional Reduction |
|---|---|---|---|---|
| (from and including, to but excluding) | | | | (at end of period) |
| 20 Sep 07 | to | 06 Oct 07 | 40,000,000 | |
| 06 Oct 07 | to | 06 Nov 07 | 40,000,000 | |
| 06 Nov 07 | to | 06 Dec 07 | 40,000,000 | |
| 06 Dec 07 | to | 06 Jan 08 | 40,000,000 | |
| 06 Jan 08 | to | 06 Feb 08 | 40,000,000 | |
| 06 Feb 08 | to | 06 Mar 08 | 40,000,000 | |
| 06 Mar 08 | to | 06 Apr 08 | 40,000,000 | |
| 06 Apr 08 | to | 06 May 08 | 40,000,000 | |
| 06 May 08 | to | 06 Jun 08 | 40,000,000 | |
| 06 Jun 08 | to | 06 Jul 08 | 40,000,000 | |
| 06 Jul 08 | to | 06 Aug 08 | 40,000,000 | |
| 06 Aug 08 | to | 06 Sep 08 | 40,000,000 | |
| 06 Sep 08 | to | 06 Oct 08 | 40,000,000 | |
| 06 Oct 08 | to | 06 Nov 08 | 40,000,000 | |
| 06 Nov 08 | to | 06 Dec 08 | 40,000,000 | |
| 06 Dec 08 | to | 06 Jan 09 | 39,400,609 | |
| 06 Jan 09 | to | 06 Feb 09 | 36,172,048 | |
| 06 Feb 09 | to | 06 Mar 09 | 32,985,122 | |
| 06 Mar 09 | to | 06 Apr 09 | 30,281,111 | |
| 06 Apr 09 | to | 06 May 09 | 27,163,045 | |
| 06 May 09 | to | 06 Jun 09 | 24,089,915 | |
| 06 Jun 09 | to | 06 Jul 09 | 21,062,784 | |
| 06 Jul 09 | to | 06 Aug 09 | 18,082,735 | |
| 06 Aug 09 | to | 06 Sep 09 | 15,150,874 | |
| 06 Sep 09 | to | 06 Oct 09 | 12,947,634 | |
| 06 Oct 09 | to | 06 Nov 09 | 10,083,911 | |
| 06 Nov 09 | to | 06 Dec 09 | 7,272,403 | |
| 06 Dec 09 | to | 06 Jan 10 | 4,514,318 | |
| 06 Jan 10 | to | 06 Feb 10 | 1,810,888 | |
| 06 Feb 10 | to | 06 Mar 10 | 0 | |
| 06 Mar 10 | to | 06 Apr 10 | 0 | |
| 06 Apr 10 | to | 06 May 10 | 0 | |
| 06 May 10 | to | 06 Jun 10 | 0 | |
| 06 Jun 10 | to | 06 Jul 10 | 0 | |
| 06 Jul 10 | to | 06 Aug 10 | 0 | |
| 06 Aug 10 | to | 06 Sep 10 | 0 | |
| 06 Sep 10 | to | 06 Oct 10 | 0 | |
| 06 Oct 10 | to | 06 Nov 10 | 0 | |
| 06 Nov 10 | to | 06 Dec 10 | 0 | |
| 06 Dec 10 | to | 06 Jan 11 | 0 | |
| 06 Jan 11 | to | 06 Feb 11 | 0 | |
| 06 Feb 11 | to | 06 Mar 11 | 0 | |
| 06 Mar 11 | to | 06 Apr 11 | 0 | |
| 06 Apr 11 | to | 06 May 11 | 0 | |
| 06 May 11 | to | 06 Jun 11 | 0 | |
| 06 Jun 11 | to | 06 Jul 11 | 0 | |

NYI 1128668v3

Execution Copy

# SWAP TRANSACTION CONFIRMATION

**Date:**      September 20, 2007

**To:**        AmeriCredit Automobile Receivables Trust 2007-D-F ("Party B")
               AmeriCredit Financial Services, Inc.
               Attn: Derivatives Operations
               801 Cherry Street, Suite 3900
               Fort Worth, Texas 76102
               (817) 302-7951

**From:**      Lehman Brothers Special Financing Inc. ("Party A")

**Ref. No.**   Effort ID: N1607662 / Global Deal ID: 3344590

Dear Sir or Madam:

The purpose of this letter (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "ISDA Definitions"), as published by the International Swaps and Derivatives Association, Inc. are incorporated into this Confirmation. In the event of any inconsistency between the definitions in the ISDA Definitions and this Confirmation, this Confirmation will govern. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for purposes of the ISDA Definitions.

Capitalized terms not defined herein shall have the meaning assigned to them in the Indenture dated as of September 12, 2007 (the "Indenture") between Party B and Wells Fargo Bank, National Association, as Indenture Trustee, relating to the issuance by Party B of certain debt obligations or, if not defined in the Indenture, in the ISDA Definitions. In the event of any inconsistency between the definitions in the ISDA Definitions and the Indenture, the Indenture will govern.

This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master Agreement dated as of September 20, 2007 (including the Schedule thereto) as amended and supplemented from time to time (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified herein.

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

2. The terms of the particular Transaction to which the Confirmation relates are as follows:

Transaction Type:                   Interest Rate Swap

Currency for Payments:              U.S. Dollars

Notional Amount:                    For the purpose of the initial Calculation Period, the Notional Amount
will be equal to the outstanding principal balance of the Class A-4-B
Notes of Party B as of the Closing Date. The Notional Amount shall
reset on each Distribution Date and will at all times be equal to the
outstanding principal balance of the Class A-4-B Notes of Party B as of
the first day of the relevant Calculation Period; provided, however, that
if (a) an Event of Default occurs under Section 5.1 of the Indenture, (b)
the Insurer exercises its rights to declare the Notes immediately due and
payable pursuant to Section 5.2 of the Indenture and (c) as a result the
principal balance of the Class A-4-B Notes is reduced to zero,
(collectively, an "Acceleration Event"), then notwithstanding the
foregoing, the Notional Amount for the Calculation Period in which
such Distribution Date falls and for each Calculation Period thereafter,
through and including the Termination Date, shall mean the Notional
Amount set forth on the attached Schedule A (the "Scheduled Notional
Amount") for such Calculation Period, assuming that Schedule A has
been adjusted in accordance with the next two sentences.

On the Distribution Date or, in the event the outstanding principal
balance of the Notes is reduced to zero pursuant to an Acceleration
Event, a date that but for the occurrence of an Acceleration Event would
have been a scheduled Distribution Date, immediately following an
Acceleration Event, if the Notional Amount (calculated as equal to the
outstanding principal balance of the Class A-4-B Notes without giving
effect to any principal reduction that occurs solely as a consequence of
such Acceleration Event (the "Note Balance Notional Amount")) is
smaller than the Scheduled Notional Amount for the Calculation Period
in respect of such Distribution Date, then (1) the Scheduled Notional
Amount for the Calculation Period in respect of such Distribution Date
shall be reduced to equal the Note Balance Notional Amount calculated
above and (2) the Scheduled Notional Amount for each subsequent
Calculation Period shall be equal to the Scheduled Notional Amount set
forth on Schedule A for such Calculation Period multiplied by the
percentage equivalent of a fraction equal to: (a) the Note Balance
Notional Amount over (b) the Scheduled Notional Amount for the
Calculation Period in respect of the Distribution Date immediately
following the Acceleration Event.

On the Distribution Date or, in the event the outstanding principal
balance of the Notes is reduced to zero pursuant to an Acceleration
Event, a date that but for the occurrence of an Acceleration Event would
have been a scheduled Distribution Date, following an Acceleration
Event, if the Note Balance Notional Amount is greater than or equal to
the Scheduled Notional Amount, no adjustment to the Scheduled
Notional Amount shall be made.

For the purposes of determining the Settlement Amount in the event of
an Early Termination of this Transaction pursuant to Section 6 of the
Agreement, notwithstanding anything to the contrary contained in the
Agreement, Market Quotation will be determined as if this Transaction

2

NYI 1128673v3

were a fixed amortization swap transaction with an initial Notional Amount as of the Early Termination Date equal to the Scheduled Notional Balance corresponding to the Calculation Period in which such Early Termination Date occurs and amortizing according to Schedule A, subject to adjustment to the Scheduled Notional Amount in accordance with the methodology set forth above.

With respect to any Distribution Date, the outstanding balance of the Notes will be determined by reference to the Servicer's Certificate issued with respect to such Distribution Date (before giving effect to all distributions to be made on such Distribution Date).

Term:

Trade Date:

September 11, 2007

Effective Date:

September 20, 2007

Termination Date:

The earliest of (i) June 06, 2014, (ii) the date on which the outstanding principal balance of the Class A-4-B Notes is reduced to zero (unless such outstanding principal balance is reduced to zero due to the occurrence of an Acceleration Event) and (iii) the Early Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Fixed Amounts:

Fixed Rate Payer:

Party B

Fixed Rate Payer Period End Dates:

Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Fixed Rate Payer Payment Dates:

Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Business Day:

New York

Fixed Rate:

5.435%

Fixed Rate Day Count Fraction:

Actual/360

Floating Amounts:

Floating Rate Payer:

Party A

Floating Rate Payer Period End Dates:

Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Floating Rate Payer Payment Dates:

Monthly on the 6th of each month, commencing October 6, 2007, through and including the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

Business Day:

New York

Floating Rate Option:

USD-LIBOR-BBA

3

| Designated Maturity: | 1 Month |
| Spread: | Plus 80 basis points (0.80%). |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period. |
| Compounding: | Inapplicable |

3. The additional provisions of this Confirmation are as follows:

| Calculation Agent: | Party A or as otherwise defined in the Agreement |
| Payments to Party A: | As advised separately in writing |
| Payments to Party B: | As advised separately in writing |

4. For the purpose of facilitating this Transaction, an Affiliate of Party A, which is organized in the United States of America (the "Agent"), has acted as agent for Party A. The Agent is not a principal with respect to this Transaction and shall have no responsibility or liability to the parties as a principal with respect to this Transaction.

5. Party A is authorized and regulated by the Financial Services Authority and has entered into this Transaction as principal. This time to which the above Transaction was executed will be notified to Party B on request.

4

09/19/2007   16:55                                                                              NO.585   ₽05

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

Anatoly Kozlov

By:_____
Name:
Title:

Accepted and confirmed as of the date first above written:

AMERICREDIT AUTOMOBILE RECEIVABLES
TRUST 2007-D-F
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By:_____
Name:
Title

[Class A-4-B Note Swap Confirmation]

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to us.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:

Title:

Accepted and confirmed as of the date first above written:

**AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F**
BY: AmeriCredit Financial Services, Inc. as Attorney-In-Fact

By: _____

Name: Susan B. Sheffield

Title: Senior Vice President, Structured Finance

[Class A-4-B Note Swap Confirmation]

## Schedule A

| Calculation Period | | | USD Notional Amount | USD Notional Reduction |
|---|---|---|---|---|
| (from and including, to but excluding) | | | | (at end of period) |
| 20 Sep 07 | to | 06 Oct 07 | 130,000,000 | |
| 06 Oct 07 | to | 06 Nov 07 | 130,000,000 | |
| 06 Nov 07 | to | 06 Dec 07 | 130,000,000 | |
| 06 Dec 07 | to | 06 Jan 08 | 130,000,000 | |
| 06 Jan 08 | to | 06 Feb 08 | 130,000,000 | |
| 06 Feb 08 | to | 06 Mar 08 | 130,000,000 | |
| 06 Mar 08 | to | 06 Apr 08 | 130,000,000 | |
| 06 Apr 08 | to | 06 May 08 | 130,000,000 | |
| 06 May 08 | to | 06 Jun 08 | 130,000,000 | |
| 06 Jun 08 | to | 06 Jul 08 | 130,000,000 | |
| 06 Jul 08 | to | 06 Aug 08 | 130,000,000 | |
| 06 Aug 08 | to | 06 Sep 08 | 130,000,000 | |
| 06 Sep 08 | to | 06 Oct 08 | 130,000,000 | |
| 06 Oct 08 | to | 06 Nov 08 | 130,000,000 | |
| 06 Nov 08 | to | 06 Dec 08 | 130,000,000 | |
| 06 Dec 08 | to | 06 Jan 09 | 130,000,000 | |
| 06 Jan 09 | to | 06 Feb 09 | 130,000,000 | |
| 06 Feb 09 | to | 06 Mar 09 | 130,000,000 | |
| 06 Mar 09 | to | 06 Apr 09 | 130,000,000 | |
| 06 Apr 09 | to | 06 May 09 | 130,000,000 | |
| 06 May 09 | to | 06 Jun 09 | 130,000,000 | |
| 06 Jun 09 | to | 06 Jul 09 | 130,000,000 | |
| 06 Jul 09 | to | 06 Aug 09 | 130,000,000 | |
| 06 Aug 09 | to | 06 Sep 09 | 130,000,000 | |
| 06 Sep 09 | to | 06 Oct 09 | 130,000,000 | |
| 06 Oct 09 | to | 06 Nov 09 | 130,000,000 | |
| 06 Nov 09 | to | 06 Dec 09 | 130,000,000 | |
| 06 Dec 09 | to | 06 Jan 10 | 130,000,000 | |
| 06 Jan 10 | to | 06 Feb 10 | 130,000,000 | |
| 06 Feb 10 | to | 06 Mar 10 | 127,758,848 | |
| 06 Mar 10 | to | 06 Apr 10 | 122,154,946 | |
| 06 Apr 10 | to | 06 May 10 | 115,297,783 | |
| 06 May 10 | to | 06 Jun 10 | 108,602,666 | |
| 06 Jun 10 | to | 06 Jul 10 | 102,073,272 | |
| 06 Jul 10 | to | 06 Aug 10 | 95,713,348 | |
| 06 Aug 10 | to | 06 Sep 10 | 89,576,569 | |
| 06 Sep 10 | to | 06 Oct 10 | 83,596,872 | |
| 06 Oct 10 | to | 06 Nov 10 | 77,777,791 | |
| 06 Nov 10 | to | 06 Dec 10 | 72,122,927 | |
| 06 Dec 10 | to | 06 Jan 11 | 66,635,951 | |
| 06 Jan 11 | to | 06 Feb 11 | 61,320,604 | |
| 06 Feb 11 | to | 06 Mar 11 | 56,180,702 | |
| 06 Mar 11 | to | 06 Apr 11 | 51,220,130 | |
| 06 Apr 11 | to | 06 May 11 | 46,442,851 | |
| 06 May 11 | to | 06 Jun 11 | 41,852,902 | |
| 06 Jun 11 | to | 06 Jul 11 | 0 | |

# Exhibit B

**//AMERICREDIT**

RECEIVED NOV 2 0 2008

Hand
051705 AmER

November 20, 2008

Lehman Brothers Special Financing Inc.          **VIA COURIER**
c/o Lehman Brothers Inc.                          **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division                       **(212) 526-7672**
745 Seventh Avenue                                **(212) 526-7187**
New York, NY 10019                                **(646) 758-2192**

ATTN: Documentation Manager

cc: MBIA Insurance Corporation                    **VIA COURIER**
113 King Street                                   **AND FACSIMILE**
Armonk, New York, 10504                           **(914) 765-3810**
Attention: IPM-Structured

        RE:   ISDA Master Agreement and Schedule thereto dated
              June 2, 2005 between Lehman Brothers Special Financing
              Inc. and AmeriCredit Automobile Receivables Trust 2005-
              B-M (the "Master Agreement")

Dear Sir/Madam:

As a result of the filing on September 15, 2008 by Lehman Brothers Holdings Inc. (the
Credit Support Provider of Lehman Brothers Special Financing Inc. ("LBSF") under the
above-referenced Master Agreement) under Chapter 11 of the United States Bankruptcy
Code in the United States Bankruptcy Court for the Southern District of New York
(Docket No. 08-13555), AmeriCredit Automobile Receivables Trust 2005-B-M
("AmeriCredit") hereby notifies LBSF that an Event of Default of the type specified in
Section 5(a)(vii)(4) of the Master Agreement has occurred with respect to LBSF as the
Defaulting Party. Pursuant to Section 6(a) of the Master Agreement, AmeriCredit hereby
notifies LBSF that it is designating today, November 20, 2008, as the Early Termination
Date under the Master Agreement and that effective as of today's date the Transaction
memorialized by the Confirmation bearing reference numbers Effort ID: N645891 /
Global ID: 2162536 dated as of June 2, 2005 between LBSF and AmeriCredit, which is
the sole Transaction under the Master Agreement, is terminated.

AmeriCredit will, pursuant to the Master Agreement, calculate amounts payable in
respect of the Early Termination Date and will notify LBSF when such amounts are
determined.

Capitalized terms used herein but not defined herein shall have the meaning ascribed thereto in the above-referenced Master Agreement. If you have any questions with respect to this notice, please contact me at (817) 302-7061

Very truly yours,

AmeriCredit Automobile Receivables Trust 2005-B-M
By: AmeriCredit Financial Services, Inc.
as Attorney-In-Fact

Connie Coffey
Senior Vice President, Treasury

# **Exhibit C**





November 20, 2008

RECEIVED NOV 2 0 2008
Hand
040307 AMER

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019

**VIA COURIER**
**AND FACSIMILE**

**(212) 526-7672**
**(212) 526-7187**
**(646) 758-2192**

ATTN: Documentation Manager

cc: Financial Security Assurance Inc.
31 West 52nd Street
New York, NY 10019
ATTN:  Document Manager
Re:  AmeriCredit Automobile Receivables
Trust 2007-B-F

**VIA COURIER**
**AND FACSIMILE**
**(212) 339-3518**
**(212) 339-3529**
**(212) 526-7672**

> RE: ISDA Master Agreement and Schedule thereto dated
> April 19, 2007 between Lehman Brothers Special
> Financing Inc. and AmeriCredit Automobile Receivables
> Trust 2007-B-F (the "Master Agreement")

Dear Sir/Madam:

As a result of the filings (i) on September 15, 2008 by Lehman Brothers Holdings Inc.
(the Credit Support Provider of Lehman Brothers Special Financing Inc. ("LBSF") under
the above-referenced Master Agreement) and (ii) on October 3, 2008 by LBSF, in each
case, under Chapter 11 of the United States Bankruptcy Code in the United States
Bankruptcy Court for the Southern District of New York (Docket Nos. 08-13555 and 08-
13888 respectively), AmeriCredit Automobile Receivables Trust 2007-B-F
("AmeriCredit") hereby notifies LBSF that an Event of Default of the type specified in
Section 5(a)(vii)(4) of the Master Agreement has occurred with respect to LBSF as the
Defaulting Party.  Pursuant to Section 6(a) of the Master Agreement, AmeriCredit hereby
notifies LBSF that it is designating today, November 20, 2008, as the Early Termination
Date under the Master Agreement and that effective as of today's date all Transactions
under the Master Agreement (including, without limitation, those Transactions
memorialized by the Confirmations dated as of April 19, 2007 between LBSF and
AmeriCredit) shall be terminated.

AmeriCredit will, pursuant to the Master Agreement, calculate amounts payable in
respect of the Early Termination Date and will notify LBSF when such amounts are
determined.

Capitalized terms used herein but not defined herein shall have the meaning ascribed
thereto in the above-referenced Master Agreement. If you have any questions with
respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2007-B-F
By: AmeriCredit Financial Services, Inc.
   as Attorney-In-Fact

Connie Coffey
Senior Vice President, Treasury

# **Exhibit D**

# //AMERICREDIT

RECEIVED NOV 2 0 2008

November 20, 2008

Hand
0911 07 AMES

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019

**VIA COURIER**
**AND FACSIMILE**

**(212) 526-7672**
**(212) 526-7187**
**(646) 758-2192**

ATTN: Documentation Manager

cc: Financial Security Assurance Inc.
31 West 52nd Street
New York, NY 10019
Attn: Transaction Oversight Dept.
Re: Policy No. 51875B-N,
AmeriCredit Automobile Receivables
Trust 2007-D-F

**VIA COURIER**
**AND FACSIMILE**
**(212) 339-3518**
**(212) 339-3529**

RE:   ISDA Master Agreement and Schedule thereto dated
September 20, 2007 between Lehman Brothers Special
Financing Inc. and AmeriCredit Automobile Receivables
Trust 2007-D-F (the "Master Agreement")

Dear Sir/Madam:

As a result of the filings (i) on September 15, 2008 by Lehman Brothers Holdings Inc.
(the Credit Support Provider of Lehman Brothers Special Financing Inc. ("LBSF") under
the above-referenced Master Agreement) and (ii) on October 3, 2008 by LBSF, in each
case, under Chapter 11 of the United States Bankruptcy Code in the United States
Bankruptcy Court for the Southern District of New York (Docket Nos. 08-13555 and 08-
13888 respectively), AmeriCredit Automobile Receivables Trust 2007-D-F
("AmeriCredit") hereby notifies LBSF that an Event of Default of the type specified in
Section 5(a)(vii)(4) of the Master Agreement has occurred with respect to LBSF as the
Defaulting Party. Pursuant to Section 6(a) of the Master Agreement, AmeriCredit hereby
notifies LBSF that it is designating today, November 20, 2008, as the Early Termination
Date under the Master Agreement and that effective as of today's date all Transactions
under the Master Agreement (including, without limitation, those Transactions
memorialized by the Confirmations dated as of September 20, 2007 between LBSF and
AmeriCredit) shall be terminated.

AmeriCredit will, pursuant to the Master Agreement, calculate amounts payable in respect of the Early Termination Date and will notify LBSF when such amounts are determined.

Capitalized terms used herein but not defined herein shall have the meaning ascribed thereto in the above-referenced Master Agreement. If you have any questions with respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2007-D-F
By: AmeriCredit Financial Services, Inc.
as Attorney-In-Fact

Connie Coffey
Senior Vice President, Treasury

# **Exhibit E**



November 21, 2008

Lehman Brothers Special Financing Inc.                    **VIA COURIER**
c/o Lehman Brothers Inc.                                         **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division                                   **(212) 526-7672**
745 Seventh Avenue                                              **(212) 526-7187**
New York, NY 10019                                             **(646) 758-2192**

ATTN: Documentation Manager


cc: MBIA Insurance Corporation                            **VIA COURIER**
113 King Street                                                      **AND FACSIMILE**
Armonk, New York, 10504                                    **(914) 765-3810**
Attention: IPM-Structured

RE:   ISDA Master Agreement, Schedule (the "Schedule") and
      other documents relating thereto dated June 2, 2005
      between Lehman Brothers Special Financing Inc. (the
      "Counterparty") and AmeriCredit Automobile Receivables
      Trust 2005-B-M (collectively, the "Master Agreement")

Dear Sir/Madam:

        AmeriCredit Automobile Receivables Trust 2005-B-M ("AmeriCredit") and the
Counterparty are parties to the Master Agreement. Unless the context indicates
otherwise, any capitalized terms used, but not defined herein, shall have the meanings
ascribed thereto in the Master Agreement. Reference is also made to the Confirmation
entered into pursuant to the Master Agreement between AmeriCredit and the
Counterparty dated as of June 2, 2005, Effort ID: N645891 / Global ID: 2162536 related
to the Class A-4 Notes (the "Confirmation").

        As set forth in the notice from AmeriCredit sent to you on November 20, 2008
(the "Notice"), which is attached hereto as Exhibit A, AmeriCredit has designated
November 20, 2008 as the Early Termination Date under the Master Agreement as the
result of the occurrence of an Event of Default with respect to the Counterparty as the
Defaulting Party under the Master Agreement.

        This notice represents the statement under Section 6(d)(i) of the Master
Agreement setting forth the net payment required to be made by AmeriCredit to the

Counterparty pursuant to Section 6(e)(i)(3) of the Master Agreement and Part I(i) of the Schedule. Under Section 6(e) of the Master Agreement, if an Early Termination Date results from an Event of Default, an amount will be payable equal to the sum of the Settlement Amount plus the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. Pursuant to the terms of the Master Agreement, in order to determine the Settlement Amount, the party making the determination must obtain at least three quotations from Reference Market-makers for each transaction. Since less than three Market Quotations have been obtained for each transaction, under the Master Agreement, Market Quotations cannot be determined with respect to the Transaction evidenced by the Confirmation and therefore the Loss measure of payment shall apply. Although under the Loss measure of payment we are not required to do so, we have calculated this amount by reference to a quotation in the amount of USD 343,010.28 (the "Settlement Amount") received from Wachovia Bank, National Association received by us on November 20, 2008, which is attached hereto as Exhibit B.

This Settlement Amount is added to the Unpaid Amounts due to the Counterparty resulting in a total termination payment of USD 691,008.98 from AmeriCredit to the Counterparty. Further detail regarding the calculation of this amount is set forth in Exhibit C. Interest on such amount will accrue from the Early Termination Date to the date of payment at the Applicable Rate.

If you have any questions with respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2005-B-M
By: AmeriCredit Financial Services, Inc.
    as Attorney-In-Fact

Connie Coffey
Senior Vice President, Treasury

2



November 20, 2008

Lehman Brothers Special Financing Inc.      **VIA COURIER**
c/o Lehman Brothers Inc.      **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division      **(212) 526-7672**
745 Seventh Avenue      **(212) 526-7187**
New York, NY 10019      **(646) 758-2192**

ATTN: Documentation Manager

cc: MBIA Insurance Corporation      **VIA COURIER**
113 King Street      **AND FACSIMILE**
Armonk, New York, 10504      **(914) 765-3810**
Attention: IPM-Structured

      RE:    ISDA Master Agreement and Schedule thereto dated
             June 2, 2005 between Lehman Brothers Special Financing
             Inc. and AmeriCredit Automobile Receivables Trust 2005-
             B-M (the "Master Agreement")

Dear Sir/Madam:

As a result of the filing on September 15, 2008 by Lehman Brothers Holdings Inc. (the
Credit Support Provider of Lehman Brothers Special Financing Inc. ("LBSF") under the
above-referenced Master Agreement) under Chapter 11 of the United States Bankruptcy
Code in the United States Bankruptcy Court for the Southern District of New York
(Docket No. 08-13555), AmeriCredit Automobile Receivables Trust 2005-B-M
("AmeriCredit") hereby notifies LBSF that an Event of Default of the type specified in
Section 5(a)(vii)(4) of the Master Agreement has occurred with respect to LBSF as the
Defaulting Party. Pursuant to Section 6(a) of the Master Agreement, AmeriCredit hereby
notifies LBSF that it is designating today, November 20, 2008, as the Early Termination
Date under the Master Agreement and that effective as of today's date the Transaction
memorialized by the Confirmation bearing reference numbers Effort ID: N645891 /
Global ID: 2162536 dated as of June 2, 2005 between LBSF and AmeriCredit, which is
the sole Transaction under the Master Agreement, is terminated.

AmeriCredit will, pursuant to the Master Agreement, calculate amounts payable in
respect of the Early Termination Date and will notify LBSF when such amounts are
determined.

Capitalized terms used herein but not defined herein shall have the meaning ascribed
thereto in the above-referenced Master Agreement. If you have any questions with
respect to this notice, please contact me at (817) 302-7061

Very truly yours,

AmeriCredit Automobile Receivables Trust 2005-B-M
By: AmeriCredit Financial Services, Inc.
as Attorney-In-Fact

Connie Coffey

Connie Coffey
Senior Vice President, Treasury

## Exhibit B

To:           Americredit Automobile Receivables Trust 2005-B-M

Attention:    Kyle Gathright

Wachovia Bank, N.A. ("Wachovia") hereby confirms it provided you with the following quotation:

Quotation Date:                              November 20th, 2008

Transaction on which we quoted:              A transaction between you and us ("Quote Transaction") commencing on the
                                             Quotation Date with payments, deliveries, and/or option rights that would be
                                             the economic equivalent of the remaining payments, deliveries, and/or option
                                             rights falling after the Quotation Date under a certain transaction described on
                                             the attached emails (which you provided to us for this purpose) assuming they
                                             were to continue to maturity.

Effective Date of Quote Transaction:         November 6th, 2008 (this is the first day of the first Calculation Period of the
                                             Quote Transaction and does not mean the Quote Transaction became effective)

Wachovia's position
in Quote Transaction:                        Floating Rate Payor

Your position
in Quote Transaction:                        Floating Rate Payor

To enter into the Quote Transaction:

                                             Wachovia would have been willing to pay you the Upfront Payment.

Upfront Payment:                             USD $343,010.28

Time as of which quotation was given:        At or about 10:40 AM Eastern time

Person giving quotation:                     Spencer Langston

Notes:                                       Please note that the Quote Transaction was not entered into.  If Wachovia
                                             made an offer to enter into the Quote Transaction, such offer has expired and
                                             is null and void. Our quotation should not be construed as a commitment, and
                                             did not include any unpaid amounts.

Yours truly,

Spencer Langston

WACHOVIA BANK, N.A.

## Exhibit C—Calculation Statement
(Amounts owed from AmeriCredit to the Counterparty are in parentheses)

| | |
|---|---|
| Settlement Amount | USD (343,010.28) |
| Amounts Withheld by AmeriCredit Pursuant to Section 2(a)(iii) of the Master Agreement (the "Withheld Amounts") | USD (346,911.00) |
| Interest on Withheld Amounts from Date Payable to the Early Termination Date | USD (1,161.48) |
| Total Termination Payment | USD (691,082.76) |

# **Exhibit F**



November 21, 2008

Lehman Brothers Special Financing Inc.             **VIA COURIER**
c/o Lehman Brothers Inc.                           **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division                        **(212) 526-7672**
745 Seventh Avenue                                 **(212) 526-7187**
New York, NY 10019                                 **(646) 758-2192**

ATTN: Documentation Manager


cc: Financial Security Assurance Inc.        .     **VIA COURIER**
31 West 52nd Street                              **AND FACSIMILE**
New York, NY 10019                                 **(212) 339-3518**
Attn: Transaction Oversight Dept.                  **(212) 339-3529**
Re: AmeriCredit Automobile Receivables
Trust 2007-B-F

        RE:   ISDA Master Agreement, Schedule (the "Schedule") and
              other documents relating thereto dated April 19, 2007
              between Lehman Brothers Special Financing Inc. (the
              "Counterparty") and AmeriCredit Automobile Receivables
              Trust 2007-B-F (collectively, the "Master Agreement")

Dear Sir/Madam:

        AmeriCredit Automobile Receivables Trust 2007-B-F ("AmeriCredit") and the
Counterparty are parties to the Master Agreement.    Unless the context indicates
otherwise, any capitalized terms used, but not defined herein, shall have the meanings
ascribed thereto in the Master Agreement.    Reference is also made to the following
Confirmations entered into pursuant to the Master Agreement: (i) the confirmation
between AmeriCredit and the Counterparty dated as of April 19, 2007, Effort ID:
1324984, Global ID: 2993475 related to the Class A-3-B Notes (the "Class A-3-B
Confirmation"); and (ii) the confirmation between AmeriCredit and the Counterparty
dated as of April 19, 2007, Effort ID: 1324981, Global ID: 2993572 related to the Class
A-4 Notes (the "Class A-4 Confirmation": and together with the Class A-3-B
Confirmation, the "Confirmations").

        As set forth in the notice from AmeriCredit sent to you on November 20, 2008
(the "Notice"), which is attached hereto as Exhibit A, AmeriCredit has designated
November 20, 2008 as the Early Termination Date under the Master Agreement as the

result of the occurrence of an Event of Default with respect to the Counterparty as the Defaulting Party under the Master Agreement.

This notice represents the statement under Section 6(d)(i) of the Master Agreement setting forth the net payment required to be made by AmeriCredit to the Counterparty pursuant to Section 6(e) of the Master Agreement and Part 1(e) of the Schedule. Under Section 6(e)(i)(3) of the Master Agreement and as set forth on Exhibit B, the net amount due from AmeriCredit to the Counterparty (i) under the Class A-3-B Confirmation, is USD 1,479.252.90, and (ii) under the Class A-4 Confirmation, is is USD 7,776,231.59. The aggregate net amount due from AmeriCredit to the Counterparty is USD 9,255,484.49. Under Section 6(e) of the Master Agreement, if an Early Termination Date results from an Event of Default, an amount will be payable equal to the sum of the Settlement Amount plus the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. Pursuant to the terms of the Master Agreement, in order to determine the Settlement Amount, the party making the determination must obtain at least three quotations from Reference Market-makers for each Transaction. Since less than three Market Quotations have been obtained for each Transaction, under the Master Agreement, Market Quotations cannot be determined with respect to the Transaction evidenced by the Confirmation and therefore the Loss measure of payment shall apply. Although under the Loss measure of payment we are not required to do so, we have calculated this amount by reference to a quotation in the amount of USD 9,255,484.49 (the "Settlement Amount") received from Wachovia Bank, National Association received by us on November 20, 2008, which is attached hereto as Exhibit C.

This Settlement Amount is added to the Unpaid Amounts due to the Counterparty resulting in a total termination payment of USD 11,096,248.00 from AmeriCredit to the Counterparty. Further detail regarding the calculation of this amount is set forth in Exhibit B. Interest on such amount will accrue from the Early Termination Date to the date of payment at the Applicable Rate.

If you have any questions with respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2007-B-F
By: AmeriCredit Financial Services, Inc.
as Attorney-In-Fact

*Connie Coffey*

Connie Coffey
Senior Vice President, Treasury

2



November 20, 2008

Lehman Brothers Special Financing Inc.          **VIA COURIER**
c/o Lehman Brothers Inc.                         **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division                      **(212) 526-7672**
745 Seventh Avenue                               **(212) 526-7187**
New York, NY 10019                               **(646) 758-2192**

ATTN: Documentation Manager

cc: Financial Security Assurance Inc.            **VIA COURIER**
31 West 52nd Street                              **AND FACSIMILE**
New York, NY 10019                               **(212) 339-3518**
ATTN: Document Manager                           **(212) 339-3529**
Re: AmeriCredit Automobile Receivables           **(212) 526-7672**
Trust 2007-B-F

> RE:  ISDA Master Agreement and Schedule thereto dated
>      April 19, 2007 between Lehman Brothers Special
>      Financing Inc. and AmeriCredit Automobile Receivables
>      Trust 2007-B-F (the "Master Agreement")

Dear Sir/Madam:

As a result of the filings (i) on September 15, 2008 by Lehman Brothers Holdings Inc.
(the Credit Support Provider of Lehman Brothers Special Financing Inc. ("LBSF") under
the above-referenced Master Agreement) and (ii) on October 3, 2008 by LBSF, in each
case, under Chapter 11 of the United States Bankruptcy Code in the United States
Bankruptcy Court for the Southern District of New York (Docket Nos. 08-13555 and 08-
13888 respectively), AmeriCredit Automobile Receivables Trust 2007-B-F
("AmeriCredit") hereby notifies LBSF that an Event of Default of the type specified in
Section 5(a)(vii)(4) of the Master Agreement has occurred with respect to LBSF as the
Defaulting Party. Pursuant to Section 6(a) of the Master Agreement, AmeriCredit hereby
notifies LBSF that it is designating today, November 20, 2008, as the Early Termination
Date under the Master Agreement and that effective as of today's date all Transactions
under the Master Agreement (including, without limitation, those Transactions
memorialized by the Confirmations dated as of April 19, 2007 between LBSF and
AmeriCredit) shall be terminated.

AmeriCredit will, pursuant to the Master Agreement, calculate amounts payable in respect of the Early Termination Date and will notify LBSF when such amounts are determined.

Capitalized terms used herein but not defined herein shall have the meaning ascribed thereto in the above-referenced Master Agreement. If you have any questions with respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2007-B-F
By: AmeriCredit Financial Services, Inc.
   as Attorney-In-Fact

Connie Coffey
Senior Vice President, Treasury

## Exhibit B—Calculation Statement

(Amounts owed from AmeriCredit to the Counterparty are in parentheses)

Confirmations

| | |
|---|---|
| Class A-3-B Confirmation | (USD 1,479,252.90) |
| Class A-4 Confirmation | (USD 7,776,231.59) |

Net Amount (owed to the Counterparty) (USD 9,255,484.49)

| | |
|---|---|
| Settlement Amount | (USD 9,255,484.49) |
| Amounts Withheld by AmeriCredit Pursuant to Section 2(a)(iii) of the Master Agreement (the "Withheld Amounts") | (USD 1,836,319.00) |
| Interest on Withheld Amounts from Date Payable to the Early Termination Date | (USD 4,444.51) |
| Total Termination Payment | (USD 11,096,248.00) |

## Exhibit C

To:          AmeriCredit Automobile Receivables Trust 2007-B-F

Attention:    Kyle Gathright

Wachovia Bank, N.A. ("Wachovia") hereby confirms it provided you with the following quotation:

| | |
|---|---|
| Quotation Date: | November 20th, 2008 |
| Transaction on which we quoted: | A transaction between you and us ("Quote Transaction") commencing on the Quotation Date with payments, deliveries, and/or option rights that would be the economic equivalent of the remaining payments, deliveries, and/or option rights falling after the Quotation Date under a certain transaction described on the attached (which you provided to us for this purpose) assuming they were to continue to maturity. |
| Effective Date of Quote Transaction: | November 06th, 2008 (this is the first day of the first Calculation Period of the Quote Transaction and does not mean the Quote Transaction became effective) |
| Wachovia's position in Quote Transaction: | Floating Rate Payor |
| Your position in Quote Transaction: | Floating Rate Payor |
| To enter into the Quote Transaction: | |
| | Wachovia would have been willing to pay you the Upfront Payments. |
| Upfront Payments: | USD: Class A3–B: $1,479,252.90, Class A-4: $7,776,231.59 |
| Time as of which quotation was given: | At or about 10:40 AM Eastern time |
| Person giving quotation: | Spencer Langston |
| Notes: | Please note that the Quote Transaction was a firm offer but not entered into at that time. The transaction was re-offered and executed shortly thereafter at the same levels. |

Yours truly,

Spencer Langston
WACHOVIA BANK, N.A.

**<u>Exhibit G</u>**



November 21, 2008

Lehman Brothers Special Financing Inc.    **VIA COURIER**
c/o Lehman Brothers Inc.    **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division    **(212) 526-7672**
745 Seventh Avenue    **(212) 526-7187**
New York, NY 10019    **(646) 758-2192**

ATTN: Documentation Manager

cc: Financial Security Assurance Inc.    **VIA COURIER**
31 West 52nd Street    **AND FACSIMILE**
New York, NY 10019    **(212) 339-3518**
Attn: Transaction Oversight Dept.    **(212) 339-3529**
Re: Policy No. 51875B-N,
AmeriCredit Automobile Receivables
Trust 2007-D-F

    RE:    ISDA Master Agreement, Schedule (the "Schedule") and
    other documents relating thereto dated September 20, 2007
    between Lehman Brothers Special Financing Inc. (the
    "Counterparty") and AmeriCredit Automobile Receivables
    Trust 2007-D-F (collectively, the "Master Agreement")

Dear Sir/Madam:

    AmeriCredit Automobile Receivables Trust 2007-D-F ("AmeriCredit") and the
Counterparty are parties to the Master Agreement. Unless the context indicates
otherwise, any capitalized terms used, but not defined herein, shall have the meanings
ascribed thereto in the Master Agreement. Reference is also made to the following
Confirmations entered into pursuant to the Master Agreement: (i) the confirmation
between AmeriCredit and the Counterparty dated as of September 20, 2007, Effort ID:
N1607661 / Global Deal ID: 3344584 related to the Class A-2-B Notes (the "Class A-2-B
Confirmation"); (ii) the confirmation between AmeriCredit and the Counterparty dated as
of September 20, 2007, Effort ID: N1607659 / Global Deal ID: 3344588 related to the
Class A-3-B Notes (the "Class A-3-B Confirmation"); and (iii) the confirmation between

AmeriCredit and the Counterparty dated as of September 20, 2007, Effort ID: N1607662
/ Global Deal ID: 3344590 related to the Class A-4-B Notes (the "Class A-4-B
Confirmation"; and together with Class-2-B Confirmation and Class-3-B Confirmation,
the "Confirmations").

As set forth in the notice from AmeriCredit sent to you on November 20, 2008
(the "Notice"), which is attached hereto as Exhibit A, AmeriCredit has designated
November 20, 2008 as the Early Termination Date under the Master Agreement as the
result of the occurrence of an Event of Default with respect to the Counterparty as the
Defaulting Party under the Master Agreement.

This notice represents the statement under Section 6(d)(i) of the Master
Agreement setting forth the net payment required to be made by AmeriCredit to the
Counterparty pursuant to Section 6(e) of the Master Agreement and Part 1(e) of the
Schedule. Under Section 6(e)(i)(3) of the Master Agreement and as set forth on
Exhibit B, the net amount due from AmeriCredit to the Counterparty (i) under the Class
A-2-B Confirmation, is USD 7,550.03; (ii) under the Class A-3-B Confirmation, is
USD 258,519.84, and (iii) under the Class A-4-B Confirmation, is USD 706,235.35. The
aggregate net amount due from AmeriCredit to the Counterparty is USD 972,305.22.
Under Section 6(e) of the Master Agreement, if an Early Termination Date results from
an Event of Default, an amount will be payable equal to the sum of the Settlement
Amount plus the Termination Currency Equivalent of the Unpaid Amounts owing to the
Non-defaulting Party less the Termination Currency Equivalent of the Unpaid Amounts
owing to the Defaulting Party. Pursuant to the terms of the Master Agreement, in order
to determine the Settlement Amount, the party making the determination must obtain at
least three quotations from Reference Market-makers for each Transaction. Since less
than three Market Quotations have been obtained for each Transaction, under the Master
Agreement, Market Quotations cannot be determined with respect to the Transaction
evidenced by the Confirmation and therefore the Loss measure of payment shall apply.
Although under the Loss measure of payment we are not required to do so, we, have
calculated this amount by reference to a quotation in the amount of USD 972,305.22 (the
"Settlement Amount") received from Wachovia Bank, National Association received by
us on November 20, 2008, which is attached hereto as Exhibit C.

This Settlement Amount is added to the Unpaid Amounts due to the Counterparty
resulting in a total termination payment of USD 1,399,588.26 from AmeriCredit to the
Counterparty. Further detail regarding the calculation of this amount is set forth in
Exhibit B. Interest on such amount will accrue from the Early Termination Date to the
date of payment at the Applicable Rate.

2

If you have any questions with respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2007-D-F
By: AmeriCredit Financial Services, Inc.
   as Attorney-In-Fact

*Connie Coffey*

Connie Coffey
Senior Vice President, Treasury

3



November 20, 2008

Lehman Brothers Special Financing Inc.          **VIA COURIER**
c/o Lehman Brothers Inc.                        **AND FACSIMILE**
Transaction Management Group
Corporate Advisory Division                     · **(212) 526-7672**
745 Seventh Avenue                              **(212) 526-7187**
New York, NY 10019                              **(646) 758-2192**

ATTN: Documentation Manager

cc: Financial Security Assurance Inc.     ·     **VIA COURIER**
31 West 52nd Street                        **AND FACSIMILE**
New York, NY 10019                              **(212) 339-3518**
Attn: Transaction Oversight Dept.               **(212) 339-3529**
Re: Policy No. 51875B-N,
AmeriCredit Automobile Receivables
Trust 2007-D-F

RE:   ISDA Master Agreement and Schedule thereto dated
      September 20, 2007 between Lehman Brothers Special
      Financing Inc. and AmeriCredit Automobile Receivables
      Trust 2007-D-F (the "Master Agreement")

Dear Sir/Madam:

As a result of the filings (i) on September 15, 2008 by Lehman Brothers Holdings Inc.
(the Credit Support Provider of Lehman Brothers Special Financing Inc. ("LBSF") under
the above-referenced Master Agreement) and (ii) on October 3, 2008 by LBSF, in each
case, under Chapter 11 of the United States Bankruptcy Code in the United States
Bankruptcy Court for the Southern District of New York (Docket Nos. 08-13555 and 08-
13888 respectively), AmeriCredit Automobile Receivables Trust 2007-D-F
("AmeriCredit") hereby notifies LBSF that an Event of Default of the type specified in
Section 5(a)(vii)(4) of the Master Agreement has occurred with respect to LBSF as the
Defaulting Party. Pursuant to Section 6(a) of the Master Agreement, AmeriCredit hereby
notifies LBSF that it is designating today, November 20, 2008, as the Early Termination
Date under the Master Agreement and that effective as of today's date all Transactions
under the Master Agreement (including, without limitation, those Transactions
memorialized by the Confirmations dated as of September 20, 2007 between LBSF and
AmeriCredit) shall be terminated.

AmeriCredit will, pursuant to the Master Agreement, calculate amounts payable in respect of the Early Termination Date and will notify LBSF when such amounts are determined.

Capitalized terms used herein but not defined herein shall have the meaning ascribed thereto in the above-referenced Master Agreement. If you have any questions with respect to this notice, please contact me at (817) 302-7061.

Very truly yours,

AmeriCredit Automobile Receivables Trust 2007-D-F
By: AmeriCredit Financial Services, Inc.
as Attorney-In-Fact

Connie Coffey
Senior Vice President, Treasury

## Exhibit B—Calculation Statement

(Amounts owed from AmeriCredit to the Counterparty are in parentheses)

### Confirmations

| | |
|---|---|
| Class A-2-B Confirmation | (USD 7,550.03) |
| Class A-3-B Confirmation | (USD 258,519.84) |
| Class A-4-B Confirmation | (USD 706,235.35) |

Net Amount (owed to the Counterparty) (USD 972,305.22)

| | |
|---|---|
| Settlement Amount | (USD 972,305.22) |
| Amounts Withheld by AmeriCredit Pursuant to Section 2(a)(iii) of the Master Agreement (the "Withheld Amounts") | (USD 426,185.00) |
| Interest on Withheld Amounts from Date Payable to the Early Termination Date | (USD 1,098.04) |
| Total Termination Payment | (USD 1,399,588.26) |

## Exhibit C

To:        AmeriCredit Automobile Receivables Trust 2007-D-F

Attention:        Kyle Gathright

Wachovia Bank, N.A. ("Wachovia") hereby confirms it provided you with the following quotation:

| | |
|---|---|
| Quotation Date: | November 20th, 2008 |
| Transaction on which we quoted: | A transaction between you and us ("Quote Transaction") commencing on the Quotation Date with payments, deliveries, and/or option rights that would be the economic equivalent of the remaining payments, deliveries, and/or option rights falling after the Quotation Date under a certain transaction described on the attached (which you provided to us for this purpose) assuming they were to continue to maturity. |
| Effective Date of Quote Transaction: | November 06th, 2008 (this is the first day of the first Calculation Period of the Quote Transaction and does not mean the Quote Transaction became effective) |
| Wachovia's position in Quote Transaction: | Floating Rate Payor |
| Your position in Quote Transaction: | Floating Rate Payor |
| To enter into the Quote Transaction: | |
| | Wachovia would have been willing to pay you the Upfront Payments. |
| Upfront Payments: | USD: Class A-2-B: $7,550.03, Class A-3-B $258,519.84, Class A-4-B: $706,235.35 |
| Time as of which quotation was given: | At or about   10:40 AM Eastern time |
| Person giving quotation: | Spencer Langston |
| Notes: | Please note that the Quote Transaction was a firm offer but not entered into at that time.  The transaction was re-offered and executed shortly thereafter at the same levels. |

Yours truly,

Spencer Langston
WACHOVIA BANK, N.A.